1  Steve Wilson Briggs
   681 Edna Way
2  San Mateo, CA 94402
   Telephone: (510) 200 3763
3  Email: snc.steve@gmail.com

4  Pro Se Plaintiff

**FILED**

JUN 1 2 2014

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA (OAKLAND)

| | |
|---|---|
| STEVE WILSON BRIGGS | Case No.: CV 13-4679 PJH |
| Plaintiff | |
| vs. | **AMENDED**<br>**REBUTTAL TO DEFENDANTS'**<br>**"EXPERT REPORT OF JEFF ROVIN"** |
| NEILL BOMKAMP, SONY PICTURES<br>ENT. INC., TRISTAR PICTURES, INC.,<br>MEDIA RIGHTS CAPITAL (AKA MEDIA<br>RIGHTS CAPITAL II,L.P. & MRC), and<br>QED INTERNATIONAL | |
| Defendants | |

## AMENDMENT NOTE:

I, Plaintiff, Steve Wilson Briggs have amended this rebuttal to omit a passage (page 3) from my original rebuttal in which I stated Mr. Rovin had not appeared on the NY Times Best Sellers List 12 times, as he declared in his Expert Report –rather, I insisted, he had appeared only once on that list. But I have since found evidence that Mr. Rovin has appeared on the Best Sellers List more than once –although I couldn't determine how many times –or if those appearances were for separate unique works, or multiple appearances for the same work. Nonetheless, I have omitted that contention in this Amended Rebuttal. Beyond this omission, I have made only superficial corrections and minor formatting adjustments to this Amended Rebuttal.

1    <u>**PLAINTIFF'S REBUTTAL TO DEFENDANTS' EXPERT REPORT OF JEFF ROVIN**</u>

2    **INTRODUCTION**

3    I, Plaintiff, Steve Wilson Briggs, am the author of this rebuttal to the false, and willfully

4    dishonest "expert" report submitted by the Defendants to the Court on March 14th, 2014, captioned:

5    "EXPERT REPORT OF JEFF ROVIN".  I believe the Honorable Court may find several of Mr.

6    Rovin's statements and action, outlined herein, rise to an actionable level (particularly Example IV,

7    page 6, 7; and his falsified qualifications, page 3, 4 ). Although I am not an attorney or a copyright

8    expert, I have cultivated a considerable understanding of copyright history, intent, language, and

9    law over the past year that I have been involved in this unusual copyright matter.

10   In respect for the Court's time I will be as concise as possible. To meet this goal, due to the

11   volume of Mr. Rovin's false statements and inventions in Mr. Rovin's report, I will omit many of

12   his less significant misleading or false statements, and reduce my commentary on Mr. Rovin's

13   disregard for truth and Court authority. But I will suggest that the submission of Mr. Rovin's faulty

14   report seems to admit the Defense either: 1) didn't proof read and fact check their witness; or 2)

15   they knowingly submitted factually deficient report to the Court.

16   NOTE:

17   Although, I felt none of the books, movies and comics Mr. Rovins cited had any meaningful

18   relationship to my screenplay, Butterfly Driver (or Uberopolis), I decided to buy as many of the

19   books and comics that he referenced  –to see for myself. Thus, I purchased and read (and skimmed),

20   10 novels, 20 comic books, 1 graphic novel, downloaded 1 novella –and watched one episode

21   of Star Trek. This rebuttal is based on the true contents of these books, shorts, comics and episodes.

22   <u>**REBUTTAL**</u>

23   As the Plaintiff in this copyright infringement suit, I, Steve Wilson Briggs, assert the

24   Court should disregard the Defendants' "EXPERT REPORT OF JEFF ROVIN" due to Mr. Rovin's

25   fraudulent, dishonest and misleading testimony, as I will outline herein. But Mr. Rovin's lack of

26   qualification are also an issue, as: 1) he is not a qualified copyright expert; 2) he lacks any requisite

27   education of an expert; 3) Mr. Rovin has falsified and/or provided fraudulent claims concerning his

28   qualification.

## MR. ROVIN'S LACK OF QUALIFICATIONS

1. <u>MR. ROVIN IS NOT A COPYRIGHT EXPERT</u>.

      Mr. Rovin has interesting comics and literature credentials, but has no background in copyright IP or copyright law, making him wholly ill-suited to opine on an infringement case.

2. <u>MR. ROVIN IS ESSENTIALLY UNEDUCATED</u>.

      A typical EXPERT witness in a copyright matter would be a copyright or intellectual property attorney. This usually means 4-5 years college, then an additional 3-4 years of law school. Yet, Mr. Rovin has no formal education beyond high school. In fact, <u>he may not have even completed high school</u> (see "Qualifications", pages 3, 4 of his report). The Defendants' inability to find a reasonably trained copyright expert speaks volumes to the merits of their defense.

      As a consequence of Mr. Rovin's lack of "expert' copyright education, even when he's not knowingly misleading the court, he opines wrongly, misinforming the court about matters beyond his purview.

3. <u>MR. ROVIN FALSIFIED AND MISSTATED HIS QUALIFICATIONS.</u>

      In his report Mr. Rovins makes the following claims about his qualifications, all of which are false or greatly exaggerated:

    A)  Mr. Rovin claims to have "created" Atlas Comic. This claim is fraudulent. On page 3, para 2, line 11 and 12 of his report, Rovin states: "My magazine publications include creating and editing the Atlas Comics line –several titles of which…". But, in fact, Atlas Comics (Atlas/Seaboard) was created by Martin Goodman.  Wikipedia provides details of Altas' creation (including the following quote from Jeff Rovin himself):

> Goodman hired Warren Publishing veteran Jeff Rovin to edit the color comic-book line, and writer-artist Larry Lieber, brother of Marvel editor-in-chief Stan Lee, as editor of Atlas' black-and-white comics magazines.
> <u>Rovin said</u> in 1987 he became involved after answering an ad in The New York Times."**I was working for Jim Warren, running his mail-order division, Captain Company, and just starting to edit Creepy [and] I'd edited comics for DC and Skywald…. Several weeks after answering the ad, I receive a call from Martin Goodman…. I was one of several people Martin interviewed, and I got the job because I'd had experience not only in comics but in mail order, the latter of which was to contribute significantly to Seaboard's cash flow. Sharing editorial duties on the comics was writer Larry Lieber, whom Martin had long wanted to transplant from under the shadow of Larry's brother…. Larry ended up handling about a quarter of Atlas' output—primarily the police, Western [and] war [comics], and color**

**Anthologies of horror srories."**
Lieber later became editor of the color comics following Rovin's departure.
                                        *-From Wikipedia (http://en.wikipedia.org/wiki/Atlas/Seaboard_Comics)*

## FRAUDULENT, DISHONEST AND INACCURATE CONTENT OF ROVIN REPORT

What follows are several examples of Mr. Rovin's deliberate efforts to misinform the Court.

## EXAMPLE I

Mr. Rovin cites his own work three times in his report (page 19, 48, 58); which seems a conflict of interest. The most offensive of these citations occurs on page 58 of his report, when Mr. Rovin gives a wholly false account of his book, *"The Transgalactic Guide to Solar System M-17"*– an extremely hard to find book, which ran only one printing, in 1981, on the rather small publisher, Perigee Books.

MR. ROVIN WRITES on page 58, para 1, (from Rovin's *The Transgalactic Guide to Solar System M-17*): "For my own science fiction, The Transgalactic Guide to Solar System M-17, I created an **exclusive** space settlement that offers royal accommodations with advanced medical facilities for those who can afford them... "

**IN TRUTH:**

**Mr. Rovin's endeavors to show the collection of ideas that make Butterfly Driver a unique, copyrightable work, are somehow commonplace. To this end, Mr. Rovin calls his swan-shaped spaceship "exclusive", to make my satellite city for the rich seem less unique.**

**In Mr. Rovins actual book,** *The Transgalactic Guide to Solar System M-17*, **by Rovin's own description, his space swan is NOT exclusive (page 28, para 4), Rovin writes: "*Space is for everyone. And Transgalactic works hard to make it as accessible as a trip to any city, park, resort, of your home world.*" [Exhibit A].**

**Then, in the very next paragraph Rovin goes on to show just how un**exclusive his **world is, showing that only two crimes restrict space access, as he writes: "*MasterPass cards* (required to board the space-swan) *will not be issued to anyone who, within the previous three years, has been convicted of a crime involving artificial aging or a fine exceeding twenty-five Standards.*" Rovin goes on in his book to show how recreational drug usage is perfectly legal on his space-swan.**

If the Court wonders if Rovin may have meant that the price of space travel in Rovin's book is so prohibitive that it might makes space travel seem exclusive by its prohibitive expense? I assure the court that that is not the case as Rovin describes a future where space travel was made extremely affordable by Rovin's hero, the visionary space travel pioneer, Edmond Rostand Scott.

It should also be observed the Rovin attempted to call his modest 900 feet long swan hotel a "space-settlement", in effort to make it seem analogous to my 3 mile wide satellite city. But In truth, Rovin's space-swan is merely a spaceship that transports tourist travelers back and forth, from Earth to his imaginary galaxy "M-17". The swan is not a "settlement". The swan doesn't remain in a fixed location or orbit, and people don't live on the swan indefinitely.

### EXAMPLE II

MR. ROVIN WRITES (on page 38 of his report, para 2): "In another example of separating rich from poor, the 2004 comic book Ministry of Space was set on a space station where blue collar people of color were segregated from white citizens."

IN TRUTH:

Ministry of Space was set primarily on Earth, with a few short excursion into space, primarily in rockets, but also to a lunar station and two quick excursions to space stations – but it was not set on a space station.

The insert picture (page 38 of his report) that Rovin strategically uses to make his point was taken from the very last panel of the comic. Mr . Rovin actually meticulously cut out the word "END" from his insert photo, so the Court wouldn't see that he had taken the photo from the last page, last panel of the graphic novel. But as seen in the attachment [Exhibit B] in a side by side comparison of the last panel of the actual graphic novel (top) and Rovin's insert (bottom), Rovin has cut out the word "END" from the panel.

### EXAMPLE III

MR. ROVIN WRITES (p 46, para 4), under the heading "Special Identification For Entering The Satellite": "Murray Leinster's *Space Platform* (1953) presented the core elements that the plaintiff claims as proprietary – a space station that is resented by those who are not aboard, a base that not only represents wealth but is a fortified sanctuary removed from the threat of war hanging

- 5 -

1   over the Earth:"

2   **IN TRUTH:**

3          The fact that Mr. Rovin chose this book is simply astonishing. In Leinster's *Space*

4   *Platform* there is  no "space station" that Rovin speaks of. Period. There is no "base that

5   represents wealth". Period. Leinster's Space Platform is a sci-fi/adventure/mystery about a

6   platform that is being built on a U.S. military base, on Earth. When the platform is completed

7   it is going to be transported into space by rockets, to be the foundation of a future space

8   station. All of the action takes place on Earth. In the final 5 pages the platform is rocketed

9   into space, as hero, Joe and his friends watch. At no point in the story was the Platform ever

10   manned. At no point was the platform ever a "space station" that was "resented by those who

11   are not aboard", as Rovin fabricates. And the U.S. military base did not "represent wealth…"

12   as Rovin invents.

13                              **EXAMPLE IV**

14          To reinforce his fabricated information, on the very next page, MR. ROVIN FALSELY

15   QUOTES Leinster's *Space Platform* (p 47, para 1) writing: "The platform was guarded like no

16   object in history ever been guarded… But the greatest irony of all was that (it's proponents) would

17   in time become rich beyond envy."

18   **IN TRUTH:**

19          This is one of Rovin's most unbelievable lies (or fabrications) because in quoting

20   Leinster, Mr. Rovin inserts the parenthetic phrase "it's proponents" for an omission, then

21   continues the quotation, as if he's simply chosen a different pronoun. But in fact, Mr. Rovin

22   removed 42 words and an entire paragraph.

23          The 42 words Rovin has removed are 180 degrees the opposite of what Mr. Rovin

24   states. The actual words Rovin removed from the passage read: "…its most probable

25   immediate usefulness would be the help it would give in making nuclear experiments that

26   weren't safe enough to make on Earth. That was the pure irony. Because if those experiment

27   were successful, they could mean that everybody in the world…" This is where Rovin cuts

28   back to his falsified point. That final sentence by great Murray Leinster should have read:

PLAINTIFF'S REBUTTAL TO EXPERT REPORT OF JEFF ROVIN  CV 13-4679 PJH

1   "Because if those experiment were successful, they could mean that everybody in the world in

2   time would become rich beyond envy."

3        Leinster wrote words that showed great hope that our future in space would make

4   everyone on Earth rich beyond envy. But for his own personal gain, and the gain of the

5   Defendants, Rovin reconstructed  Leinster's work, entirely, to suggest that only the rich and

6   powerful will prosper if the Space Platform succeeds.

7                                        EXAMPLE V

8        Countering the debilitating headaches my screenplay's hero suffers, on page 63, 64 and 65

9   of his report, Mr. Rovin discusses 3 films in which characters suffer headaches that aliens or some

10  external, telepathic beings cause (*Donovan's Brian*, 1953; *Beneath the Planet of The Apes*, 1970;

11  and *They Live*, 1988). On page 65, Rovin also describes a short story, "Where I wasn't Going"

12  (1963), in which a character gets anti-radiation injections which cause him to suffer a terrible

13  headache. **All of Rovin's examples have no relationship to my character's headaches.**

14       Then on page 66, para 1, Rovin writes: "The comic book *Warp* (1983) is about an ordinary

15  earthman who is about to become a space hero (on a space habitat) and who suffers crushing

16  headaches. Mr. Rovin also provides an insert image of page 4 of the first issues of the comic series

17  in which the character is having a terrible headache.

18  **IN TRUTH:**

19       **The comic *Warp* only ran 19 issues. Over the course of all 19 issues the main**

20  **character, David Carson, has only one headache (although Rovin claimed this character**

21  **"suffers crushing headaches" –plural), which occurs in the first issues (page 4-7). As a result**

22  **of this one massive headache, David Carson is transformed into the superhero Lord Cumulus.**

23           **OTHER SIGNIFICANT PROBLEMS WITH MR. ROVIN'S REPORT**

24       Mr. Rovin explains that he has been paid to assess if "the elements in Plaintiff's screenplay

25  which the Defendants allegedly copied are common elements in prior works or are scènes à faire."

26       There are TWO  significant problems with Mr. Rovin's assessment objective:

27       FIRST –an "element" is something that is irreducible. A story element is nothing more than

28  an idea. In copyright law individual ideas (such as a simple character elements, such as a muscular

PLAINTIFF'S REBUTTAL TO EXPERT REPORT OF JEFF ROVIN  CV 13-4679 PJH

1  hero, or a big satellite) are not copyrightable. But I, Plaintiff, made no claims of ownership to any

2  simple plot element, character element, set element, etc. However, collections of ideas, or

3  collections of events or attributes, or collections of plot pointgs, settings and themes etc. –these

4  ARE copyrightable. In my Amended Complaint I provided very elaborate copyrightable collections

5  of ideas, events, attributes, settings, etc. ALL of which are copyrightable. Mr. Rovins occupation of

6  trying to tear my copyrights claims into individual elements is against very intent and basis of

7  copyright law.

8        SECOND –the fact that Mr. Rovin labors to assess if certain "elements" of my screenplay

9  are scènes à faire admits that the contended aspects of my story are NOT scènes à faire.

10        ***Scène à faire*** (French for "scene to be made" or "scene that must be done"; plural: *scènes à*
          *faire*) is a scene in a book or film which is almost obligatory for a genre of its type. In the
11        U.S. it also refers to a principle in copyright law in which certain elements of a creative
          work are held to be not protected when they are mandated by or customary to the genre.
12        For example, a spy novel is expected to contain elements such as numbered Swiss
          bank accounts, a femme fatale, and various spy gadgets hidden in wristwatches, belts, shoes,
13        and other personal effects. These elements are not protected by copyright, though specific
          sequences and compositions of them can be.
14                                                                                    Wikipedia:

15        Scènes à faire are simple scenes you would expect to see in almost any film of a certain

16  genre. If an "expert" has to analyze and deconstruct and remove features, plot points and themes, to

17  see if something might be scènes à faire, then, clearly, it is not scènes à faire.

18                    **ROVIN'S PRIOR ART EXAMPLES ARE NOT <u>PRIOR</u> ART**

19        Another very significant problem with Mr. Rovin's report is that several of his sources are

20  not just flawed, <u>they should never have been posited **as they are NOT prior works**</u>. On page 42

21  Mr. Rovin cites the film WALL-E (2008) and the video game Mass Effect (November 2007).

22  However, the first four drafts of the Plaintiff's screenplay (including the version registered with the

23  WGA-w) were completed three years prio, in 2005, and the seventh (and last) draft was completed

24  in August 2007 –all well before the release of *WALL-E* or *Mass Effect*.

25                             FINAL NOTE ON OMISSIONS

26        In respect for the court's time, and to submit this rebuttal before the cutoff date, I had to

27  omit dozens of less significant (but noteworthy) fabrications, misstatements and inventions Mr.

28  Rovin included in his report. Although they are omitted here, I expect to bring them to the

1    Court's attention, soon.

2

3

4    Respectfully submitted this 12th day of June, 2014

5

6                              Signed, _____

7                                           Steve Wilson Briggs
                                            Plaintiff, In Pro Per
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S REBUTTAL TO EXPERT REPORT OF JEFF ROVIN  CV 13-4679 PJH

## 28   GENERAL PASSENGER INFORMATION

verability. However, because it does not travel through space or at mach speeds, we were able to give the fifteen-ton vessel transparent Corning-ITT-manufactured siding. The result is a panoramic view of whatever terrain you are visiting, a truly breathtaking way to see any world. There is one pilot and one guide per Shuttle Bus, a seat computer and tray, and closer quarters, since the ship has been built compactly for easier piloting through tight spots. However, its small size makes for more personal contact with your guide.

**Other Vessels.** The scientists and tour employees who work and live on the worlds of M-17 have a wide variety of transports at their disposal. These include one-, two-, or three-person skyfliers and orbiters, atomic moles that burrow beneath the surface, multishuttles that fly as one unit in space but can be broken into two or four smaller probes once they've entered a planet's lower atmosphere, space disks for fast interplanetary travel, and a battery of land vehicles. Most of these are geared for rugged-ness rather than comfort, and while you may see them going about their business, you will never have to ride in one.

On the other hand, since Transgalactic encourages everyone to participate in our tours, from the very young to the young in spirit no matter what their age, we equip all of our vehicles with Automeds, the Warner-Cadence Corporation's portable health machine. If someone should have the misfortune to fall ill during a tour, the Automed will maintain that person's bodily functions until a Rescue Vessel arrives. There are between ten and twenty such aide ships stationed at different points on every world. All of our hotels have at least one Supermed Incorporated "Minihospital" and a human physician in residence. Transgalactic feels that you will enjoy your tour more if your mind is completely at ease. Rest assured that because people are not perfect, we must be.

## ENTRY REGULATIONS AND CUSTOMS RESTRICTIONS

Space is for everyone, and Transgalactic works hard to make it as accessible as a trip to any city, park, or resort on your home world. However, as with intraplanetary travel, there are sundry entry requirements. Listed herewith, they are rigidly enforced.

Most of the worlds in M-17 ask only that you present a MasterPass card for admittance, a computer card that is a combination visa and general ID. MasterPass cards are available through any Transgalactic agent or from the Bureau of Space Travel (BST). The initial fee is ten Standards, and the card is renewable annually at the rate of three Standards. A late payment automatically invalidates MasterPass, and no one is permitted into a spaceport boarding area without one. MasterPass cards

will *not* be issued to anyone who, within the previous three years, has been convicted of a crime involving artificial aging or a fine exceeding twenty-five Standards. Transgalactic services families, not felons.

Although your travel agent will alert you to particulars, be advised that some worlds in M-17 have additional entry requirements. To avoid last-minute arrangements at the terminal, be certain that all of your data records are in order.

As with BST regulations, restrictions regarding customs are among the most stringently enforced in the universe. While they vary from world to world, the general limitations are as follows. Consumable goods such as narcotics, liquor, and food may not leave the planet you are visiting, nor may they be carried to any world from your Star Cruiser. However, within a 600 vertical mile limit of wherever they are purchased, you may buy and use unlimited amounts of such items. Nonconsumables such as souvenirs, microfilm novels, and clothing may be taken beyond 600 miles of their point of purchase providing that their value does not exceed fifty Standards. In addition, you may have twenty-five Standards worth of nonconsumables shipped to your home by Universal Post—delivery takes from one to two weeks—or you may purchase over 200 and under 350 Standards worth of such goods and have them all shipped to your home. In either case, there is a tax of twenty percent on any nonconsum-





An Orbiter Bus seat, with computer console in front of the passenger; the holovision and CRT computer screen are located in the back of the preceding seat, along with a slide out, fold-down tray.

GENERAL PASSENGER INFORMATION   29





EXHIBIT 39