1  KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
   MICHAEL J. KUMP (SBN 100983)
2     mkump@kwikalaw.com
   GREGORY P. KORN (SBN 205306)
3     gkorn@kwikalaw.com
   808 Wilshire Boulevard, 3rd Floor
4  Santa Monica, California 90401
   Telephone: 310.566.9800
5  Facsimile: 310.566.9850

6  Attorneys for Defendants
   NEILL BLOMKAMP, SONY PICTURES
7  ENTERTAINMENT INC., TRISTAR
   PICTURES, INC., MEDIA RIGHTS CAPITAL
8  II, L.P., and QED INTERNATIONAL, LLC

9

10              UNITED STATES DISTRICT COURT

11        NORTHERN DISTRICT OF CALIFORNIA (OAKLAND)

12

13  STEVE WILSON BRIGGS,                  Case No. CV 13-4679-PJH

14          Plaintiff,                    **DEFENDANTS' NOTICE OF MOTION
                                          AND MOTION FOR SUMMARY
15     vs.                                JUDGMENT; MEMORANDUM OF
                                          POINTS AND AUTHORITIES IN
16  NEILL BLOMKAMP; SONY PICTURES         SUPPORT THEREOF**
    ENT., INC., TRISTAR PICTURES, INC.,
17  MEDIA RIGHTS CAPITAL, and QED         [Declarations of Neill Blomkamp, Jeff Rovin,
    INTERNATIONAL,                        and Gregory Korn, and Proposed Order, filed
18                                        and served concurrently herewith]
            Defendants.
19                                        Date:      September 3, 2014
                                          Time:      9:00 a.m.
20                                        Crtrm.:    3

21

22

23

24

25

26

27

28

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

**TO PLAINTIFF STEVE WILSON BRIGGS:**

**PLEASE TAKE NOTICE** that on September 3, 2014 at 9:00 a.m., or as soon thereafter as the matter can be heard in Courtroom No. 3 on the Third Floor of the above entitled Court, located at 1301 Clay Street, Oakland, California 94612, before the Honorable Phyllis J. Hamilton, Defendants Neill Blomkamp, Sony Pictures Entertainment Inc., Tristar Pictures, Inc., Media Rights Capital II, L.P., and QED International, LLC ("Defendants"), and each of them, will appear and move for summary judgment in their favor as to the entirety of Count One for Copyright Infringement, the only claim of relief asserted in Plaintiff's First Amended Complaint (Dkt. No. 17) filed on December 19, 2013.

Defendants' motion is made pursuant to Rule 56 of the Federal Rules of Civil Procedure on the grounds that there are no genuine issues of material fact and that Defendants are entitled to judgment as a matter of law in their favor on Plaintiff's First Amended Complaint. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-325 (1986).

This Motion is based upon this Notice, the attached Memorandum of Points and Authorities, the Declarations of Neill Blomkamp, Jeff Rovin, and Gregory P. Korn, and supporting Exhibits filed concurrently herewith, all papers and pleadings on file in this action, and on such other and further evidence and argument as the Court may lawfully consider in the exercise of its wise discretion.

**PLEASE TAKE FURTHER NOTICE** that pursuant to Local Rule 7-2(c), Defendants are filing and serving concurrently herewith a Proposed Order in Favor of Defendants.

DATED: July 30, 2014                    Respectfully submitted,

                                        KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP


                              By:  _____/s/ Michael J. Kump_____
                                        Michael J. Kump
                                        Attorneys for Defendants
                                        NEILL BLOMKAMP, SONY PICTURES
                                        ENTERTAINMENT INC., TRISTAR PICTURES,
                                        INC., MEDIA RIGHTS CAPITAL II, L.P., and QED
                                        INTERNATIONAL, LLC

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................ 1

II.   STATEMENT OF UNDISPUTED FACTS ........................................ 3

    A.    Synopsis Of *Butterfly Driver* (Korn Decl., Ex. 1)........................ 3

    B.    Synopsis of *Elysium* (Korn Decl., Ex. 2). .................................. 5

    C.    *Elysium* Is An Original Work Of Neill Blomkamp. ..................... 7

III.  LEGAL STANDARDS ...................................................................... 8

    A.    Legal Standards For Copyright Infringement. ............................... 8

    B.    Legal Standards for Summary Judgment. ...................................... 9

IV.  SUMMARY JUDGMENT IS WARRANTED BECAUSE THERE ARE NO GENUINE ISSUES OF MATERIAL FACT REGARDING ACCESS OR SIMILARITY ................................................................................ 10

    A.    The Absence Of Evidence Of Access Requires That Plaintiff Establish "Striking Similarity" Between The Two Works. ..................... 11

    B.    Plaintiff Can Establish Neither Striking Nor Substantial Similarity. .................... 12

        1.    The Plot / Sequence Of Events are not Similar. ........................ 12

            (a)    The Allegedly Copied "Plot Features" that Plaintiff's FAC Identifies are Generic, Non-Copyrightable Ideas........................ 13

            (b)    The "Plot Features" in Paragraph 46 of Plaintiff's FAC are not Expressed Similarly, if at all, by the Parties' Works. .............. 15

        2.    The Settings are not Similar. ................................................ 20

        3.    The Dialogue is not Similar. ................................................ 20

        4.    The Characters are not Similar. ............................................ 20

        5.    The Themes are not Similar. ................................................ 23

        6.    The Mood / Pace are not Similar.......................................... 23

    C.    The Parties' Works Share Nothing More Than "Stock," Cliché Ideas. ................. 23

V.   CONCLUSION ............................................................................... 25

Kinsella Weitzman Iser Kump & Aldisert LLP
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Tel 310.566.9800 • Fax 310.566.9850

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

<u>CASES</u>

*Art Attacks Ink, LLC v. MGA Entertainment Inc.*,
    581 F.3d 1138 (9th Cir. 2009)........................................................... 11

*Benay v. Warner Bros. Entertainment, Inc.*,
    607 F.3d 620 (9th Cir. 2010)........................................................ passim

*Berkic v. Crichton*,
    761 F.2d 1289 (9th Cir. 1985).............................................. 3, 9, 14, 15

*Bernal v. Paradigm Talent & Literary Agency*,
    788 F.Supp.2d 1043 (C.D. Cal. 2010) ........................................... passim

*Bissoon-Dath v. Sony Computer Entertainment America, Inc.*,
    694 F.Supp.2d 1071 (N.D. Cal. 2010) ....................................... 10, 19

*Cavalier v. Random House*,
    297 F.3d 815 (9th Cir. 2002)........................................... 9, 10, 14

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) .......................................................... 10

*Doody v. Penguin Group (USA) Inc.*,
    673 F.Supp.2d 1144 (D. Haw. 2009) ......................................... 20

*Feist Publications, Inc. v. Rural Tel. Serv. Co., Inc.*,
    499 U.S. 340 (1991) .......................................................... 24

*Funky Films, Inc. v. Time Warner Entm't Co., L.P.*,
    462 F.3d 1072 (9th Cir. 2006)...................................................... passim

*Gable v. National Broadcasting Co.*,
    727 F.Supp.2d 815 (C.D. Cal. 2010)........................................... passim

*Goldberg v. Cameron*,
    787 F.Supp.2d 1013 (N.D. Cal. 2011) ....................................... 10, 14

*Idema v. Dreamworks, Inc.*,
    162 F.Supp.2d 1129 (C.D. Cal. 2001)..................................... 10, 15, 22

*Jorgensen v. Epic/Sony Records*,
    351 F.3d 46 (2d Cir. 2003) ...................................................... 11

*Kouf v. Walt Disney Pictures & Television*,
    16 F.3d 1042 (9th Cir. 1994)......................................... 9, 10, 14, 21

*Lichtfield v. Spielberg*,
    736 F.2d 1352 (9th Cir. 1984).................................................... 2

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) .......................................................................................... 10

*Muller v. Twentieth Century Fox Film Corp.*,
    794 F.Supp.2d 429 (S.D.N.Y. 2011) ............................................................... 15

*Narell v. Freeman*,
    872 F.2d 907 (9th Cir. 1989) .......................................................................... 20

*Overman v. Universal City Studios, Inc.*,
    605 F.Supp. 350 (C.D. Cal. 1984) ..................................................................... 7

*Quirk v. Sony Pictures Entertainment, Inc.*,
    2013 WL 1345075 ..................................................................................... 10, 22

*Rice v. Fox Broadcasting Co.*,
    330 F.3d 1170 (9th Cir. 2003) ................................................................ 9, 21, 23

*Stewart v. Wachowski*,
    574 F.Supp.2d 1074 (C.D. Cal. 2005) ............................................................. 11

*Three Boys Music Corp. v. Bolton*,
    212 F.3d 477 (9th Cir. 2000) .......................................................................... 11

*Wild v. NBC Universal, Inc.*,
    788 F.Supp.2d 1083 (C.D. Cal. 2011) ...................................................... passim

*Zella v. E.W. Scripps Co.*,
    529 F.Supp.2d 1124 (C.D. Cal. 2007) ............................................................. 23

## STATUTES

Federal Rule of Civil Procedure 56(a) ......................................................................... 9

## TREATISES

4 Melville B. Nimmer & David Nimmer,
    NIMMER ON COPYRIGHT § 13.02[B] (2005) ................................................... 11

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

MOTION FOR SUMMARY JUDGMENT

1   <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2   **I.   INTRODUCTION**

3       A claim for copyright infringement requires proof of (i) access to plaintiff's work and

4   (ii) substantial similarity between the two works.  Plaintiff Steve Wilson Briggs can produce

5   neither.  The First Amended Complaint ("FAC") (Dkt. No. 17) alleges that the feature film

6   *Elysium* ("Film"), written and directed by Defendant Neill Blomkamp, the Oscar-nominated

7   writer/director of the hit film *District 9*, infringes a screenplay Plaintiff wrote entitled *Butterfly*

8   *Driver* ("Screenplay").  Based on vague similarities he perceived when he saw *Elysium*, Plaintiff

9   concluded that Blomkamp must have obtained and copied his Screenplay.  Plaintiff's FAC admits,

10  however, that he **never** submitted his Screenplay to Blomkamp or anyone associated with him.

11  (FAC, ¶ 22.)  Without a scintilla of evidence, Plaintiff hypothesizes that Blomkamp must have

12  read his Screenplay on a website called triggerstreet.com, where Plaintiff allegedly posted his

13  work from February to August 2007.  (FAC, ¶¶ 22-24.)  Plaintiff's rank speculation is false; and

14  Plaintiff's lawsuit stems from a grave misunderstanding of the degree of similarity of protectable

15  expression required in the Ninth Circuit to sustain a copyright claim.

16      The evidence submitted with this Motion is incontrovertible: Blomkamp was not aware of

17  triggerstreet.com before this action was filed; he has never visited that site; he did not access

18  Plaintiff's Screenplay there or anywhere else; no one provided the screenplay to Blomkamp or

19  discussed it with him; and to this day, he has not read Plaintiff's work.  Because Plaintiff has no

20  evidence of access, he must prove that the works are **"strikingly similar"** to support an inference

21  of copying—a bar so high that it means that "in human experience," it is "virtually impossible" the

22  two works could have been independently created.  (*See infra* pp. 10-11.)

23      To say the least, *Butterfly Driver* and *Elysium* are not "strikingly similar."  In fact, as

24  shown below, there is not a **single** similarity when, as the law requires, the focus is on the

25  copyrightable expression in the two works.  (*See infra* pp. 12-23.)

26      Plaintiff attempts to create the illusion of similarity in the same way that one could

27  superficially argue that *The DaVinci Code* and *Indiana Jones and the Last Crusade* are similar

28  because both works feature an adventurous, handsome college professor who solves ancient

Kinsella Weitzman Iser Kump & Aldisert llp
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Tel 310.566.9800 • Fax 310.566.9850

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1   riddles on a quest to find the "Holy Grail."  Plaintiff ignores the detailed expression in the

2   Screenplay and the Film, and instead teases out of the two works certain abstract ideas he believes

3   can be found in each.  Over and over, courts have held that this process of "abstraction" is

4   improper because it "obfuscates the radical differences in the two works' expression."  *Wild v.*

5   *NBC Universal, Inc.*, 788 F.Supp.2d 1083, 1103 (C.D. Cal. 2011).  Such is the case here.

6        As shown below, the specific plots, scenes, dialogue, characters, and settings in the

7   Screenplay and Film do not resemble each other whatsoever.  (*See infra* pp. 12-23.)  Only by

8   scrubbing the works of all detail and describing them at the highest level of abstraction does

9   Plaintiff discern the slightest similarity.  It could be said that *Butterfly Driver* and *Elysium* each in

10  their own different ways involve a male protagonist who travels to a space station for some type of

11  medical care and saves the life of a young girl in the process.  But this is a tortured abstraction of

12  the two works.  It is a mischaracterization of their actual premises.  And even if the Screenplay

13  and Film share this premise, it is a general plot idea which is **not** protected under copyright law

14  and must be **ignored** when analyzing substantial similarity.  Copyright law in this Circuit and

15  others is replete with cases granting summary judgment on the basis that general plot ideas—

16  including ideas far more specific and nuanced than the one these works might be accused of

17  sharing—are non-copyrightable and irrelevant for purposes of determining infringement.

18        Plaintiff's FAC purports to identify a handful of other random, supposed similarities

19  between the works.  The Ninth Circuit considers such lists "inherently subjective and unreliable,"

20  especially "where the list emphasizes random similarities scattered throughout the works."

21  *Lichtfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984).  That is the case here.

22  Plaintiff cherry-picks random, mostly insignificant bits and pieces from *Butterfly Driver* and, once

23  again, compares them to *Elysium* through a process of "abstraction" which masks that the scenes

24  do not appear the least bit similar in an unvarnished comparison of the works.

25        Submitted with this Motion is the Declaration and Report (Ex. 3) of defense expert Jeff

26  Rovin ("Rovin Report"), an author, editor, and publisher with decades of experience in science

27  fiction and action/adventure works, and a qualified expert in several prior copyright cases.  Rovin

28  explains that the general plot ideas and settings that Plaintiff identifies in both his Screenplay and

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1    *Elysium*—a futuristic Earth; a space station inhabited by the wealthy; a protagonist who travels

2    there for life-saving medical treatment—are merely "stock" ideas that can be found in  dozens of

3    past science fiction works.  (*See infra* pp. 23-25.)  The fact that these generic ideas appear in both

4    works does not evidence copying.  "It merely reminds us that in Hollywood . . . there is only rarely

5    anything new under the sun."  *Berkic v. Crichton*, 761 F.2d 1289, 1294 (9th Cir. 1985).

6        Accordingly, for all the reasons discussed below, Defendants respectfully request that their

7    Motion for Summary Judgment be granted in its entirety.

8    **II.    STATEMENT OF UNDISPUTED FACTS**

9        **A.    Synopsis Of *Butterfly Driver* (Korn Decl., Ex. 1).**

10        The Screenplay's protagonist is Arlo Grainer.  He is a "legend" on Earth because of his

11   military service and subsequent defiance of the "Global State."  Arlo lives with his wife and two

12   children in a "Zone" outside of the State's jurisdiction, working as a hover-craft pilot flying

13   supplies.  Arlo's antagonist, Drexler, is the President of the State and the owner of "Uberopolis," a

14   3-mile wide "satellite city" that orbits Earth.

15        At work in the warehouse from which he flies supplies, Arlo receives a distress signal from

16   fellow pilot, Roddy, and races to Roddy's location to find him shot and near death.  Roddy tells

17   Arlo that he was ambushed by bounty hunters, who will be seeking out Arlo and his family next.

18   Arlo flies home to collect his family and send them to New York.  Knowing that they will need

19   thousands of dollars in "repatriation fees" to reenter the State, Arlo accepts a dangerous "butterfly

20   run" in which he will transport Tamara Gwynn to Los Angeles.  Tamara is heading to Los Angeles

21   for a trial in a civil suit against The State concerning her rights to an "A-cell"—a small glass

22   cylinder that produces electricity from water.  Arlo sends the real A-Cell to a different Zone to

23   hide it and has Tamara travel with a decoy.  On the flight, they are ambushed by police "sky-cars"

24   and crash into the streets of Los Angeles, where Arlo is promptly caught.  Television news reports

25   falsely claim that Arlo kidnapped and killed Tamara.  Jerry Mathiessen, a federal agent who once

26   attended flight school with Arlo, is sent to investigate.

27        Arlo is criminally charged and taken to a jail on Uberopolis.  Talking with fellow prisoner

28   David Levine, Arlo discerns that Uberopolis has been killing prisoners by shuttling and then

1   dumping them into space.  Arlo and David are forced onto a shuttle but escape into an "airlock"

2   before suffering the same fate.  They pilot the shuttle back to Earth and part ways.

3   When Arlo finds his family in a Manhattan apartment, daughter Franny is on a respirator,

4   near death, and in need of the drug "Drexlerin."  Arlo races to a warehouse that normally stocks

5   the drug, but supplies on Earth are exhausted because Drexlerin was discontinued in anticipation

6   of the release of its replacement, "Drexlerin 2."  At the warehouse, Arlo meets brother and sister

7   Louis and Benni.  They help Arlo obtain a fake ID to covertly travel by shuttle to Uberopolis to

8   find Drexlerin.  Benni gives Arlo a yellow butterfly "dream catcher" for luck.

9   Jerry intercepts Arlo but Arlo gets the drop and forces Jerry into the trunk of a sky-car,

10  telling him that he must find Drexlerin for Franny. Once on Uberopolis, Arlo contacts Drexler to

11  set up an exchange—Tamara's valuable A-Cell for a supply of Drexlerin.  Drexler agrees to the

12  meeting after Arlo threatens to use the A-Cell to destroy Uberopolis if he refuses.

13  Based on the investigation he has been conducting, Jerry now knows that Arlo and Drexler

14  are acquainted from their past during wartime and he surmises that Arlo is heading to Uberopolis

15  to confront Drexler.  He follows Arlo to Uberopolis and orders a technician in the "Drexler Media

16  Building" to track Arlo's movements with surveillance cameras located throughout the satellite.

17  Jerry forces the tech to broadcast the video from the surveillance cameras to television stations.

18  With the surveillance cameras tracking and broadcasting his movements, Arlo crashes a

19  police "sky-ranger" through the glass windows of Drexler's 57th floor office.  They converse, and

20  not knowing that the conversation is being televised, Drexler confesses to a host of crimes and to

21  being an imposter: Drexler is actually "Midland," a soldier who murdered the real Drexler,

22  adopted his identity, and inherited Drexler's fortune.  A struggle ensues.  Arlo, Drexler, and the

23  A-Cell fall out of the broken window in Drexler's office but float harmlessly toward the ground

24  because of the reduced gravity on Uberopolis.  A lengthy fight and chase scene follows,

25  culminating in Drexler bearing down on Arlo on a sky-cycle.  Arlo dives into a harbor to escape

26  Drexler and encounters a dolphin named Spike (whom he met previously while an Uberopolis

27  prisoner) and is guided to an escape hatch.

28  Drexler finds Arlo on a shuttle.  Just when Arlo gains the upper hand, he suffers a

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

Kinsella Weitzman Iser Kump & Aldisert llp
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Tel 310.566.9800 • Fax 310.566.9850

1   debilitating "ice pick" headache caused by a longstanding chronic affliction.  Drexler shoots Arlo

2   and is on the verge of killing him when Jerry arrives and knocks Drexler unconscious.  Arlo and

3   Jerry pilot the shuttle off Uberopolis.  They are immediately targeted by a missile launched from

4   Uberopolis.  Arlo drifts out of consciousness (from his bullet wound) and has a dreamlike vision

5   of a pale child with a respirator holding a yellow flower, and of Benni's dream catcher in the eyes

6   of Spike the dolphin.  Arlo awakes and orders Jerry to turn back toward Uberopolis.  The missile

7   follows, and just before a deadly collision with Uberopolis, Arlo launches an evacuation pod.

8   The shuttle and missile continue forward and destroy Uberopolis.

9        Arlo and Franny survive.  They attend the funeral of Jerry's son, Matty, who died of

10   respiratory problems (and ostensibly is the child in Arlo's vision).  Arlo's wife, Rianna, asks him

11   to "repatriate" into the State with his family.  He refuses and returns to his job as a hover-jet pilot.

12        **B.**     **Synopsis of _Elysium_ (Korn Decl., Ex. 2).**[1]

13        The Film opens with images of Earth in total squalor.  The uber wealthy have fled the

14   planet to live in a lush utopian space station called "Elysium."  Elysium is exclusive to its wealthy

15   citizens, who have futuristic "med bays" that cure all ailments and halt aging.  The demonstrably

16   less fortunate on Earth are poor, they live in rundown apartments, they have inadequate medical

17   care, and they are policed by a brutal robotic police force.

18        The Film's protagonist, Max (played by Matt Damon), grows up as a child in a convent

19   where he befriends a young girl, Frey.  As a child, Max steals under the delusion that he can buy

20   his way onto Elysium.  He continues stealing as an adult and has an extensive criminal history.

21   On probation, Max works at a company called Armadyne building the robots that police Earth.

22        Walking toward a bus headed to work, Max is confronted and battered by robot police

---

[1] Although it makes no difference to the outcome, it bears noting that Plaintiff's work is properly compared to the motion picture _Elysium_ and not to the screenplays for the Film.  _See Quirk v. Sony Pictures Entertainment Inc._, 2013 WL 1345075 *6 (N.D. Cal. Apr. 2, 2013) ("[E]ven assuming the preliminary drafts of _Premium Rush_ scripts would be admissible to show access, and that they include indications of copying that was later deleted or revised, the only relevant question at this juncture is whether the final movie as filmed, edited, and released contains matter substantially similar to protectable elements of Quirk's novel."); _see also See v. Durang_, 711 F.2d 141, 142 (9th Cir. 1983).

23

24

25

26

27

28

1    officers.  He walks to a hospital and is treated by Frey, now a nurse.

2        The Film cuts to a mass of people trying to board shuttles bound for Elysium.  An ID is

3    burned onto the wrist of everyone who boards the shuttle.  As the shuttles take off and near

4    Elysium, the space station's Defense Secretary Delacourt (played by Jodie Foster) gives a covert

5    agent on Earth, Kruger, the order to destroy them.  Kruger destroys two of the shuttles with

6    shoulder-fired rockets.  The third shuttle lands on Elysium, and the "illegal aliens" on board flee

7    robot police forces.  One young girl enters a home on Elysium and is able to use a med bay

8    because the ID on her wrist fools the device into believing she is a citizen of Elysium.

9        While working at Armadyne, Max is accidentally shut in a chamber and exposed to heavy

10   doses of radiation.  In a flashback, a nun hands Max a locket with a photo of Earth to remind him

11   that Earth looks as beautiful from there as Elysium "looks beautiful from here."  Max awakes and

12   is told by an Armadyne robot that he will die from the radiation in five days.

13       Max finds Spider, who runs the illegal shuttles to Elysium.  In exchange for a promise of a

14   shuttle ride to Elysium where he might use a med bay to cure his fatal condition, Max accepts a

15   dangerous mission: he must kidnap Armadyne's chief officer, John Carlyle, and download

16   valuable data from Carlyle's brain into his own using a futuristic device.  An exoskeleton is

17   installed onto Max's body and head to give him super-human strength.

18       Simultaneously, Delacourt persuades Carlyle, who designed Elysium, to prepare a "reboot

19   sequence" that would allow her to wrest the presidency of Elysium from its current President,

20   Patel.  Carlyle prepares uploads the software program into his brain.  As he leaves Earth on a

21   private shuttle, Max and his fellow rebels shoot the shuttle down, capture Carlyle, and plug

22   Carlyle's brain into Max's.  Max's brain seizes when the download starts because of a defense

23   mechanism that Carlyle encoded into the reboot sequence.

24       Delacourt learns of the kidnapping and orders Kruger to intercede but to avoid harming

25   Max (who holds the reboot sequence in his brain).  Max evades Kruger and his men, who arrive in

26   an airship and kill everyone else.  Severely injured, he finds Frey, who takes him to her home.

27   He tells Frey that he must travel to Elysium to save his life.  Frey begs Max to take her daughter

28   Matilda, who is dying of leukemia, with him.  He refuses to help and leaves.

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1    Max returns to Spider's hideout to get a shuttle to Elysium, but the flight system is frozen.

2    Spider plugs a computer into Max's brain and is astonished to see that Max now possesses a

3    reboot sequence that would "override the whole system" and "open the borders," thus "mak[ing]

4    everyone a citizen of Elysium."  Max is interested only in saving his own life and refuses to help

5    Spider.  He leaves and voluntarily surrenders to Kruger.  Max threatens that he will blow up

6    Kruger's ship with a grenade unless he is taken to a med bay on Elysium, but as he boards the

7    ship, he discovers that Kruger has found and kidnapped Frey and Matilda.

8    A fight erupts en route to Elysium.  Max drops the grenade.  It detonates, destroying

9    Kruger's face and crashing the ship on Elysium.  Frey and Matilda flee to a house in hopes of

10   using a med bay, but it does not work because she is not a citizen.  All three are captured.

11   Delacourt confronts Kruger for crashing a ship onto Elysium.  (Kruger's mangled face has

12   been regenerated by a med bay.)  Kruger decides that he will use the reboot sequence to make

13   himself the president of Elysium, and he stabs and kills Delacourt.

14   Max, Frey, and Matilda are being held separately in a control center on Elysium.

15   Max escapes and sees on a video screen that Spider and his men have landed on Elysium.

16   He contacts Spider to set up a rendezvous.  He then rescues Frey and Matilda and tells them to

17   head to a med bay.  Max and Spider race to download the reboot sequence as Kruger chases them.

18   Max suffers a seizure which allows Kruger to catch up, but he is able to kill Kruger.

19   Max and Spider make it to a control room.  Max has learned that he will die the moment

20   the reboot sequence is extracted from his brain.  Max studies his locket with the picture of Earth

21   while staring at the actual planet out a large window.  He pushes a button to start the download

22   and dies instantly.  When the download completes, Elysium's computer systems recognize

23   everyone on Earth as citizens of Elysium.  Matilda's leukemia is cured by a med bay, and an

24   armada of shuttles equipped with med bays is dispatched toward Earth.

25   **C.    _Elysium_ Is An Original Work Of Neill Blomkamp.**

26   To quote the court in _Overman v. Universal City Studios, Inc._, "it is impossible to read

27   plaintiff's screenplay[ ] and . . . view defendants' film and conclude that defendants wrongfully

28   appropriated something which belongs to the plaintiff."  605 F.Supp. 350, 353 (C.D. Cal. 1984).

Kinsella Weitzman Iser Kump & Aldisert llp
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Tel 310.566.9800 • Fax 310.566.9850

Kinsella Weitzman Iser Kump & Aldisert llp
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Tel 310.566.9800 • Fax 310.566.9850

1  Nevertheless, Plaintiff was somehow convinced upon seeing *Elysium* that Neill Blomkamp could

2  not have written or directed it without reading and copying his Screenplay.  Plaintiff concedes that

3  the website triggerstreet.com is the "ONLY place [he] ever posted a complete script of *Butterfly*

4  *Driver*" and the only place where he released a version of the Screenplay with certain elements

5  that are allegedly misappropriated in *Elysium.*  (FAC ¶ 22.)  He also admits he only posted the

6  Screenplay on triggerstreet.com from February to August 2007.  (*Id.* ¶ 24.)  Nevertheless, Plaintiff

7  deduces that "TriggerStreet.com is where the Defendants had access to [his] script."  (*Id.* ¶ 23.)

8       Plaintiff alleges no facts to support that Blomkamp found his Screenplay on

9  triggerstreet.com.  He speculates that a "young director" complimented his screenplay on

10  triggerstreet.com, and that this director "MAY have been Defendant, Neill Blomkamp."

11  (FAC ¶ 26.)  Plaintiff's speculation is false.  Blomkamp had not heard of triggerstreet.com before

12  this suit was filed.  He did not obtain Plaintiff's Screenplay on triggerstreet.com or from any other

13  source.  And no one ever discussed the Screenplay with Blomkamp.  (Blomkamp Decl. ¶¶ 7-8.)

14       The **actual** genesis for *Elysium* is briefly explained in Blomkamp's Declaration.

15  The South African writer/director, who began in the film business as a teenager creating 3D

16  animation and visual effects, began by developing the visual concepts for the Film.  (Blomkamp

17  Decl., ¶¶ 2, 5.)  During this process, Blomkamp reviewed images of several space stations, some

18  of which were in the shape of a circular "torus" like the space station in *Elysium.*  (*Id.* ¶ 5.)  Those

19  images inspired the Film's utopian space station.  (*Id.*)  The plot for *Elysium* followed from that

20  idea and from some of the themes that Blomkamp wanted to explore, such as racial and class

21  segregation, which are also evident in his previous film, *District 9.*  (*Id.* ¶ 6.)

22       Simply put, nothing in *Elysium* was or could have been based upon Plaintiff's Screenplay.

23  **III.   LEGAL STANDARDS**

24      **A.   Legal Standards For Copyright Infringement.**

25       "A plaintiff bringing a claim for copyright infringement must demonstrate '(1) ownership

26  of a valid copyright, and (2) copying of constituent elements of the work that are original.'"

27  *Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072, 1076 (9th Cir. 2006) (citation

28  omitted).  Absent evidence of direct copying, plaintiff must demonstrate that (1) defendant had

Kinsella Weitzman Iser Kump & Aldisert llp
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Tel 310.566.9800 • Fax 310.566.9850

1    "access" to the plaintiff's work and (2) the two works are substantially similar.  *Id.*  "To determine

2    whether two works are substantially similar, a two-part analysis—an extrinsic test and an intrinsic

3    test—is applied."  *Rice v. Fox Broadcasting Co.*, 330 F.3d 1170, 1174 (9th Cir. 2003).

4            Only the extrinsic test is applied at the summary judgment stage.  *Funky Films*, 462 F.3d at

5    1077.  "The extrinsic test focuses on 'articulable similarities between the plot, themes, dialogue,

6    mood, setting, pace, characters, and sequence of events' in the two works."  *Id.*, quoting *Kouf v.*

7    *Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994).  In applying the extrinsic

8    test, courts must "take care to inquire only whether 'the **protectable elements, standing alone,**

9    are substantially similar.'"  *Id.*, quoting *Cavalier v. Random House*, 297 F.3d 815, 822 (9th Cir.

10   2002) (emphasis in original); *see also Rice*, 330 F.3d at 1174 (holding that courts "must

11   distinguish between the protectable and unprotectable material because a party claiming

12   infringement may place 'no reliance upon any similarity in expression resulting from

13   unprotectable elements.'") (citation omitted).  In other words, courts "filter out and disregard the

14   non-protectable elements in making [a] substantial similarity determination."  *Funky Films*, 462

15   F.3d at 1077, quoting *Cavalier*, 297 F.3d at 822.

16          Because unprotected elements are irrelevant, it is "not the basic plot ideas for stories, but

17   the actual concrete elements that make up the total sequence of events and the relationships

18   between the major characters" that must be compared.  *Funky Films*, 462 F.3d at 1077, quoting

19   *Berkic*, 761 F.2d at 1293.  Similarities in general plot ideas are not probative of infringement.  *Id.*

20   at 1081; *see also Benay v. Warner Bros. Entertainment, Inc.*, 607 F.3d 620, 625 (9th Cir. 2010)

21   ("In applying the extrinsic test, we look 'beyond the vague abstracted idea of a general plot.'")

22   (citation omitted).  Likewise, *scenes a faire* that "flow naturally from generic plot-lines" are

23   unprotected and therefore ignored under the extrinsic test.  *Funky Films*, 462 F.3d at 1077.

24          **B.      Legal Standards for Summary Judgment.**

25          "The court shall grant summary judgment if the movant shows that there is no genuine

26   dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

27   Civ. P. 56(a).  Where, as here, the nonmoving party (Plaintiff) will have the burden of proof at

28   trial, the moving parties (Defendants) need only show that there is no evidence to support a

1   necessary part of the nonmoving party's claim.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325

2   (1986).  This burden is met by simply "showing—that is, pointing out to the district court—that

3   there is an absence of evidence to support the nonmoving party's case."  *Id.*  Once the moving

4   party meets this burden, the burden shifts to the nonmoving party to "come forward with specific

5   facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith*

6   *Radio Corp.*, 475 U.S. 574, 587 (1986).

7        The Ninth Circuit has repeatedly reaffirmed that "substantial similarity 'may often be

8   decided as a matter of law,'" and the Circuit "frequently affirm[s] summary judgment in favor of

9   copyright defendants on the issue of substantial similarity."  *Funky Films*, 462 F.3d at 1076-1077

10  (citation omitted).  Numerous cases grant summary judgment in the context of literary works,

11  motion pictures, and television shows, where—as here—the works share only unprotected plot

12  ideas and stock scenes.  *See, e.g., Funky Films,* 462 F.3d at 1081; *Benay*, 607 F.3d at 625;

13  *Cavalier*, 297 F.3d 815; *Kouf*, 16 F.3d at 1045-1046; *Quirk v. Sony Pictures Entertainment, Inc.*,

14  2013 WL 1345075 *9 (N.D. Cal. Apr. 2, 2013); *Bissoon-Dath v. Sony Computer Entertainment*

15  *America, Inc.*, 694 F.Supp.2d 1071 (N.D. Cal. 2010); *Goldberg v. Cameron*, 787 F.Supp.2d 1013

16  (N.D. Cal. 2011); *Bernal v. Paradigm Talent & Literary Agency*, 788 F.Supp.2d 1043 (C.D. Cal.

17  2010); *Gable v. National Broadcasting Co.*, 727 F.Supp.2d 815 (C.D. Cal. 2010); *Idema v.*

18  *Dreamworks, Inc.*, 162 F.Supp.2d 1129, 1187 (C.D. Cal. 2001).

19  **IV.    SUMMARY JUDGMENT IS WARRANTED BECAUSE THERE ARE NO**

20          **GENUINE ISSUES OF MATERIAL FACT REGARDING ACCESS OR**

21          **SIMILARITY**

22        A comparison of *Butterfly Driver* and *Elysium* compels the conclusion that the Film is not

23  infringing as a matter of law.  Because Defendants' evidence rebuts Plaintiff's speculative

24  allegation of access, Ninth Circuit authority requires even **more** than a showing of substantial

25  similarity.  Plaintiff must prove such "striking" similarities between *Butterfly Driver* and *Elysium*

26  that Blomkamp could not logically have conceived his work independently.  Under either

27  standard, Plaintiff cannot come close to meeting his burden.  There are no similarities between the

28  Screenplay and the Film at the level of protectable expression.  They at most share a few cliché,

Kinsella Weitzman Iser Kump & Aldisert llp
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Tel 310.566.9800 • Fax 310.566.9850

Kinsella Weitzman Iser Kump & Aldisert llp
808 Wilshire Boulevard, 3ᵗʰ Floor
Santa Monica, California 90401
Tel 310.566.9800 • Fax 310.566.9850

1    non-copyrightable ideas that can be found in dozens of other science fiction work and are

2    irrelevant in proving infringement.  Thus, summary judgment is warranted here.

3        A.    **The Absence Of Evidence Of Access Requires That Plaintiff Establish**

4        **"Striking Similarity" Between The Two Works.**

5        To support an inference of infringement, Plaintiff must first prove access.  *Funky Films*,

6    462 F.3d at 1076.  "To prove access, Plaintiff must show that Defendants had a 'reasonable

7    opportunity' or 'reasonable possibility' of viewing Plaintiff's work prior to the creation of the

8    infringing work." *Bernal*, 788 F.Supp.2d at 1053, citing *Three Boys Music Corp. v. Bolton*, 212

9    F.3d 477, 482 (9th Cir. 2000).  "**Reasonable access requires more than a 'bare possibility,' and**

10   **'may not be inferred through mere speculation or conjecture**.'"  *Id.*, quoting *Three Boys*

11   *Music*, 212 F.3d at 482 (emphasis added).  "In order to support a claim of access, a plaintiff must

12   offer 'significant, affirmative and probative evidence.'"  *Bernal*, 788 F.Supp.2d at 1054, quoting

13   *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003) (affirming summary judgment on

14   access where plaintiff produced "no reasonable documentation that he actually mailed" the

15   copyrighted work to defendants); *see Art Attacks Ink, LLC v. MGA Entertainment Inc.*, 581 F.3d

16   1138 (9th Cir. 2009) (holding that the "slight chance" defendant may have visited a fair exhibiting

17   plaintiff's works "does not create more than a 'bare possibility'" of access).

18       **Plaintiff has no evidence of access**.  His speculation that Blomkamp accessed his

19   Screenplay on triggerstreet.com is unavailing, *Bernal*, 788 F.Supp.2d at 1054, and it is expressly

20   rebutted by Blomkamp's uncontroverted Declaration.  (Blomkamp Decl. ¶¶ 7-8.)  Because

21   Plaintiff lacks any evidence of access, he can establish copyright infringement only by showing

22   "striking similarity." *Three Boys Music*, 212 F.3d at 485; *see also Stewart v. Wachowski*, 574

23   F.Supp.2d 1074, 1084 (C.D. Cal. 2005) ("Where evidence of access is lacking, a 'striking

24   similarity' between the works may give rise to a permissible inference of copying.").

25       Striking similarity is a high bar.  "At base, 'striking similarity' simply means that, in

26   human experience, it is virtually impossible that the two works could have been independently

27   created."  4 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT § 13.02[B]

28   (2005), quoted with approval in *Stewart*, 574 F.Supp.2d at 1100-1101; *see also Bernal*, 788

1   F.Supp.2d at 1052 (defining striking similarity as "where the works are so unmistakably similar

2   that, as a matter of logic, the only explanation . . . must be copying rather than . . . coincidence,

3   independent creation, or prior common source") (citation omitted).

**B.      Plaintiff Can Establish Neither Striking Nor Substantial Similarity.**

5       It is a "rare" case in which a plaintiff can prove striking similarity.  *Bernal*, 788 F.Supp.2d

6   at 1052.  This is no exception.  Plaintiff's burden is to show striking similarity between the

7   **protectable expression** in the plots, sequences of events, characters, settings, dialogue, themes,

8   and mood/pace of his Screenplay and the Film.  As discussed below, **not a single** similarity in

9   expression—let alone striking similarity—can be found in these elements of the two works.

**1.      The Plot / Sequence Of Events are not Similar.**

11      The plots of the Screenplay and Film are not at all similar.  In the Screenplay, war

12  hero/pilot Arlo learns that bounty hunters who killed fellow pilot, Roddy, are after his family.

13  He accepts a "butterfly run" transporting Tamara to Los Angeles for a trial over a revolutionary

14  energy-producing A-Cell; is captured and framed for Tamara's murder; escapes imprisonment

15  from Uberopolis and pilots a shuttle back to Earth; evades police while seeking the drug Drexlerin

16  to save his daughter Franny from a respiratory condition; obtains a fake ID to covertly travel back

17  to Uberopolis to obtain the drug; negotiates an exchange with Drexler of the A-Cell for Drexlerin;

18  exposes Drexler as a criminal and imposter; and destroys Uberopolis while piloting off the space

19  station to safety.  Literally, **none** of these plot points, nor any of the specific plot points that flesh

20  out this overview, can be found in the Film.

21      The same is true for the works' sequence of events.  Not a single scene from the

22  Screenplay is replicated in the Film, let alone in the same sequence.  *See Bernal*, 788 F.Supp.2d at

23  1072 ("The sequence of events refers to the actual sequence of the scenes, not just having similar

24  scenes out of sequence.").  The inquiry could end here: the Screenplay and Film cannot be

25  strikingly similar when they share no specific plot points or scenes.  *Cf. Wild*, 788 F.Supp.2d at

26  1109 (holding that the lack of parallel characters alone suggests no substantial similarity because

27  "[o]ne cannot imagine how two works could be substantially similar without a story that focuses

28  on the actions of similar characters").

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

(a)   **The Allegedly Copied "Plot Features" that Plaintiff's FAC**

**Identifies are Generic, Non-Copyrightable Ideas.**

Instead of comparing copyrightable expression in the works, Plaintiff distills his Screenplay down into a handful of highly abstract ideas that he alleges can be found in the Film as well. (*See* FAC ¶¶ 44-48.) Specifically, Plaintiff identifies the following fourteen "plot features" of the Screenplay that the Film allegedly copied: "1) a giant satellite world for the super-rich; 2) a hero prone to excruciating headaches (which knock him to his knees); 3) a villain who has been genetically reprogrammed to appear much younger than he/she is; 4) advanced medicine found on the satellite world; 5) a hero who must get to the satellite world for medicine (medical care); 6) a 'plight of immigrant' theme; 7) a sick girl, who will die without the hero's action; 8) a hero who is poor, and needs I.D. and transport to a satellite world; 9) an 'anguish of living without healthcare' theme; 10) a disabled transporter who helps the hero; 11) an agent (sent by the villain to apprehend the hero) who accepts the assignment after negotiating; 12) a keepsake necklace, carried by the hero, which factors in to the stories' conclusion; 13) an overpopulated, impoverished Earth, where police vehicles loom in the sky and brutalize the poor, ruled by a rich elite who live on the satellite world; 14) a hero who threatens the villain with detonating an explosive device." (FAC ¶ 46.)

Plaintiff's list of "plot features" in Paragraph 46 of the FAC "addresses the plots abstractly and ignores the requirement that the Court focus on the expression of the idea in applying the extrinsic test." *Wild*, 788 F.Supp.2d at 1102. As the following Ninth Circuit cases demonstrate, Plaintiff's general plot ideas are not copyrightable and are irrelevant in determining infringement.

In *Funky Films*, the copyrighted and accused works shared a novel plot point: both were narratives about a family-run funeral parlor, the death of the family patriarch, the inheritance of the business by the patriarch's two sons, and the return of the "prodigal son" to run the business. 462 F.3d at 1077-1078. The Court held that "[a]t first blush, these apparent similarities in plot appear significant," but that summary judgment was nevertheless required because "an actual reading of the two works reveals greater, more significant differences and few real similarities at the levels of plot, characters, themes, mood, pace, dialogue, or sequence of events." *Id.* at 1078.

1    In *Benay*, in both the copyrighted and accused works "an American war veteran travels to

2    Japan in the 1870s to train the Imperial Army in modern Western warfare in order to combat a

3    samurai uprising."  607 F.3d at 625.  The stories shared numerous elements arising from their

4    "shared premise," including that "the protagonist starts in America and travels to Japan where he

5    meets the Emperor, who is struggling to modernize Japan"; "[b]oth protagonists introduce modern

6    warfare to the Imperial Army, using contemporary Western weaponry and tactics"; "[b]oth works

7    feature a Japanese foil in the form of the leader of the samurai rebellion"; "[a]nd in both works the

8    protagonist suffers a personal crisis and is transformed as a result of his interaction with the

9    samurai."  *Id.*  Despite these seemingly unique similarities, the Court affirmed summary judgment,

10   holding that the works were similar only at a "cursory" level, and that a "closer examination of the

11   protectable elements . . . exposes many more differences than similarities."  *Id.*

12   In *Berkic*, similarly, both the copyrighted and accused works concerned "criminal

13   organizations that murder healthy young people, then remove and sell their vital organs to wealthy

14   people in need of organ transplants."  761 F.2d at 1293.  Both works depicted "the adventures of a

15   young professional who courageously investigates, and finally exposes, the criminal

16   organization."  *Id.*  The Court nevertheless held that "this degree of similarity between the basic

17   plots of two works cannot sustain a plaintiff's claim that the works are "substantially similar."  *Id.*

18   *Funky Films*, *Benay*, and *Berkic* are just three of the many examples in which courts

19   granted summary judgment because the general plot ideas found in the copyrighted and accused

20   works were unprotected.  *See also*, *e.g.*, *Cavalier*, 297 F.3d at 824 (finding unprotectable the

21   "general premise of a child, invited by a moon-type character, who takes a journey through the

22   night sky and returns safely to bed to fall asleep"); *Kouf*, 16 F.3d at 1045 (affirming summary

23   judgment where both works involved children who were shrunk to a fraction of their sizes);

24   *Gable*, 727 F.Supp.2d at 840 (granting summary judgment where "both works have the main

25   character win a lottery ticket, and both characters use the lottery winnings to remedy past deeds");

26   *Bernal*, 788 F.Supp.2d at 1064 (finding plots "substantially different" despite "abstract

27   similarities"); *Goldberg*, 787 F.Supp.2d at 1020 (granting summary judgment where "in both

28   works, advanced, self-aware computer networks seek to destroy humanity, who must fight mass-

Kinsella Weitzman Iser Kump & Aldisert llp
808 Wilshire Boulevard, 3ᴿᴰ Floor
Santa Monica, California 90401
Tel 310.566.9800 • Fax 310.566.9850

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1    produced, death-ray-shooting robot armies to survive"); *Idema*, 162 F.Supp.2d at 1182 (finding no

2    infringement though both works were "motivated by the same general 'story idea' of the theft of

3    nuclear weapons from the decaying and ill-guarded arsenal of Russia/the former Soviet Union");

4    *Muller v. Twentieth Century Fox Film Corp.*, 794 F.Supp.2d 429, 445 (S.D.N.Y. 2011) (granting

5    summary judgment where "both works tell the story of an expedition team that travels to

6    Antarctica where they discover an underground ancient pyramid or city").

7          Here too, the "plot features" in Paragraph 46 of the FAC are unprotectable.  They are even

8    more abstract than the plot ideas held unprotectable in *Funky Films*, *Benay*, and *Berkic*.  These

9    ideas are also not original to Plaintiff.  As discussed more below, defense expert Jeff Rovin

10   specifically addresses numbers 1-5, 8, 12, and 13 from Paragraph 46 and offers numerous

11   examples were these same ideas appeared in other books, comics, films, television shows, and

12   videogames.  (*See infra* pp. 23-25.)  All of Plaintiff's generic "plot features," therefore, must be

13   disregarded in a striking/substantial similarity determination, and even if they appear in both

14   works, they do not support an inference of copying.  *Funky Films*, 462 F.3d at 1077.

15             **(b)**       **The "Plot Features" in Paragraph 46 of Plaintiff's FAC are not**

16                             **Expressed Similarly, if at all, by the Parties' Works.**

17         To demonstrate copying, Plaintiff would need to show that the fourteen plot ideas in

18   Paragraph 46 of the FAC, together with the settings, characters, and other aspects of the works, are

19   **expressed** similarly in the Screenplay and Film.  *Funky Films*, 462 F.3d at 1077.  Plaintiff cannot

20   come close to making that showing.  In each case, Plaintiff either mischaracterizes the Screenplay

21   or Film, or ignores the total dissimilarity in how these fourteen ideas are expressed:

22         1.      **"a giant satellite world for the super-rich."** The Screenplay and Film both use

23   the common idea of a satellite world or space station, but the expression of these locations is very

24   different.  Plaintiff's Uberopolis is **not** exclusive to the "super-rich," as Paragraph 89 of the FAC

25   misstates.  To the contrary, everyone is invited to travel to Uberopolis, and there is constant shuttle

26   travel to Uberopolis for ordinary citizens of Earth.  (Screenplay at 3-4, 29.)  In *Elysium*, by

27   contrast, the space station truly **is** exclusive to the "super-rich."  Earth's population is barred from

28   visiting or moving to Elysium.  There is a stark racial divide between those on Earth and on

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1   Elysium.  And unlike in Plaintiff's Screenplay, where advanced medical care is equally available

2   on Earth, the med bays in the Film are exclusive to the citizens of Elysium.

3        Uberopolis and Elysium are also distinct physically.  The Screenplay describes Uberopolis

4   as "an ultra-modern city, replete with casinos, golf courses, towering apartments and offices."

5   (Screenplay at 26.)  Elysium, on the other hand, is a lushly landscaped, tropical paradise that is

6   predominated by residential mansions rather than casinos, towering apartments, and offices.

7        2.   **"a hero prone to excruciating headaches (which knock him to his knees)."**

8   This comparison mischaracterizes *Elysium*. The Screenplay's Arlo suffers from "ice pick"

9   headaches caused by a chronic condition.  (Screenplay at 22-23.)  The Film's Max does **not** suffer

10  headaches from a chronic condition.  Instead, he begins suffering seizures after downloading the

11  reboot sequence from Carlyle's brain.  (Film at 00:45-00:51.)  Although Arlo suffers a headache

12  and Max a seizure in the climactic scenes of the works, those scenes are not similar.  Arlo and

13  Drexler are fighting in a shuttle when Arlo suffers a headache and Drexler shoots him in the neck.

14  (Screenplay at 109-110.)  In the Film, Max's seizure allows Kruger time to catch up, but Max kills

15  Kruger in a fight .  (Film at 1:30-1:36.)  "These events might appear similar when described in the

16  abstract, but in context, they are exceedingly different."  *Bernal*, 788 F.Supp.2d at 1067.

17       3.   **"a villain who has been genetically reprogrammed to appear much younger**

18  **than he/she is."**  This attempted comparison of the Screenplay's Drexler and the Film's Delacourt

19  is misplaced.  The Screenplay contains one vague, unexplained reference to Drexler's "DNA

20  reprogramming."  (Screenplay at 90.)  Plaintiff does not describe anything like the med bays in the

21  Film that Delacourt and other citizens of Elysium use to prevent aging.

22       4.   **"advanced medicine found on the satellite world."**  This is another

23  mischaracterization.  In the Screenplay, the drug Drexlerin is **equally available** on Earth and on

24  Uberopolis.  (Screenplay at 35.)  In the Film, the so-called "advanced medicine" consists of med

25  bays, not drugs, and unlike in the Screenplay, these med bays are categorically unavailable to

26  Earth's population.

27       5.   **"a hero who must get to the satellite world for medicine (medical care)."**

28  This abstract idea is not expressed similarly in the Screenplay and the Film.  In Plaintiff's work,

Kinsella Weitzman Iser Kump & Aldisert LLP
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Tel 310.566.9800 • Fax 310.566.9850

Arlo is on a mission to save his daughter and must travel to Uberopolis merely because supplies of Drexlerin on Earth are exhausted.  In the Film, Max is dying from a fatal dose of radiation.  He must travel to Elysium because it is the only place that the necessary medical care is or ever would be available, and he travels there to save **himself** rather than to save a daughter.

6.    **"a 'plight of immigrant' theme."**  This generic theme is not expressed similarly in the two works.  The Screenplay references Arlo's family "repatriating" to the "State" to obtain better healthcare for Franny.  This is nothing like the illegal immigration that occurs in the Film, where people on Earth risk their lives on undocumented shuttles bound for Elysium to access the space station's med bays.

7.    **"a sick girl, who will die without the hero's action."**  This cliché idea is expressed differently in the parties' works.  In the Screenplay, Franny appears sparingly, has little or no dialogue, and is simply cured when Arlo returns home with Drexlerin.  The Film's Matilda, conversely, is intermixed in the drama.  She is kidnapped by Kruger, taken to Elysium, and successfully uses a med bay on the space station.  Moreover, unlike Franny, Matilda is critical to the protagonist's story arc.  She tells Max a parable about sacrifice when first meeting him (Film at 1:01-1:05), and she is the catalyst for Max's decision to sacrifice himself at the end of the Film.

8.    **"a hero who is poor, and needs I.D. and transport to a satellite world."**  This is a disingenuous comparison.  In the Screenplay, Arlo requires a fake ID in the nature of a driver's license because he is a fugitive on the run from authorities.  In the Film, Max needs an ID burned onto his arm so that the med bays on Elysium will recognize him as a citizen.

9.    **"an 'anguish of living without healthcare' theme."**  Both works confront the generic idea of inadequate healthcare, but differently.  In the Film, unlike in the Screenplay, the wealthy elite have exclusive access to med bays.  Those devices could be used to cure all sickness and disease on Earth, yet the planet's population is arbitrarily denied access.  This forces people on Earth who are ill to risk their lives by boarding the space station "illegally" to access the med bays.  There is nothing akin to this in the Screenplay.

10.    **"a disabled transporter who helps the hero."**  This is a severe abstraction of the incomparable roles played by Dylan and Spider in the Screenplay and Film, respectively.  In the

1   Screenplay, Dylan is Arlo's boss, and he plays a very minor role by setting Arlo up with a

2   "butterfly run" for Tamara.  In the Film, Spider is not Max's boss, and there are no "butterfly

3   runs."  Spider runs undocumented shuttles to Elysium, engages Max to kidnap Carlyle and

4   download data from his brain to help the cause, and spearheads the effort to reboot Elysium's

5   computers to make everyone a citizen of Elysium.  This bears no resemblance to the minor role

6   that Dylan plays in the Screenplay.

7          11.     **"an agent (sent by the villain to apprehend the hero) who accepts the**

8   **assignment after negotiating."**  This generalization of the Screenplay's Jerry and the Film's

9   Kruger obfuscates the vast differences between these characters and their roles.  Jerry investigates

10  Arlo for the alleged murder of Tamara Gwynn, discovers that he is innocent, helps Arlo expose

11  Drexler as a murderer and imposter, and saves Arlo from Drexler.  In the Film, Kruger does none

12  of these things.  Instead, he pursues Max to obtain the reboot sequence in his brain.  And instead

13  of rescuing Max, Kruger hunts him down trying to kill him.

14         12.     **"a keepsake necklace, carried by the hero, which factors into the stories'**

15  **conclusion."**  This is another tortured generalization of the works.  In the Screenplay, Benni, who

16  is interested romantically in Arlo, provides him a yellow butterfly dream catcher for good luck.

17  Although Arlo sees the dream catcher in Spike's eye during his dreamlike vision, its significance

18  to the work as a whole is negligible.  In the Film, the nun who raises Max provides him a locket

19  with a picture of Earth.  It is not a dream catcher, a good luck charm, or a sign of romantic interest.

20  It is a teaching tool to remind Max of the beauty around him.  The locket, moreover, plays into the

21  climax of the Film in a way that is unique to the Film and unrelated to the Screenplay.

22         13.     **"an overpopulated, impoverished Earth, where police vehicles loom in the sky**

23  **and brutalize the poor, ruled by a rich elite who live on the satellite world."**  This stock idea

24  of a futuristic Earth is not expressed similarly in the Screenplay and the Film.

25  Plaintiff's Screenplay describes that there is "100 percent employment" and "almost no crime" in

26  the "Global State" on Earth.  (Screenplay at 4.)  The city of Manhattan is portrayed like a typical

27  major city with apartment complexes, shopping malls, and subways.  (*Id.* at 33-34.)  Citizens drive

28  sky-cars, sky-cycles, and hover-jets.  (*Id.* at 19 (referencing "heavily trafficked 'skyways.'").)

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

In *Elysium*, by contrast, Earth has lost all vestiges of how it appears presently.  There are no malls, apartment complexes, or subways.  The population does not fly sky-cars. Earth's populace is heavily unemployed and extremely poor.  They live in shanty towns, with defunct skyscrapers smoldering in the background.  They are policed by an abusive robotic police force which has no counterpart in the Screenplay.  Apart from the highly generalized idea of Earth set in the future, there is no similarity here.

14.    **"a hero who threatens the villain with detonating an explosive device."**  Again, Plaintiff tries to create a false appearance of similarity through abstraction.  In the Screenplay, Arlo threatens that he will use the A-Cell to blow up Uberopolis if Drexler refuses to meet.  In the Film, Max threatens that he will blow up Kruger's shuttle if Kruger or his men try to harm him. The only similarity between these two scenes is the stock idea of using an explosive as leverage.

In sum, **none** of the fourteen "plot features" listed in Paragraph 46 of the FAC are expressed similarly by these two works.  Plaintiff is relying on "highly unfair **characterizations** of material in the [Screenplay] and the [Film] to create highly strained purported 'similarities.'" *Quirk*, 2013 WL 1345075 *9 (disregarding plaintiff's "35 pages of alleged substantial similarities"); *see also Bernal*, 788 F.Supp.2d at 1065 (noting that plaintiff's "many pages of plot comparisons . . . are often based on mischaracterizations").  The "two stories' plots are similar only at a level of abstraction that is barely meaningful, if at all."  *Bissoon-Dath*, 694 F.Supp.2d at 1082, 1091.  When the slightest detail is added to Plaintiff's fourteen "plot features," any illusion of similarity evaporates.

The same is true of the other claimed similarities that Plaintiff lists in the FAC under the headings "secondary scene infringement" and "minor script infringement."  (FAC ¶¶ 152-164, 184-199.)  In this portion of the FAC, Plaintiff offers an "abstract list of random similarities" that are insignificant to the works.  *Bernal*, 788 F.Supp.2d at 1067.  For example, he compares scenes in which Arlo/Max frees a friend from a seat they are strapped in (FAC ¶¶ 155-156), in which Jerry/Frey "negotiate" to obtain medical care for their children (FAC ¶¶ 157-158); and in which an assassin kills a friend of Arlo/Max (FAC ¶¶ 186-187).  These are "unprotectable stock elements or *scenes-a-faire* that are scattered throughout the works" and are not **expressed** similarly.  *Gable*,

Kinsella Weitzman Iser Kump & Aldisert llp
808 Wilshire Boulevard, 3ʳᴰ Floor
Santa Monica, California 90401
Tel 310.566.9800 • Fax 310.566.9850

727 F.Supp.2d at 841 (disregarding "random similarities that have no qualitative significance to the works"); *see also Doody v. Penguin Group (USA) Inc.*, 673 F.Supp.2d 1144, 1158 (D. Haw. 2009) (disregarding "numerous insignificant details found in both works" which were "at most coincidences in minute non-protected details that the court cannot consider in its analysis").

### 2.   The Settings are not Similar.

Like the plots of the Screenplay and the Film, the settings of these two works are not similar except at the most abstract level.  Plaintiff alleges that "the two central settings of [the Film] infringe on the two central settings of the [Screenplay]"—a "giant satellite world for the rich" and "dystopian Earth."  (FAC ¶¶ 87-100.)  Both of these settings are common in science fiction works.  (Rovin Report at 8-45.)  They are unprotected, therefore, and not relevant in determining striking or substantial similarity.  *See Bernal*, 788 F.Supp.2d at 1071 ("A generic suburban neighborhood is not a copyrightable expression.").

To support an inference of striking/substantial similarity, Plaintiff must show that the two works **express** these settings similarly.  For the reasons described above, they do not.  (*See supra* pp. 15, 18.)  The Screenplay and Film share nothing more than the generic ideas of a futuristic Earth and a space station.  *Cf. Funky Films*, 462 F.3d at 1080 ("Although both works take place in a contemporary, family-run funeral home, the similarities in setting end there.").

### 3.   The Dialogue is not Similar.

"To support a claim of substantial similarity based on dialogue, the plaintiff must demonstrate 'extended similarity of dialogue.'"  *Bernal*, 788 F.Supp.2d at 1072 (citation omitted). Here, Plaintiff cites no such similarities, and there are no similarities between the dialogue of *Butterfly Driver* and *Elysium* except to the extent that the works may contain "[o]rdinary phrases" which "are not entitled to copyright protection."  *Narell v. Freeman*, 872 F.2d 907, 911 (9th Cir. 1989) (disregarding similarities in "commonly-used expressions").

### 4.   The Characters are not Similar.

All of Plaintiff's character comparisons focus on abstract, unprotected traits.  **None** of the characters are similar at the level of protectable expression.  Plaintiff contends that the protagonists from the Screenplay and Film, Arlo and Max, are similar (FAC ¶¶ 51-57), but

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

"[a]gain, through the use of abstraction, Plaintiff obscures the radical differences between the two characters." *Wild*, 788 F.Supp.2d at 1107.  Arlo is a war hero and hover-craft pilot who flies supplies in Zones outside the "Global State."  He is a married father of two who goes on a selfless mission to save his daughter and succeeds.  Max is none of these things.  He is an orphan, raised in a convent, who grows up into a petty criminal.  He is unmarried, has no kids, and works at Armadyne fabricating robotic police officers.  Unlike Arlo, Max is on a self-centered mission to save his own life at the expense of the lives of others.  Arlo and Max are similar only in that they occupy the role of a male protagonist.  *See Funky Films*, [cite] ("The 'prodigal son' characters of the two works, while similar at the abstract level, are markedly different in the two scripts.").

The FAC compares the Screenplay's Drexler and the Film's Delacourt (FAC ¶¶ 75-78), but they are not similar.  Drexler is male, an ex-soldier, a former acquaintance of Arlo's, and an imposter who murdered the real Drexler and his family and stole Drexler's identity.  Drexler is President of the Global State and owner of Uberopolis, which he built with Drexler's inheritance.  Delacourt is female, has no prior relationship with Max, and holds no position on Earth.  She does not own Elysium but is instead staging a coup to take over its presidency.  Drexler and Delacourt are ruthless authorities, but the similarities end there.  *See Wild*, 788 F.Supp.2d at 1108 ("These are stock characters of the type one would expect to find in [plaintiff's work].").

Plaintiff compares the Screenplay's Franny (Arlo's daughter) and Matty (Jerry's son) with Matilda from the Film.  (FAC ¶¶ 79-86, 179-182.)  The only similarity between these characters is that they are sick children.  That is not a protectable characteristic.  *See Kouf*, 16 F.3d at 1046 (holding that "the genius kid with thick-rimmed glasses . . . is not distinctive enough to be a protectible character"); *Rice*, 330 F.3d at 1175 (holding that "characters are ordinarily not afforded copyright protection" unless they are "especially distinctive").

Plaintiff alleges that the Film's Frey is a "hybrid" of the Screenplay's Rianna (Arlo's wife) and Benni.  (FAC ¶ 165.)  Calling Frey a "hybrid" of two characters tacitly admits that she is substantially similar to **neither** of them.  And in fact, Frey and Rianna have no similarities except for the unprotected generic characteristic that they each have a young daughter who is ill.  *See Bernal*, 788 F.Supp.2d at 1069 (holding that leads "Michael and David have little in common

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1   other than that they both have mysterious pasts have involve a dead woman").  Also, in contrast to

2   Rianna, who appears sparingly in the Screenplay and does not drive the story, Frey is a critical

3   character whose friendship with Max is the catalyst for his decision to sacrifice his own life.  *See*

4   *Funky Films*, 462 F.3d at 1079 (distinguishing between two young female characters on the basis

5   that one "is a very minor character" while the other "is a central character").

6          Frey and Benni are even less similar.  Benni is a mercenary who guards a warehouse with

7   her brother Louis.  She helps Arlo obtain a fake ID to travel to Uberopolis and gives him a yellow

8   butterfly "dream catcher" for luck.  Benni has nothing in common with Frey except they have a

9   vague romantic interest in the male protagonist.  *Id.* at 1079 (finding "little in common" between

10  female characters "both of whom are romantically involved with the older brother in each story").

11         Plaintiff compares the Screenplay's Jerry to the Film's Kruger on the basis that they are

12  both agents who pursue the protagonist.  (FAC ¶¶ 170-175.)  The comparison is "emblematic of

13  how tortured the attempt to find substantial similarity between the works becomes."  *Quirk*, 2013

14  WL 1345075 *9.  Those characters could not be more **dissimilar**.  Jerry is a law-abiding federal

15  officer and one-time acquaintance of Arlo who rescues Arlo after discovering that he is innocent.

16  Kruger is a rabid murderer who kills everyone in his path in his quest to take over control of

17  Elysium, and who is dogged in his efforts to kill (not rescue) Max.

18         Plaintiff compares the Screenplay's Dylan to the Film's Spider.  (FAC ¶¶ 176-178.)  Dylan

19  is a minor character in Plaintiff's Screenplay with virtually no relevance to the story, whereas

20  Spider is a central character.  Their actions in the two works are not similar.  (*See supra* p. 17.)

21  The fact that one is "missing an arm" and the other has "a paralyzed leg" (FAC ¶¶ 176-178) does

22  not make them similar.  *Cf. Idema*, 162 F.Supp.2d at 1186 ("[T]o the extent that the two characters

23  are similar, it is only with respect to traits that are so generalized and/or cliché as to be nearly

24  *scenes a faire* . . . .").

25         In addition to the differences in the main characters of *Butterfly Driver* and *Elysium*,

26  "[t]here are a number of important characters in the Film and the Screenplay who have no obvious

27  parallel in the other work."  *Benay*, 607 F.3d at 627.  Tamara plays an important role in Plaintiff's

28  Screenplay and has no possible counterpart.  Several key characters from *Elysium* including the

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1   nun who raised Max, Carlyle, President Patel, and the robot police force also have no "obvious

2   parallel" in *Butterfly Driver*.

### 5.    The Themes are not Similar.

4        *Elysium* overtly explores themes of current relevance in the United States and in

5   Blomkamp's native South Africa, including racial segregation, universal health care, and class

6   inequality.  **None** of these themes are present in *Butterfly Driver*.  Racial distinctions are omitted

7   from the Screenplay.  (FAC ¶ 139.)  Medical treatment is equally available on Earth and

8   Uberopolis, and so no theme of universal health care is evident.  The Screenplay does not portray

9   class inequality in the same way as the Film: although some wealth is presumably necessary to

10  live on Uberopolis, there are no limits on who can travel or live there.

11       *Elysium* also explores the idea of self-sacrifice for the greater good which is missing from

12  *Butterfly Driver*.  Plaintiff's protagonist does not face the dilemma that he must die for others to

13  live, and he never sacrificially changes his mission like the Film's Max.

14       Plaintiff alleges that his Screenplay and the Film share the themes of the "plight of

15  immigrants" and the "anguish of living without healthcare."  (FAC ¶ 46.)  But there is no

16  similarity in how these common themes are expressed.  (*See supra* pp. 16-17.)

### 6.    The Mood / Pace are not Similar.

18       The mood and pace of *Butterfly Driver* and *Elysium* are stock in science fiction and

19  action/adventure works.  To the extent they are similar, therefore, they are *scenes a fair* which

20  "merge" with the idea of this type of work and are not indicative of striking or substantial

21  similarities.  *See Rice*, 330 F.3d at 1177 (holding that "an overall mood of secrecy and mystery" is

22  "generic, constitute[s] *scenes a fair*, and merge[s] with the idea of [a show about] revealing magic

23  tricks"); *Zella v. E.W. Scripps Co.*, 529 F.Supp.2d 1124, 1136 (C.D. Cal. 2007) (granting motion

24  to dismiss and holding that the "upbeat mood flowing from a cooking/talk show . . . is merely

25  another example of *scenes a fair* and merger, common to all cooking/talk shows.").

### C.    The Parties' Works Share Nothing More Than "Stock," Cliché Ideas.

27       Plaintiff cannot establish infringement by showing that a handful of abstract concepts can

28  be found in both *Butterfly Driver* and *Elysium*.  Ideas are not just unprotected; copyright law

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1    actually "**encourages** others to build freely upon the ideas and information conveyed by a work."

2    *Feist Publications, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 350 (1991) (emphasis added).

3         Nevertheless, the evidence here rebuts any notion that *Elysium* was inspired by *Butterfly*

4    *Driver*.  The accompany Declaration and Report of defense expert Jeff Rovin (attached as Ex. 3)

5    demonstrate that if these works share any ideas at all, it is a mere coincidence resulting from the

6    fact that those ideas are extraordinarily common in science fiction and action/adventure works.

7         Rovin has decades of experience as a writer, publisher, and editor of science fiction works.

8    (Ex. 3 at 3, App. 2.)  He has been accepted as an expert in high profile copyright infringement

9    cases.  *See Gable*, 727 F.Supp.2d at 837 (listing Rovin's qualifications and holding that "Rovin

10   has significant knowledge and experience in the literary field to render an opinion on whether the

11   expressive elements of *Karma!* and *Earl* are substantially similar").  Rovin's encyclopedic

12   knowledge of science fiction dating back decades makes him uniquely qualified for the task at

13   hand: his Report analyzes and shows that the generalized ideas that Plaintiff alleges were

14   misappropriated are in fact stock, unprotectable ideas that are replete throughout prior works.

15        The settings which Plaintiff alleges were taken from his Screenplay are common to the

16   point of being cliché.  Rovin provides several examples showing that a "dystopic future is an

17   exceedingly common theme in the prior art."  (Ex. 3 at 8-16.)  Plaintiff's particular expression of a

18   futuristic Earth, with hover-craft and flying cars, is highly derivative of prior science fiction

19   classics like *Blade Runner*.  (*Id.* at 17-21.)  Likewise, the idea of a space station serving as a

20   refuge for the wealthy is common in past works.  (*Id.* at 21-45.)

21        The key "plot features" that Plaintiff alleges were misappropriated are also stock.  The idea

22   that special identification would be needed to board a space station is commonplace.  (*Id.* at 46-

23   51.)  The existence of advanced medicine found on a space station is common in prior works.  (*Id.*

24   at 51-58.)  The ideas of a protagonist who suffers headaches and wears a necklace of some sort

25   can be found in past works.  (*Id.* at 63-70.)  Other plot ideas that Rovin does not address, including

26   a sick girl who will die without medical care and a hero who threatens to detonate an explosive,

27   are "so common as to require little comment."  *Wild*, 788 F.Supp.2d at 1103 (disregarding idea of

28   "a murder suspect or some other character being chased by an angry mob").

1    These generalized ideas, which are common throughout science fiction, are in the public

2    domain and cannot be the basis for an infringement claim.  *See, e.g.*, *Bernal*, 788 F.Supp.2d at

3    1065 (holding that a "dead narrator" was not a protectable element because it occurred in prior

4    films like *Sunset Boulevard* and *American Beauty*); *Wild*, 788 F.Supp.2d at 1099-1100 (holding

5    that elements common in past works including Ray Bradbury's *Something Wicked This Way*

6    *Comes*, the *Harry Potter* series, and *Star Trek* were unoriginal and unprotectable); *Gable*, 727

7    F.Supp.2d at 842 (holding that the "visual effect of a piece of paper magically floating back to

8    someone is not a protectable expression" because the "effect is commonly used").

9    The fact that the settings and plot ideas Plaintiff cites have been recycled in science fiction

10   literature and film for years underscores why copyright law must and does ignore such generalized

11   similarities.  The same process by which Plaintiff strips the Screenplay and Film of expressive

12   details and focuses on a misleading abstraction of the works could be employed to make **any** film

13   appear similar to a previous work—including Plaintiff's own Screenplay.  (*See* Ex. 3 at 73-77.)

14   Setting aside stock settings and ideas, and focusing only on expressive details, there is not

15   one scene, one plot point, one character, or one line of dialogue from *Butterfly Driver* that can be

16   found in *Elysium*.  These works are not similar at all, let alone strikingly similar, and Plaintiff's

17   claim for copyright infringement fails as a matter of law.

18   V.   **CONCLUSION**

19   For all the reasons set forth above, Defendants respectfully request that their Motion for

20   Summary Judgment be granted in its entirety, and that Judgment be entered in their favor.

21   DATED: July 30, 2014          Respectfully submitted,

22                                 KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP

23

24                                 By:  _____/s/ Michael J. Kump_____

25                                      Michael J. Kump
                                        Attorneys for Defendants

26                                      NEILL BLOMKAMP, SONY PICTURES
                                        ENTERTAINMENT INC., TRISTAR PICTURES,

27                                      INC., MEDIA RIGHTS CAPITAL II, L.P., and QED
                                        INTERNATIONAL, LLC

28   10021.00015/217607

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850