1  KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
   MICHAEL J. KUMP (SBN 100983)
2    mkump@kwikalaw.com
   GREGORY P. KORN (SBN 205306)
3    gkorn@kwikalaw.com
   808 Wilshire Boulevard, 3rd Floor
4  Santa Monica, California 90401
   Telephone: 310.566.9800
5  Facsimile: 310.566.9850

6  Attorneys for Defendants
   NEILL BLOMKAMP, SONY PICTURES
7  ENTERTAINMENT INC., TRISTAR
   PICTURES, INC., MEDIA RIGHTS CAPITAL
8  II, L.P., and QED INTERNATIONAL, LLC

9

10                **UNITED STATES DISTRICT COURT**

11          **NORTHERN DISTRICT OF CALIFORNIA (OAKLAND)**

12

13  STEVE WILSON BRIGGS,                    Case No. CV 13-4679-PJH

14          Plaintiff,                      **DEFENDANTS' OPPOSITION TO
                                            PLAINTIFF'S MOTION FOR SUMMARY
15          vs.                             JUDGMENT; MEMORANDUM OF
                                            POINTS AND AUTHORITIES IN
16  NEILL BLOMKAMP; SONY PICTURES           SUPPORT THEREOF**
    ENT., INC., TRISTAR PICTURES, INC.,
17  MEDIA RIGHTS CAPITAL, and QED           Date:     September 3, 2014
    INTERNATIONAL,                          Time:     9:00 a.m.
18                                          Crtrm.:   3
            Defendants.
19

20

21

22

23

24

25

26

27

28

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

1

## TABLE OF CONTENTS

2

Page

3    I.    INTRODUCTION ............................................................................ 1

4    II.   STATEMENT OF UNDISPUTED FACTS ........................................ 2

5          A.    *Butterfly Driver* And *Elysium* Are Dissimilar Works. ................ 2

6          B.    Defendant Neill Blomkamp Wrote *Elysium* Independently. ..................... 3

7    III.  LEGAL STANDARDS ..................................................................... 3

8          A.    Legal Standard For Infringement. ............................................. 3

9          B.    Legal Standard For Summary Judgment. ..................................... 5

10   IV.   PLAINTIFF'S MOTION IS PROCEDURALLY DEFICIENT ......................... 5

11   V.    *ELYSIUM* DOES NOT INFRINGE THE SCREENPLAY AS A MATTER OF
           LAW ............................................................................................ 6

12

13         A.    The Lack Of Evidence Of Access Compels Plaintiff To Prove "Striking
                 Similarity" Between His Screenplay And The Film. ......................... 6

14         B.    Plaintiff Can Establish Neither Striking Nor Substantial Similarity. ................ 7

15               1.    The Plots and Sequences of Events are not Similar. ................... 8

16               2.    Plaintiff's Argument that the Film Infringes the Screenplay's "Plot
                       Structures" Improperly Analyzes the Works Abstractly. ............ 10

17

18               3.    The Works' Settings are not Similar. .................................... 22

19               4.    The Dialogue is not Similar. .............................................. 23

20               5.    The Characters are not Similar. .......................................... 23

21               6.    The Themes are not Similar. .............................................. 24

22               7.    The Mood / Pace is not Similar. .......................................... 25

23   VI.   CONCLUSION ............................................................................. 25

24

25

26

27

28

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1

# TABLE OF AUTHORITIES

2

**Page**

3

## FEDERAL CASES

4

*Art Attacks Ink, LLC v. MGA Entertainment Inc.*
 581 F.3d 1138 (9th Cir. 2009)......................................................................... 6, 7

5

6

*Benay v. Warner Bros. Entertainment, Inc.*
 607 F.3d 620 (9th Cir. 2010)................................................. 4, 9, 11, 24

7

*Berkic v. Crichton*
 761 F.2d 1289 (9th Cir. 1985).............................................. 4, 8, 9, 11

8

*Bernal v. Paradigm Talent & Literary Agency*
 788 F.Supp.2d 1043 (C.D. Cal. 2010) ........................................... passim

9

10

*C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*
 213 F.3d 474 (9th Cir. 2000).................................................................. 5

11

*Cavalier v. Random House*
 297 F.3d 815 (9th Cir. 2002)................................................................. 4, 9

12

13

*Feist Publications, Inc. v. Rural Tel. Serv. Co., Inc.*
 499 U.S. 340, 345 (1991) ....................................................................... 8

14

*Funky Films, Inc. v. Time Warner Entm't Co., L.P.*
 462 F.3d 1072 (9th Cir. 2006)........................................................ passim

15

16

*Gable v. National Broadcasting Co.*
 727 F.Supp.2d 815 (C.D. Cal. 2010) ............................................ 8, 9, 14

17

*Goldberg v. Cameron*
 787 F.Supp.2d 1013 (N.D. Cal. 2011) .................................................. 9

18

19

*Greer v. Lockheed Martin Corp.*
 855 F. Supp. 2d 979 (N.D. Cal. 2012) ................................................... 5

20

*Idema v. Dreamworks, Inc.*
 162 F.Supp.2d 1129 (C.D. Cal. 2001)...................................... 10, 11, 15

21

22

*Jorgensen v. Epic/Sony Records*
 351 F.3d 46 2d Cir. 2003) ..................................................................... 6

23

*Kouf v. Walt Disney Pictures & Television*
 16 F.3d 1042 (9th Cir. 1994)............................................................. 4, 16

24

25

*Muller v. Twentieth Century Fox Film Corp.*
 794 F.Supp.2d 429 (S.D.N.Y. 2011) ..................................................... 9

26

*Narell v. Freeman*
 872 F.2d 907 (9th Cir. 1989)................................................................. 23

27

28

Kinsella Weitzman Iser Kump & Aldisert LLP
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Tel 310.566.9800 • Fax 310.566.9850

*Quirk v. Sony Pictures Entertainment Inc.*
   2013 WL 1345075 *6 (N.D. Cal. Apr. 2, 2013) ........................................................ passim

*Rice v. Fox Broadcasting Co.*
   330 F.3d 1170 (9th Cir. 2003)...................................................................... 4, 16, 25

*Stewart v. Wachowski*
   574 F.Supp.2d 1074 (C.D. Cal. 2005) ............................................................... 7

*Three Boys Music Corp. v. Bolton*
   212 F.3d 477 (9th Cir. 2000)............................................................................ 6, 7

*Wady v. Provident Life & Accident Ins.*
   216 F.Supp.2d 1060 (C.D. Cal. 2002)............................................................... 5

*Wild v. NBC Universal, Inc.*
   788 F.Supp.2d 1083 (C.D. Cal. 2011).......................................................... passim

*Zella v. E.W. Scripps Co.*
   529 F.Supp.2d 1124 (C.D. Cal. 2007) ............................................................ 25

## **STATUTES**

Fed. R. Civ. P. 56(a) ....................................................................................... 5

Fed. R. Evid. 901(a) ....................................................................................... 5

## **TREATISES**

4 Melville B. Nimmer & David Nimmer,
   NIMMER ON COPYRIGHT § 13.02[B] (2005) ................................................. 7

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

1

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

2

## I.    <u>INTRODUCTION</u>

3    Defendants and Plaintiff Steve Wilson Briggs have each filed motions for summary

4    judgment on Plaintiff's claim for copyright infringement, which requires proof of (i) access to

5    Plaintiff's *Butterfly Driver* ("Screenplay") and (ii) substantial similarity between the Screenplay

6    and the motion picture *Elysium* ("Film").  (Dkt. No. 64 ("Defs.' Mot.") [1]  Plaintiff's Motion is

7    procedurally deficient and can be denied on those bases alone.  (*See infra* pp. 5-6.)  Furthermore,

8    Plaintiff has failed to meet his burden of proof on summary judgment; he produces no evidence of

9    access, which means he must prove the two works are "strikingly similar."  Plaintiff has not and

10    cannot make such a showing because, as demonstrated below, the Screenplay and the Film are not

11    at all similar when examined under the extensive copyright case law of the Ninth Circuit.

12    The contrast between Plaintiff's and Defendants' approaches in moving for summary

13    judgment is telling.  As Ninth Circuit case law requires, Defendants focused on the concrete

14    expression in the Screenplay and Film in comparing and contrasting the two works.  To do so,

15    Defendants submitted the Screenplay and Film, and provided more than four pages of synopses of

16    the two works.  (Defs.' Mot. pp. 3-7.)  Although a literal scene-by-scene description was not

17    possible given page constraints, Defendants' synopses described the **specific** scenes and events

18    that occur in the Screenplay and the Film.  (*Id.*)

19    In contrast, Plaintiff fails to provide an unvarnished description of *Butterfly Driver* and

20    *Elysium* in his Motion.  Nowhere in the Motion does Plaintiff describe the **actual** scenes of the

21    Screenplay or the Film.  Instead, Plaintiff takes the same improper, ill-fated approach that is

22    criticized throughout copyright jurisprudence in this Circuit—i.e., rather than describe the

23    Screenplay and Film faithfully, he mischaracterizes the works with abstractions that are intended

24    to create the illusion of similarity.  For example, Plaintiff takes two characters and their story lines

25    which bear no resemblance whatsoever in the works themselves, but claims to find a "similarity"

26    _____

27    [1]    Neither party has requested a jury trial.

28

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1  because they are each a "disabled transporter who will help the hero's emigration plan." (Mot. at

2  11.) In another example, he takes two characters who are polar opposites—the first, a peaceful,

3  law-abiding officer who helps the Screenplay's protagonist; the second, a crazed murderer who is

4  unceasing in his efforts to kill the Film's protagonist—and argues that they are similar because

5  they are "agents" who were "sent by the villain to apprehend the hero." (*Id*.)

6       Plaintiff contravenes Ninth Circuit law by comparing the works at the highest level of

7  abstraction. The vague, abstract plot ideas on which Plaintiff focuses are not copyrightable and

8  are disregarded in assessing similarity. The test for similarity focuses exclusively on the

9  "concrete" elements in the works that are protectable. Were the law otherwise, **every** feature film

10  could be manipulated, as Plaintiff has done here, to support a claim of copying. No film would be

11  safe under this approach, including Plaintiff's own Screenplay, which is highly derivative—and

12  lawfully so—of prior science fiction films like *Blade Runner* and *Total Recall*.

13       As demonstrated below and in Defendants' Motion for Summary Judgment, there is **not**

14  **one scene**, **one line of dialogue**, or **one specific plot point** from Plaintiff's Screenplay that can be

15  found in the Film. The works have **no** similarities at the level of protectable expression and

16  certainly not the striking similarities that Plaintiff must prove to prevail.

17       For the reasons discussed further below, Plaintiff's Motion for Summary Judgment should

18  be denied, and summary judgment should be granted in Defendants' favor.

19  **II.**    **STATEMENT OF UNDISPUTED FACTS**

20      **A.**    ***Butterfly Driver* And *Elysium* Are Dissimilar Works.**

21       Plaintiff attached a copy of his Screenplay as Exhibit A to the Motion. Plaintiff, however,

22  did not submit the Film, but instead relied upon an unauthenticated copy of what is claimed to be a

23  screenplay for *Elysium* attached as Exhibit B to the Motion. Defendants filed a DVD copy of

24  *Elysium* with their Motion, which is incorporated by reference. (Dkt. No. 70.) To avoid

25  redundancy, Defendants also incorporate by reference the detailed synopses of *Butterfly Driver*

26  and *Elysium* from their Motion for Summary Judgment. (Defs.' Mot. pp. 3-7.)

27       As discussed below, *Elysium* was independently written by Defendant Neill Blomkamp

28  without access to Plaintiff's Screenplay, and the two works are nothing alike.

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

**B.   Defendant Neill Blomkamp Wrote _Elysium_ Independently.**

Plaintiff's Motion presents no evidence of access.  Plaintiff states that he posted his Screenplay on a website called triggerstreet.com from "February to August of 2007."  (Mot. at 6:8.)  The Motion states that "Trigger Street is the ONLY place the Plaintiff ever posted his complete script."  (_Id._ at 6:11.)  The Motion argues that "TriggerStreet.com is where the Defendants had access to the Plaintiff's script."  (_Id._ at 6:12.)  But Plaintiff provides **no evidence** supporting these allegations.  He bases his claim of access on wild speculation that Blomkamp "would have been drawn to Trigger Street" in 2007 to find ideas for a film.  (Mot. at 6.)

The Declaration of Neill Blomkamp filed in support of Defendants' Motion for Summary Judgment, which is incorporated by reference, dispels this conjecture.  (Dkt. No. 65 ("Blomkamp Decl.").)  Blomkamp's Declaration is uncontroverted that he had not heard of triggerstreet.com before this suit was filed; he did not obtain Plaintiff's Screenplay on triggerstreet.com or from any other source; and no one ever discussed the Screenplay with him.  (_Id._ ¶ 8.)

Blomkamp's Declaration explains the **actual** genesis for the settings, story, and characters in _Elysium_.  The South African writer/director first developed the visual concepts for the Film.  (Blomkamp Decl., ¶ 5.)  During this process, he reviewed images of several space stations, some of which were in the shape of a circular "torus" like the space station featured in _Elysium_.  (_Id._)  Those images inspired the Film's utopian space station.  (_Id._)  The plot for _Elysium_ followed from that idea and from some of the themes that Blomkamp wanted to explore like racial and class segregation, which are also evident in his previous hit film, _District 9_.  (_Id._ ¶ 6.)

**III.   LEGAL STANDARDS**

**A.   Legal Standard For Infringement.**

"A plaintiff bringing a claim for copyright infringement must demonstrate '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" _Funky Films, Inc. v. Time Warner Entm't Co., L.P._, 462 F.3d 1072, 1076 (9th Cir. 2006) (citation omitted).  Absent evidence of direct copying, the plaintiff must demonstrate (1) that the defendant had "access" to the plaintiff's work and (2) that the two works are substantially similar.  _Id._

1   "To determine whether two works are substantially similar, a two-part analysis—an

2   extrinsic test and an intrinsic test—is applied."  *Rice v. Fox Broadcasting Co.*, 330 F.3d 1170,

3   1174 (9th Cir. 2003).  Only the extrinsic test is applied at the summary judgment stage.

4   *Funky Films*, 462 F.3d at 1077.

5   "The extrinsic test focuses on 'articulable similarities between the plot, themes, dialogue,

6   mood, setting, pace, characters, and sequence of events' in the two works."  *Id.*, quoting *Kouf v.*

7   *Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994).  In applying the extrinsic

8   test, courts must "take care to inquire only whether 'the **protectable elements, standing alone**,

9   are substantially similar.'"  *Id.*, quoting *Cavalier v. Random House*, 297 F.3d 815, 822 (9th Cir.

10  2002) (emphasis in original); *see also Rice*, 330 F.3d at 1174 (holding that courts "must

11  distinguish between the protectable and unprotectable material because a party claiming

12  infringement may place 'no reliance upon any similarity in expression resulting from

13  unprotectable elements.'") (citation omitted).  In other words, courts "filter out and disregard the

14  non-protectable elements in making [a] substantial similarity determination."  *Funky Films*, 462

15  F.3d at 1077, quoting *Cavalier*, 297 F.3d at 822.

16  Because unprotected elements are irrelevant, it is "not the basic plot ideas for stories, but

17  the actual concrete elements that make up the total sequence of events and the relationships

18  between the major characters" that must be compared.  *Funky Films*, 462 F.3d at 1077, quoting

19  *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985).  Similarities in general plot ideas are not

20  probative of infringement.  *Id.* at 1081; *see also Benay v. Warner Bros. Entertainment, Inc.*, 607

21  F.3d 620, 625 (9th Cir. 2010) ("In applying the extrinsic test, we look 'beyond the vague

22  abstracted idea of a general plot.'") (citation omitted).  Likewise, *scenes a faire* that "flow

23  naturally from generic plot-lines" are unprotected and therefore ignored under the extrinsic test.

24  *Funky Films*, 462 F.3d at 1077.

25  Contrary to Plaintiff's suggestion, the burden of establishing substantial similarity of

26  protectable elements is not relaxed on the basis that the Screenplay is "entirely imaginative; owing

27  nothing to fact, history, or the public domain."  (Mot. at 24.)  Plaintiff cites no case law supporting

28  the proposition that "entirely imaginative" works receive greater protection than other works.

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1   Further, as discussed throughout this Opposition, *Butterfly Driver* is anything but "entirely

2   imaginative."  The Screenplay is heavily derivative of prior science fiction.  (*See infra* pp. 10

3   *et seq.*)

4        **B.    Legal Standard For Summary Judgment.**

5        "The court shall grant summary judgment if the movant shows that there is no genuine

6   dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

7   Civ. P. 56(a).  "Where the party moving for summary judgment would bear the burden of proof at

8   trial, that party bears the initial burden of producing evidence that would entitle it to a directed

9   verdict if uncontroverted at trial."  *Greer v. Lockheed Martin Corp.*, 855 F. Supp. 2d 979, 984

10  (N.D. Cal. 2012), citing *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480

11  (9th Cir. 2000).

12  **IV.    PLAINTIFF'S MOTION IS PROCEDURALLY DEFICIENT**

13       Because of three technical deficiencies, Plaintiff fails to carry his burden of producing

14  evidence entitling him to a directed verdict.  **First**, the Motion relies **exclusively** on a purported

15  copy of the screenplay for *Elysium* printed off the Internet.  (Dkt. No. 75.)  Plaintiff has no basis to

16  authenticate that document as a genuine copy of the screenplay for *Elysium*.  *See* Fed. R. Evid.

17  901(a); *Wady v. Provident Life & Accident Ins.*, 216 F.Supp.2d 1060, 1064 (C.D. Cal. 2002)

18  (refusing to consider documents printed from website where the proponent "has no personal

19  knowledge of who maintains the website, who authored the documents, or the accuracy of their

20  contents").  Plaintiff's Motion cannot be granted when the accused work is not authenticated.

21       **Second**, Plaintiff's burden is **not** to prove that a purported underlying screenplay for

22  *Elysium* infringes his work, but to prove that the **film version** of *Elysium* released to the public is

23  infringing.  *See Quirk v. Sony Pictures Entertainment Inc.*, 2013 WL 1345075 *6 (N.D. Cal. Apr.

24  2, 2013) ("[E]ven assuming the preliminary drafts of *Premium Rush* scripts would be admissible

25  to show access, and that they include indications of copying that was later deleted or revised, the

26  only relevant question at this juncture is whether the final movie as filmed, edited, and released

27  contains matter substantially similar to protectable elements of Quirk's novel.")  Plaintiff cannot

28  carry that burden by submitting an unauthenticated screenplay for the Film, **especially given that**

Kinsella Weitzman Iser Kump & Aldisert llp
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Tel 310.566.9800 • Fax 310.566.9850

1    **the Film departs substantially from the document Plaintiff submitted**.

2       **Third**, Plaintiff presents no evidence demonstrating that each named Defendant is

3    responsible for the alleged infringement.[2]  Each of these deficiencies is fatal to Plaintiff's Motion.

4    **V.    _ELYSIUM_ DOES NOT INFRINGE THE SCREENPLAY AS A MATTER OF LAW**

5       In addition to the procedural deficiencies described in the preceding section, Plaintiff fails

6    to carry his burden to prove that the Film is sufficiently similar to his Screenplay to infringe the

7    copyrights therein.  As discussed below, the lack of evidence of access in this case compels

8    Plaintiff to prove such "striking" similarities between _Butterfly Driver_ and _Elysium_ that it is

9    inconceivable Blomkamp wrote the Film without copying his work.  Plaintiff does not and cannot

10   come close to meeting that heavy burden.

11      **A.    The Lack Of Evidence Of Access Compels Plaintiff To Prove "Striking"**

12           **Similarity" Between His Screenplay And The Film.**

13      To support an inference of infringement, Plaintiff must first prove access.  _Funky Films_,

14   462 F.3d at 1076.  "To prove access, Plaintiff must show that Defendants had a 'reasonable

15   opportunity' or 'reasonable possibility' of viewing Plaintiff's work prior to the creation of the

16   infringing work."  _Bernal v. Paradigm Talent & Literary Agency_, 788 F.Supp.2d 1043, 1053 (C.D.

17   Cal. 2010), citing _Three Boys Music Corp. v. Bolton_, 212 F.3d 477, 482 (9th Cir. 2000).

18   "**Reasonable access requires more than a 'bare possibility,' and 'may not be inferred**

19   **through mere speculation or conjecture**.'"  _Id._, quoting _Three Boys Music_, 212 F.3d at 482

20   (emphasis added).  "In order to support a claim of access, a plaintiff must offer 'significant,

21   affirmative and probative evidence.'"  _Bernal_, 788 F.Supp.2d at 1054, quoting _Jorgensen v._

22   _Epic/Sony Records_, 351 F.3d 46, 51 (2d Cir. 2003) (affirming summary judgment on access where

23   plaintiff produced "no reasonable documentation that he actually mailed" the copyrighted work to

24   defendants); _see Art Attacks Ink, LLC v. MGA Entertainment Inc._, 581 F.3d 1138 (9th Cir. 2009)

25   ──────────────

26      [2]   In opposing Plaintiff's motion to file a further amended complaint, Defendants
     represented that they were not seeking summary judgment on the basis that Plaintiff had named
27   the wrong defendants.  Of course, Defendants never suggested that it was relieving Plaintiff of this
     burden to the extent that he affirmatively seeks summary judgment in his favor.

28

Kinsella Weitzman Iser Kump & Aldisert llp
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Tel 310.566.9800 • Fax 310.566.9850

1  (holding that the "slight chance" defendant may have visited a fair exhibiting plaintiff's works

2  "does not create more than a 'bare possibility'" of access).

3      Plaintiff presents no **evidence** of access.  He muses that "[i]n 2007, as a short filmmaker

4  with no experience on feature-length projects, Defendant Blomkamp would have been drawn to

5  Trigger Street to: 1) to find a screenplay to direct and produce; 2) to interact with other short

6  filmmakers; 3) to observe the work of other short filmmakers; 4) to contact industry professionals

7  who might need an able director."  (Mot. at 6:20-23.)  Plaintiff states that MRC "would also have

8  had reason to scout or screenplays on triggerstreet.com."  (*Id*. at 6:24-25.)

9      Plaintiff's hypothesizing is "mere speculation or conjecture."  *Bernal*, 788 F.Supp.2d at

10  1053, quoting *Three Boys Music*, 212 F.3d at 482; and it is rebutted by the uncontroverted

11  declaration from Blomkamp.  The Motion's passing suggestion that the Screenplay was "widely

12  disseminated" is erroneous.  (Mot. at 6:27.)  Plaintiff posted his Screenplay on a single obscure

13  website from February to August 2007.  (*Id*. at 6:8)  This is not wide dissemination.  *See Art

14  Attacks*, 581 F.3d at 1144 (citing cases).

15      Because Plaintiff lacks any evidence of access, he can establish copyright infringement

16  only by showing "striking similarity."  *Three Boys Music*, 212 F.3d at 485; *see also Stewart v.

17  Wachowski*, 574 F.Supp.2d 1074, 1084 (C.D. Cal. 2005) ("Where evidence of access is lacking, a

18  'striking similarity' between the works may give rise to a permissible inference of copying.").

19      Striking similarity is a high bar.  "At base, 'striking similarity' simply means that, in

20  human experience, it is virtually impossible that the two works could have been independently

21  created."  4 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT § 13.02[B]

22  (2005), quoted with approval in *Stewart*, 574 F.Supp.2d at 1100-1101; *see also Bernal*, 788

23  F.Supp.2d at 1052 (defining striking similarity as "where the works are so unmistakably similar

24  that, as a matter of logic, the only explanation . . . must be copying rather than . . . coincidence,

25  independent creation, or prior common source") (citation omitted).

26          **B.**    **Plaintiff Can Establish Neither Striking Nor Substantial Similarity.**

27      To prevail, Plaintiff must prove striking similarity between the **protectable expression** in

28  the plots, sequences of events, characters, settings, dialogue, themes, and mood/pace of his

Kinsella Weitzman Iser Kump & Aldisert llp
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Tel 310.566.9800 • Fax 310.566.9850

Kinsella Weitzman Iser Kump & Aldisert llp
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Tel 310.566.9800 • Fax 310.566.9850

1  Screenplay and the Film.  As discussed below, there are in fact **no similarities** between the

2  protectable expression of the two works.  Plaintiff's claimed "summary" of similarities (Mot. at

3  11) relies on highly abstract ideas that are not copyrightable and would not give rise to a claim of

4  infringement even if they did inspire *Elysium* (which they did not).

5        Moreover, most if not all of the claimed similarities consist of stock ideas and *scenes a*

6  *faire* that are common in prior works.  The Declaration and report of defense expert Jeff Rovin

7  filed in support of Defendants' Motion for Summary Judgment is incorporated herein by

8  reference.  (Dkt. No. 67 ("Rovin Report")).  Rovin is an author, editor, and publisher with decades

9  of experience in science fiction and action/adventure works.  His Report shows that the

10  generalized ideas as to which Plaintiff claims copying are common in science fiction dating back a

11  century.  (*See generally id.*)  Even had such stock been appropriated from Plaintiff's Screenplay—

12  which it was not—these generic ideas are not protected and are disregarded when testing the

13  works for similarity.  *Feist Publications, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 345

14  (1991) ("To qualify for copyright protection, a work must be original to the author."); *see also*

15  *Bernal*, 788 F.Supp.2d at 1065 (holding that a "dead narrator" was not a protectable element

16  because it occurred in prior films like *Sunset Boulevard* and *American Beauty*); *Wild v. NBC*

17  *Universal, Inc.*, 788 F.Supp.2d 1083, 1099-1100 (C.D. Cal. 2011) (holding that elements common

18  in past works including Ray Bradbury's *Something Wicked This Way Comes*, the *Harry Potter*

19  series, and *Star Trek* were unoriginal and unprotectable); "); *Gable v. National Broadcasting Co.*,

20  727 F.Supp.2d 815, 842 (C.D. Cal. 2010) (holding that the "visual effect of a piece of paper

21  magically floating back to someone is not a protectable expression" because the "effect is

22  commonly used").

23        **1.**    **The Plots and Sequences of Events are not Similar.**

24        Plaintiff's burden is to demonstrate striking similarities between "the actual concrete

25  elements that make up the total sequence of events and the relationships between the major

26  characters."  *Funky Films*, 462 F.3d at 1077, quoting *Berkic*, 761 F.2d at 1293.  It is not sufficient

27  to show that *Butterfly Driver* and *Elysium* share a general premise (which, in any event, they do

28  not).  Courts routinely grant summary judgment for lack of substantial similarity where the

copyrighted and accused works share specific premises but nevertheless **express** those ideas

uniquely.  *See Funky Films*, 462 F.3d at 1077 (granting summary judgment though both works

were narratives about a family-run funeral parlor, the death of the family patriarch, the inheritance

of the business by the patriarch's two sons, and the return of the "prodigal son" to run the

business); *Benay*, 607 F.3d at 625 (granting summary judgment though both the copyrighted and

accused works shared the same premise: "an American war veteran travels to Japan in the 1870s to

train the Imperial Army in modern Western warfare in order to combat a samurai uprising");

*Berkic*, 761 F.2d at 1293 (granting summary judgment though both the copyrighted and accused

works concerned "criminal organizations that murder healthy young people, then remove and sell

their vital organs to wealthy people in need of organ transplants"); *Cavalier*, 297 F.3d at 824

(finding unprotectable the "general premise of a child, invited by a moon-type character, who

takes a journey through the night sky and returns safely to bed to fall asleep"); *Gable*, 727

F.Supp.2d at 840 (granting summary judgment where "both works have the main character win a

lottery ticket, and both characters use the lottery winnings to remedy past deeds"); *Goldberg v.

Cameron*, 787 F.Supp.2d 1013, 1020 (N.D. Cal. 2011) (granting summary judgment where "in

both works, advanced, self-aware computer networks seek to destroy humanity, who must fight

mass-produced, death-ray-shooting robot armies to survive"); *Muller v. Twentieth Century Fox

Film Corp.*, 794 F.Supp.2d 429, 445 (S.D.N.Y. 2011) (granting summary judgment where "both

works tell the story of an expedition team that travels to Antarctica where they discover an

underground ancient pyramid or city").

Looking "beyond the vague abstracted idea of a general plot," *Benay*, 607 F.3d at 625,

there are **no** articulable similarities between the protectable expression in the plots of *Butterfly

Drier* and *Elysium*.  The plot of Plaintiff's Screenplay could be summarized as follows: War hero

and hover-craft pilot Arlo Grainer learns that bounty hunters who killed fellow pilot, Roddy, are

after his family.  To earn his family's "repatriation" into the "Global State," Arlo accepts a

"butterfly run" transporting Tamara Gwynn to Los Angeles for a trial over a revolutionary energy-

producing A-Cell.  Arlo is captured and framed for Tamara's murder; escapes imprisonment from

Uberopolis and pilots a shuttle back to Earth; evades police while seeking the drug Drexlerin to

Kinsella Weitzman Iser Kump & Aldisert llp
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Tel 310.566.9800 • Fax 310.566.9850

Kinsella Weitzman Iser Kump & Aldisert LLP

808 Wilshire Boulevard, 3RD Floor
Santa Monica, California 90401
Tel 310.566.9800 • Fax 310.566.9850

1  save his daughter Franny from a respiratory condition; obtains a fake ID to covertly travel back to

2  Uberopolis to obtain the drug; negotiates an exchange with Drexler of the A-Cell for Drexlerin;

3  exposes Drexler as a criminal and imposter; and destroys Uberopolis while piloting off the space

4  station to safety.  **None** of these plot points or any of the more detailed subplot points in the

5  Screenplay are in the Film.

6      Likewise, the sequences of events in the works lack a single similarity.  In fact, there is **not**

7  **one scene** from the Screenplay that is replicated in the Film, let alone in the same sequence.  *See*

8  *Bernal*, 788 F.Supp.2d at 1072 ("The sequence of events refers to the actual sequence of the

9  scenes, not just having similar scenes out of sequence.").  The Film cannot possibly infringe

10  Plaintiff's Screenplay without using a single scene from that work.  *Cf. Wild*, 788 F.Supp.2d at

11  1109 ("One cannot imagine how two works could be substantially similar without a story that

12  focuses on the actions of similar characters").

13      **2.      Plaintiff's Argument that the Film Infringes the Screenplay's "Plot**

14      **Structures" Improperly Analyzes the Works Abstractly.**

15      Plaintiff argues that *Elysium* uses eighteen[3] "plot structures" from his Screenplay.  (Mot. at

16  11.)  Each of these "plot structures," however, is a highly-generalized **characterization** of the

17  works.  Plaintiff "addresses the plots abstractly and ignores the requirement that the Court focus

18  on the expression of the idea in applying the extrinsic test."  *Wild*, 788 F.Supp.2d at 1102.

19      Courts recognize that comparing abstractions of the copyrighted and accused work is not

20  probative because it "obfuscates the radical differences in the two works' expression."  *Id.* at 1103.

21  In *Idema v. Dreamworks, Inc.*, 162 F.Supp.2d 1129, 1187 (C.D. Cal. 2001), for example, the Court

22  accepted that the plaintiffs' and defendants' works were "motivated by the same general 'story

23  idea' of the theft of nuclear weapons from the decaying and ill-guarded arsenal of Russia/the

24  former Soviet Union."  162 F.Supp.2d at 1182 .  The Court nevertheless held that the defendants'

25

26      [3]      Plaintiff's Motion states that nineteen "plot structures" were used, but only
    eighteen are identified.  These eighteen "plot structures" are largely identical to the fourteen "plot

27  features" that are listed in the FAC and are addressed in Defendants' Motion for Summary
    Judgment.  (*See* Defs.' Mot., pp. 15-19.)

28

Kinsella Weitzman Iser Kump & Aldisert llp
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Tel 310.566.9800 • Fax 310.566.9850

film "tells an entirely different story than that which is **expressed and protectable** in any of the Plaintiffs' copyrighted works." *Id.* (emphasis in original).   The Court found that the plaintiff "has clearly just emphasized those few similarities that can be observed at a general level and deemphasized the many **dis** similarities between [the] works which are obvious to a casual observer." *Id.* at 1180 (emphasis in original).   The Court was not persuaded by the plaintiffs' list of 106 supposed similarities between the works, finding the comparisons "quite lacking in objectivity, as they frequently mischaracterize the works at issue," and finding that most of the similarities "are at the abstract level of 'ideas' . . . rather than 'expression.'" *Id.* at 1181; *see also id.* at 1183 (describing particular scenes which were "similar only at a high level of abstraction").

In *Quirk*, the district court disregarded "35 pages of alleged substantial similarities," holding: "Review of that listing, however, reveals that Quirk is relying on subjective and often highly unfair **characterizations** of material in the book and the movie to create highly strained purported 'similarities.'"  2013 WL 1345075 *8.  For instance, the plaintiff's claim that two "dispatcher characters" were similar relied on "generalized traits and negative behaviors." *Id.* The presence of "Chinese gangsters" in both works were "too generalized and generic to support an infringement claim." *Id.*  The court also found that many of the plaintiff's comparisons "misstate matters to create an exaggerated sense of the degree of similarity." *Id.* *9.  In one extreme example, the plaintiff re-characterized two different story lines—one in which Chinese gangsters kidnap the protagonist's love interest; the other in which a bicycle is impounded—under the vague heading, "'[a]ntagonists take a hostage as leverage . . . .'" *Id.*

Here, as in *Idema* and *Quirk*, Plaintiff has abstractly characterized—and repeatedly **mischaracterized**—the Screenplay and the Film in hopes of creating a false appearance of similarity.  As discussed below, **none** of the eighteen "plot structures" listed on page 11 of the Motion are expressed similarly (if at all) by these two works.  Any similarity with respect to these plot features solely concerns generalized ideas which are even more abstract than those found non-copyrightable in *Funky Films*, *Benay*, *Berkic*, and the other cases cited above.

    **1.**    **"the central setting of a giant satellite world for the super-rich, which features giant forests and aquatic features."**  This comparison mischaracterizes *Butterfly Driver* by

OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1   conscripting features of the satellite world in *Elysium* and acting as though they describe the

2   Screenplay's settings as well.

3       First, it is inaccurate to state that both the satellite in Plaintiff's Screenplay (known as

4   "Uberopolis" and "Sky Town") and the satellite in the Film (known as "Elysium") are "for the

5   super-rich" only.  That assertion is true with respect to the Film, where there is a stark class divide

6   between the affluent, mansion-dwelling population of Elysium and the severely impoverished

7   population of Earth.  It is **not true**, however, with respect to Plaintiff's Uberopolis.  A television

8   commercial in the beginning of the Screenplay reflects that Uberopolis is **not** reserved for the

9   "super-rich."  In that commercial, the satellite's owner, Drexler, states to TV viewers on Earth: "I

10  invite you to come enjoy our casinos, museums and golf courses, all orbiting 1000 miles above the

11  worries of Earth."  (Screenplay at 4.)  He adds:

12      Last year the first half of Uberopolis sold out in 6 months.  The second half is

13      under construction, to be opened next year.  Reserve your home now.  See why

14      over 150,000 people like me call Sky Town home.

15  (Screenplay at 4.)  There is no indication in the Screenplay that the hundreds of thousands moving

16  from Earth to Uberopolis are any wealthier than the rest of the population living in Earth's "Global

17  State," who enjoy "100 percent employment."  (*Id*.)

18      Second, Plaintiff's claim that both satellite worlds feature "giant forests and aquatic

19  features" is also false.  This is a fair description of the Film's Elysium, which is a lushly

20  landscaped, tropical paradise with residential mansions surrounded by heavy vegetation, large

21  lakes, and swimming pools.  It is **not**, however, an accurate description of Plaintiff's Uberopolis.

22  The Screenplay describes Uberopolis as "three miles in diameter, enclosed in a transparent,

23  spherical shield, with a flora-sphere and aqua-sphere **beneath the city floor**."  (Screenplay at 26

24  (emphasis added).)  Although this suggests water and plant life below ground, above ground

25  Uberopolis is an "ultra-modern city, replete with casinos, golf courses, towering apartments, and

26  offices."  (*Id.*)  Nowhere in the Screenplay is Uberopolis described as having "giant forests and

27  aquatic features."

28

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1    Third, the satellite worlds in the Screenplay and Film have another critical, distinguishing

2  feature.  The defining characteristic of Elysium is that Earth's population is prohibited from

3  traveling or emigrating to the space station.  Those who attempt to illegally board Elysium on

4  undocumented shuttles are shot down and killed.  (Film at 13:15-17:30.)  By contrast, in the

5  Screenplay Earth's population is moving in droves to Uberopolis.  (Screenplay at 4.)  There are

6  hourly commuter shuttles traveling between Uberopolis and Earth.  (Screenplay at 29 ("the hourly

7  citizen commuter shuttle takes five hours – to Earth and back").)  The free travel back-and-forth

8  between Earth and Uberopolis is the antithesis of the setting described in the Film.

9    Uberopolis and Elysium are similar **only** in that they are both satellites of some sort.

10  This setting is beyond common in film, television, and literature.  (Rovin Report at 21-59.)

11  Accordingly, it is not copyrightable.  *Bernal*, 788 F.Supp.2d at 1071 ("A generic suburban

12  neighborhood is not a copyrightable expression.").  Plaintiff's burden is to show that these settings

13  are **expressed** similarly.  For the reasons discussed above, he has not and cannot meet that burden.

14  *Cf. Funky Films*, 462 F.3d at 1080 ("Although both works take place in a contemporary, family-

15  run funeral home, the similarities in setting end there.").

16    **2.    "a hero prone to excruciating headaches (which knock him to his knees)."**

17  Plaintiff asserts a "highly unfair characterization[ ] of material in the [Screenplay] and the [Film]

18  to create highly strained purported 'similarities.'"  *Quirk*, 2013 WL 1345075 *9.  In the

19  Screenplay, the protagonist, Arlo, suffers "ice-pick headaches" caused by a lifelong condition

20  called opthalmodynia.  (Screenplay at 22-23.)  In the Film, the protagonist Max (played by Matt

21  Damon) does not suffer from an equivalent condition.  Instead, he begins to suffer seizures after he

22  uses a futuristic device to download a computer program from the brain of Elysium's designer

23  John Carlyle into his own brain—the seizures resulting from a defense mechanism that Carlyle

24  installed in the program.  (Film at 46:00-51:00.)

25    Plaintiff notes that the purported screenplay for *Elysium* describes Max's symptoms as

26  "like a migraine."  (Mot. at 12.)  It also describes Max as suffering "an epileptic white static," "a

27  mini seizure," and "searing white light."  (*Id.* at 12-13.)  Whatever it is called, the stories behind

28  Arlo's and Max's afflictions are dissimilar.  "These events might appear similar when described in

Kinsella Weitzman Iser Kump & Aldisert llp
808 Wilshire Boulevard, 3ʳᵈ Floor
Santa Monica, California 90401
Tel 310.566.9800 • Fax 310.566.9850

1    the abstract, but in context, they are exceedingly different." *Bernal*, 788 F.Supp.2d at 1067.

2    Moreover, even if the Screenplay's and Film's protagonists suffered from similar

3    headaches (which they do not), this is a common idea in past films.  Several prior works have

4    featured lead characters who are brought to their knees by headaches.  (Rovin Report at 63-68.)

5    Plaintiff cannot own this stock idea.  *Cf. Gable*, 727 F.Supp.2d at 841 (disregarding "several

6    unprotectable stock elements . . . that are scattered throughout the works").

7    **3.     "a villain who has been genetically reprogrammed to appear much young than**

8    **he/she is."**  Plaintiff is attempting to compare the Screenplay's Drexler and the Film's Delacourt

9    (played by Jodie Foster).  These two characters are not alike.  In the Screenplay, Drexler is male,

10   an ex-soldier, and an imposter actually named "Midland" who murdered the real Drexler, stole his

11   identity, killed Drexler's family, and inherited his fortune, which he used to build Uberopolis.

12   (Screenplay at 93-94.)  Plaintiff's protagonist, Arlo, was previously acquainted with Drexler and

13   exposes him as an imposter.  (*Id.*)  Arlo and Drexler have a lengthy fight and chase scene in the

14   climactic scenes of the Screenplay, culminating in Arlo's escape from Uberopolis, the destruction

15   of the satellite, and the death of Drexler.  (*Id.* at pp. 97 *et seq.*)

16   The Film's Delacourt is not similar to Drexler.  Delacourt is female and has no prior

17   relationship with the Film's protagonist, Max.  She has not murdered anyone to steal their identity.

18   She does not own Elysium but rather stages a coup to take over its presidency.  (Film at 35:20-

19   37:00.)  She has no fight scene with Max and is not killed by him; she is killed, rather, by her own

20   agent Kruger.  (Film at 1:26:30-1:27:55.)  Other than being ruthless authorities, Drexler and

21   Delacourt are not similar.  *See Wild*, 788 F.Supp.2d at 1108 ("These are stock characters of the

22   type one would expect to find in [plaintiff's work].").

23   Plaintiff argues that these characters are nevertheless similar because they were both

24   genetically modified to appear younger.  Plaintiff's Screenplay contains vague references to

25   Drexler's "DNA reprogramming," (Screenplay at 36, 90), and the purported *Elysium* screenplay

26   submitted with this Motion alludes to Delacourt being "re-atomized" to appear younger than her

27   actual age of 108.  (Mot., Exh. B at 2, 18.)  However, the film version of *Elysium* has different

28   dialogue than in Plaintiff's unauthenticated screenplay.  In the Film, the scene to which Plaintiff

Kinsella Weitzman Iser Kump & Aldisert llp
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Tel 310.566.9800 • Fax 310.566.9850

1   points does not refer to Delacourt's advanced age and thus does not allude to her being "re-

2   atomized" to look younger.  (Film at 25:40-27:08.)  Whatever similarity existed in a previous

3   (purported) version of the *Elysium* screenplay is irrelevant.  *See Quirk*, 2013 WL 1345075 *4-6.

4       Moreover, even assuming for the sake of argument that both Drexler and Delacourt used

5   futuristic medical procedures to reduce the appearance of aging, this is a stock idea that neither

6   Plaintiff nor Defendants invented.  (Rovin Report at 71-72.)  These two incomparable characters

7   are not similar simply because they share this one unprotectable trait.  *Cf. Idema*, 162 F.Supp.2d at

8   1186 ("[T]o the extent that the two characters <u>are</u> similar, it is only with respect to traits that are so

9   generalized and/or cliché as to be nearly *scenes a faire . . . .*").

10      **4.     "advanced medicine only found on the satellite world."**  This is another

11  mischaracterization designed to exaggerate the appearance of similarity.  Plaintiff is correct that in

12  the Film, the advanced med bays are available only on Elysium.  In Plaintiff's Screenplay,

13  however, the advanced medicine—a drug called "Drexlerin"—is **equally available** on Earth.

14  (Screenplay at 35.)  As the Screenplay explains, Plaintiff's protagonist is forced to travel to the

15  satellite to find Drexlerin solely because supplies on Earth are momentarily exhausted pending the

16  release of a replacement drug: "Drexlerin was discontinued.  Drexlerin 2 will be released in a

17  week or two.  **There's none left in The State**." (*Id.* (emphasis added).)

18      Additionally, the idea of advanced medicine found only in a satellite world is common in

19  prior works.  (Rovin Report at 51-58.)  Thus, this setting is not original or copyrightable.

20      **5.     "a hero who must get to the satellite world for medicine (or medical care)."**

21  This is another misleading abstraction.  The specific story lines and sequences of events in the

22  Screenplay and Film which express this idea are not comparable.  Whereas the Screenplay's Arlo

23  travels to Uberopolis because his daughter, Franny, is dying of respiratory failure and needs

24  Drexlerin, the Film's Max travels to Elysium to use a med bay to cure himself of a fatal dose of

25  radiation that he received.  All of the specific scenes showing how Arlo and Max travel to the

26  satellites and what they do once there are different.  The conclusions of the stories are also

27  different.  Arlo exposes Drexler as a criminal and imposter, escapes with the Drexlerin his

28  daughter needs, destroys Uberopolis, and returns to life as normal.  (Screenplay at 92 *et seq.*)

Max, on the other hand, sacrifices his own life by downloading the reboot sequence from his brain into Elysium's computers, thereby turning all of Earth's population into citizens of Elysium who are eligible to use its med bays.  (Film at 1:26:30-1:41:00.)  These stories are similar only at the most abstract level.

6.    **"a 'plight of immigrant' theme."**  This generic theme is not expressed similarly in the two works.  The Screenplay references Arlo's family "repatriating" to the "State" to obtain better healthcare for his daughter.  (Screenplay at 12-14.)  This is nothing like the illegal immigration that occurs in the Film, where people on Earth risk their lives on undocumented shuttles bound for Elysium to access the space station's med bays.  (Film at 12:01-17:24.)

7.    **"a sick girl, who will die without the hero's action."**  This is an attempted comparison of the Screenplay's Franny and the Film's Matilda.  (Mot. at 14.)  These two characters are both sick children, but this is not a protectable trait.  *See Kouf*, 16 F.3d at 1046 (holding that "the genius kid with thick-rimmed glasses . . . is not distinctive enough to be a protectible character"); *Rice*, 330 F.3d at 1175 (holding that "characters are ordinarily not afforded copyright protection" unless they are "especially distinctive").  Apart from being young girls who are sick, Franny and Matilda do not have similar roles in the works.  Franny appears sparingly in the Screenplay, has little or no dialogue, and is simply cured when Arlo returns home with Drexlerin.  In the Film, on the other hand, Matilda is central to the drama.  She is kidnapped by Kruger, taken to Elysium, and successfully uses a med bay once Max reboots Elysium's computers.  Importantly, Matilda is a catalyst for Max's decision to sacrifice his left for the rest of humanity—a role that is very different from Franny's negligible role in the Screenplay.  (Film at 1:01:00-1:04:06, 1:35:43-1:38:45.)  Setting aside stock traits, these characters are not similar.

8.    **"a hero who witnesses the death of his best-friend, and struggles to get I.D. and transport to a satellite world."**  Here too, Plaintiff uses generalizations to mask the vast differences between the **actual** stories in the Screenplay and Film.

The scenes in which the works' protagonists witness the death of a friend are dissimilar.  In the Screenplay, Arlo responds to a distress signal from his fellow pilot Roddy, who was shot by bounty hunters, and Roddy warns Arlo that the bounty hunters are after Arlo's family.

Kinsella Weitzman Iser Kump & Aldisert llp
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Tel 310.566.9800 • Fax 310.566.9850

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1   (Screenplay at 8-10.)  This bears no resemblance to the Film, where Max and his friend Julio are

2   on a mission to kidnap Carlyle and steal data from his brain, when covert agent Kruger arrives and

3   kills Julio with a sword.  (Film at 45:54-56:40.)  Arlo and Max both witness a friend die, but such

4   a scene is "so common as to require little comment."  *Wild*, 788 F.Supp.2d at 1103.

5       Plaintiff's assertion that Arlo and Max both "struggle to get I.D. and transport to a satellite

6   world" is also disingenuous.   In the Screenplay, Arlo takes an ordinary commuter shuttle to

7   Uberopolis but needs a fake I.D. card because he is a fugitive and must avoid detection.

8   (Screenplay at 56-58.)  In the Film, Max does not require an I.D. card, but rather an I.D. burned

9   onto his arm so that the med bays on Elysium will recognize him as a citizen.  (Film at 37:03-

10   40:10.)  In context, these characters' stories are entirely different.

11       9.   **"an 'anguish of living without healthcare' theme."**  Both works confront the

12   generic idea of inadequate healthcare, but the Film does so differently.  Whereas in Plaintiff's

13   Screenplay, medical care including the drug Drexlerin is available both on Earth and on the

14   satellite, in the Film, the wealthy citizens of Elysium have exclusive access to med bays.

15   The Film thus explores the idea of arbitrarily denying access to readily available health care in a

16   way that the Screenplay does not.

17       10.   **"a disabled transporter who will help the hero's emigration plan – IF the hero**

18   **does a very dangerous mission**."  This comparison exemplifies the lengths to which Plaintiff will

19   go to use abstractions to compare dissimilar characters and story lines.  Although the Motion does

20   not elaborate, this is clearly an attempt to compare the Screenplay's Dylan and the Film's Spider.

21   (*See* FAC ¶¶ 176-178.)  These characters and their roles are not alike.  In the Screenplay, Arlo's

22   boss, Dylan, plays a minor role by setting Arlo up with a "butterfly run" to earn the money

23   necessary for his family to "repatriate" to the Global State.  (Screenplay at 6-7, 13-14.)  In the

24   Film, Spider is not Max's boss.  He does not provide Max a "butterfly run"—a concept that is

25   absent from the Film.  Rather, Spider operates undocumented shuttles to Elysium, and Max seeks

26   his help to obtain a shuttle ride to Elysium to use a med bay to cure his fatal condition.  (Film at

27   30:11-34:10.)  Spider engages Max to kidnap Carlyle and download data from his brain, and he

28   spearheads the effort to use the computer program that Max obtains from Carlyle to reboot

1   Elysium's computers.  (*Id.* at 1:07:19-1:10:28, 1:20:45-1:41:20.)  The fact that one character is

2   "missing an arm" and the other has "a paralyzed leg" (FAC ¶¶ 176-178) does not make these

3   incomparable characters similar.

4        **11.**    **"an agent (sent by the villain to apprehend the hero) who accepts the**

5   **assignment after negotiating."**  Plaintiff is trying to compare the Screenplay's Jerry with the

6   Film's Kruger.  (*See* FAC ¶¶ 170-175.)  The comparison is "emblematic of how tortured the

7   attempt to find substantial similarity between the works becomes."  *Quirk*, 2013 WL 1345075 *9.

8   Those characters and their roles in the stories could not be more **dissimilar**.

9        In the Screenplay, Jerry is a law-abiding federal officer and a past acquaintance of Arlo.

10  (Screenplay at 22-23.)  Jerry investigates Arlo for the kidnapping and murder of Tamara, for

11  which Arlo is framed.  (*Id.* at 24-25.)  Jerry learns during his investigation that Arlo is innocent, he

12  helps Arlo expose Drexler as a criminal, and he rescues Arlo as Drexler is preparing to kill him.

13  (*Id.* at 89-90, 102-103, 109-110.)

14       The Film's Kruger is Jerry's polar opposite—a  maniacal murderer and rapist.  (Film at

15  25:40-27:08.)  Serving as Delacourt's personal agent, Kruger shoots down undocumented shuttles

16  bound for Elysium; hunts Max to obtain the reboot sequence that he downloaded from Carlyle's

17  brain; kidnaps Max's childhood friend Frey and her daughter Matilda to use as bait; transports

18  Max to Elysium; is blown up by a grenade after a fight erupts en route to Elysium; is regenerated

19  by a med bay; kills Delacourt after deciding to use the reboot sequence to make himself the

20  president of Elysium; and then kills everyone in his path before being thrown off a platform by

21  Max.  There are **no similarities** whatsoever between these characters.

22       **12.**    **"a keepsake necklace, carried by the hero, which factors into the stories'**

23  **conclusion."**  This is a tortured generalization.  In Plaintiff's work, a character named Benni, who

24  is interested romantically in Arlo, provides him a yellow butterfly dream catcher for good luck.

25  (Screenplay at 64-65.)  In the Film, Max is not given a dream catcher for luck or as a sign of

26  romantic interest.  Rather, a nun who raises Max provides him a locket with a picture of Earth.

27  (Film at 23:19-23:54.)

28

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

Kinsella Weitzman Iser Kump & Aldisert LLP
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Tel 310.566.9800 • Fax 310.566.9850

These props factor in to the conclusions of the stories but in dissimilar ways. In the Screenplay, Arlo has been shot and is near death when he has a dreamlike vision and sees the dream catcher in the eye of a dolphin. (Screenplay at 113.) This does not resemble the scene in the Film, where Max stares at his locket and at the actual planet Earth, which he can see outside a window in Elysium's control center, before pushing the button which starts downloading the reboot sequence and ends his life. (Film at 1:35:43-1:38:45.)

At most, therefore, the works share only the abstract idea of a protagonist who wears a necklace of some sort. This bare idea is not copyrightable. Numerous past works use this same device, including one film in the *Rambo* series in which Sylvester Stallone, like Plaintiff's protagonist, wears a necklace belonging to his love interest. (Rovin Report at 68-70.)

**13.    "an overpopulated, impoverished Earth, where police vehicles loom in the sky and brutalize the poor, ruled by a rich elite who live on the satellite world."** Plaintiff again distorts his Screenplay to manufacture similarities that do not exist. In the Screenplay, Earth is overpopulated **but not** "impoverished." The Screenplay in fact describes that there is "100 percent employment" and "almost no crime" in Earth's "Global State." (Screenplay at 4.) The city of Manhattan is portrayed like a typical major city with apartment complexes, shopping malls, and subways. (*Id.* at 33-34.) Citizens drive sky-cars, sky-cycles, and hover-jets. (*Id.* at 19 (referencing "heavily trafficked 'skyways.'").) Moreover, Earth's population is **not** brutalized by police, as Plaintiff claims. Bounty hunters and/or police target Roddy, Arlo, and Tamara, but violence is not waged against the masses.

The Film presents Earth very differently. The planet has lost all vestiges of how it appears presently. (Film at :57-01:15.) There are no malls, apartment complexes, or subways. The population does not fly sky-cars. They are heavily unemployed and extremely poor, living in shanty towns with defunct skyscrapers smoldering in the background. (*Id.*) They are policed by an abusive robotic police force which has no counterpart in the Screenplay. (*Id.* at 06:02-07:00.)

The only similarity between Earth in the Screenplay and in the Film is that it is set in the future. This setting is generic and unprotectable. Countless works feature a futuristic Earth akin to Plaintiff's Screenplay, including the science fiction classic *Blade Runner*, which appears to

19

1 have heavily inspired Plaintiff's Screenplay.  (Rovin Report at 8-21.)

2     **14.**    **"a hero who threatens the villain with detonating an explosive device."** The

3 two scenes that Plaintiff references look nothing alike in context.  In the Screenplay, Arlo

4 threatens that he will use Tamara's A-Cell to blow up Uberopolis if Drexler refuses to meet with

5 him.  (Screenplay at 85-88.)  In the Film, Max threatens that he will blow up Kruger's shuttle if

6 Kruger or his men try to harm him.  (Film at 1:11:20-1:13:31.)  The only similarity between these

7 two scenes is the stock idea of using an explosive as leverage—a cliché element that is commonly

8 present, for example, in films with hostage scenes.

9     **15.**    **"underground 'techie' programmers who help the hero with fake**

10 **identification to get into the satellite world"** As discussed above, the "fake identification" that

11 the Screenplay's Arlo and the Film's Max require is entirely different.  (*See supra* pp. 16-17.)

12     **17.**    **"a primary character who negotiates with insurers (or a hospital) for the life**

13 **of his/her child."**  This idea is common, including in the 2002 Denzel Washington film *John Q.*

14 In any event, it is another mischaracterization.  Plaintiff appears to be comparing the Screenplay's

15 Jerry, whose son Matty needs a "filter room" because of respiratory problems, with the Film's

16 Frey, whose daughter Matilda is in the hospital with leukemia.  Jerry is offered financial help for

17 his son's filter room if he accepts the task of investigating Arlo. (Screenplay at 25.)  Nothing like

18 this occurs with Frey, who is simply forced to take her daughter from the hospital because it

19 cannot save her.  (Film at 29:33-29:59.)  Jerry and Frey are incomparable characters who do not

20 share a single action or word of dialogue.

21     **18.**    **"a climactic battle between the hero and villain, during which the hero suffers**

22 **a terrible headache."**  Plaintiff is comparing a chase and fight scene between his characters Arlo

23 and Drexler with a chase and fight scene between the Film's Max and Kruger.  The actual scenes

24 are not similar except at the most general level.

25     In the Screenplay, Arlo confronts Drexler by flying a sky-cycle through the glass windows

26 of his 57th floor office.  Not knowing that the conversation is being recorded by surveillance

27 cameras and broadcast on television, Drexler confesses to his crimes including being an imposter.

28 In an ensuing struggle, Arlo and Drexler fly out of the office window but float harmlessly to the

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

Kinsella Weitzman Iser Kump & Aldisert llp
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Tel 310.566.9800 • Fax 310.566.9850

1   ground because of reduced gravity on Uberopolis.  Their chase and fight scene takes them through

2   the streets of Uberopolis and eventually onto a shuttle.  Arlo suffers a headache mid-combat and

3   Drexler seizes the moment to shoot him in the neck.  Drexler is about to kill Arlo when Jerry

4   intercedes and saves his life.  (Screenplay at 92 *et seq.*)

5          None of this occurs in *Elysium*.  In the Film, Max is being held captive in an Elysium

6   control center.  He escapes and sees on a video screen that Spider and his men have arrived on the

7   space station.  Max rescues Frey and Matilda and tells them to find a med bay.  He then meets

8   Spider, and the two of them race to a control room where they can start the reboot sequence in

9   Max's brain.  Max and Spider are fleeing Kruger when Max suffers a seizure caused by the

10  defense mechanism that Carlyle coded into the reboot sequence.  Kruger catches up, but Max kills

11  him in a hand-to-hand fight with the help of an exoskeleton that was grafted onto his body to give

12  him added strength.  Max and Spider continue to the control room where they succeed in

13  rebooting Elysium's computers.  (Film at 1:22:46-1:41:20.)  In all, these scenes are nothing like

14  the scenes in the Screenplay.

15         **19.    "a globally significant resolution (rare)."**  This general idea is not copyrightable

16  and is also expressed dissimilarly.  The Screenplay concludes with Arlo destroying Uberopolis.

17  The Film concludes with Max rebooting Elysium's computers to open up citizenship to everyone

18  on Earth.  These are hardly similar resolutions.

19         In each of the above eighteen comparisons, Plaintiff takes different plots, different

20  sequences of events, and different characters from his Screenplay and the Film, and then re-

21  defines these dissimilar elements using self-serving abstractions.  This process proves nothing

22  more than that "[s]elective and/or distorted characterizations of any two things can, of course,

23  produce points of similarity."  *Quirk*, 2013 WL 1345075 *9.  Indeed, **any** motion picture in the

24  past 50 years could be made to appear similar to some prior work by using generalizations and a

25  little bit of imagination.  Plaintiff's own Screenplay could be unfairly accused of knocking off

26  *Blade Runner*—a film which similarly featured a futuristic Earth with flying cars, a colony

27  existing off the planet Earth, people who have been genetically programmed, state-sponsored

28  bounty hunters, and a protagonist (Rutger Hauer) who is on the run from a government agent

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1   (Harrison Ford) sent to apprehend him.  Imagine the **dozens** of other "similarities" that could be

2   found between stock scenes and characters in *Butterfly Driver* and *Blade Runner* if one took the

3   same liberties Plaintiff takes here to define those elements in a generalized, argumentative manner.

4        **3.**    **<u>The Works' Settings are not Similar.</u>**

5        Plaintiff alleges that the Screenplay and Film feature the same two settings—a "Rich

6   Satellite World & Poor Dystopic Earth."  (Mot. at 15.)  Neither of these settings is **expressed**

7   similarly by the two works.  As discussed above, the satellite worlds in the Screenplay and Film

8   differ with respect to their exclusivity; the ability to travel to and from the satellite; the wealth

9   disparity between its citizens and those on Earth; the disparity in medical care on the satellite and

10  on Earth; and the physical appearances of the satellites.  (*See supra* pp. 12-15.)  Plaintiff lists

11  thirteen supposed similarities between Uberopolis and Elysium.  (Mot. at 15.)  Several are

12  mischaracterizations, including that Uberopolis has "forests and large aquatic features," that "only

13  the super-rich live" there, that "fantastic medical technologies are available there," and that

14  "entering the satellite requires special identification."  (*See supra* pp. 12-17.)  The other

15  supposedly similar characteristics, including flying vehicles, a lack of crime, and the presence of

16  prisoners in orange jumpsuits are *scenes a faire.*

17       Plaintiff's comparison of Earth in the two works is likewise flawed.  Earth is expressed in

18  substantially different ways in the Screenplay and Film.  (*See supra* p. 19.)  Here again, Plaintiff's

19  eight comparisons of this setting mischaracterize his own work.  (Mot. at 15.)  Among other

20  things, he misrepresents that in his Screenplay "the poor have little access to medical care," that

21  "police and military vehicles loom in the sky and brutalize the poor," and that "the poor live in the

22  ruins of cities in decay."  (*See supra* p. 19.)  In fact, most of Earth's population in the Screenplay

23  lives in ordinary cities like Manhattan where they enjoy all the usual characteristics of city life,

24  drive sky cars, and are fully employed.  (*Id.*)

25       Whatever few similarities exist between the settings in the Screenplay and Film, they are

26  generic and unprotectable features.  The Rovin Report provides numerous examples of past

27  science fiction works featuring a dystopic Earth and/or space stations that are highly similar to the

28  settings in Plaintiff's Screenplay.  (Rovin Report at 8-58.)  Plaintiff cannot copyright these stock

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1   ideas.  *See Bernal*, 788 F.Supp.2d at 1071 ("A generic suburban neighborhood is not a

2   copyrightable expression.").

3              **4.      The Dialogue is not Similar.**

4          "To support a claim of substantial similarity based on dialogue, the plaintiff must

5   demonstrate 'extended similarity of dialogue.'"  *Bernal*, 788 F.Supp.2d at 1072 (citation omitted).

6   Plaintiff admits that "[t]here are no examples of direct copying in this case."  (Mot. at 18.)

7   He claims that some of the "dialogue rings quite familiar," (*id.*), but he cites only to a handful of

8   instances in which his Screenplay and a purported screenplay for *Elysium* used common English

9   words and phrases like "pressure," "go faster," and "surveillance."  Such "[o]rdinary phrases" and

10  words "are not entitled to copyright protection."  *Narell v. Freeman*, 872 F.2d 907, 911 (9th Cir.

11  1989); *see also Bernal*, 788 F.Supp.2d at 1072 (disregarding "ordinary, common expressions that

12  are not copyrightable").

13             **5.      The Characters are not Similar.**

14         As discussed above, Plaintiff's comparisons of Drexler with Delacourt, Dylan with Spider,

15  Jerry with Kruger, and Franny with Matilda, are unfounded.  At most, these characters share one

16  or two generic traits.

17         The same is true of the protagonists in the two works, Arlo and Max.  (Mot. at 11-12.)

18  "Again, through the use of abstraction, Plaintiff obscures the radical differences between the two

19  characters."  *Wild*, 788 F.Supp.2d at 1107.  In the Screenplay, Arlo is a war hero and hover-craft

20  pilot who flies supplies in Zones outside the Global State.  He is a married father of two who goes

21  on a selfless mission to save his daughter and succeeds.  The Film's Max is none of these things.

22  He is an orphan, raised in a convent, who grows up into a petty criminal.  He is unmarried, has no

23  kids, and works at Armadyne fabricating robotic police officers.  Unlike Arlo, Max is on a self-

24  centered mission to save his own life at the expense of the lives of others.  Arlo and Max are

25  similar only in that they occupy the role of a male protagonist.  *See Funky Films*, 462 F.3d at 1078

26  ("The 'prodigal son' characters of the two works, while similar at the abstract level, are markedly

27  different in the two scripts.").

28

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1    Not only do none of the characters in *Butterfly Driver* have a legitimate parallel in *Elysium*,

2 but "[t]here are a number of important characters in the Film and the Screenplay who have no

3 obvious parallel in the other work."  *Benay*, 607 F.3d at 627.  Tamara Gwynn plays an important

4 role in Plaintiff's screenplay and has no possible counterpart.  Several key characters from

5 *Elysium* including the nun who raised Max, John Carlyle, President Patel, and the robot police

6 force also have no "obvious parallel" in *Butterfly Driver*.

7        **6.    <u>The Themes are not Similar.</u>**

8    Plaintiff contends that the Screenplay and Film share five themes.  (Mot. at 16.)

9 Each theme Plaintiff identifies is trite and describes hundreds of other works.  None of the themes,

10 moreover, are expressed similarly in the Screenplay and Film:

11     **1.    "Survival without adequate healthcare is inhumane."** The Screenplay and Film

12 treat the issue of healthcare very differently.  In Plaintiff's work, some are in need of healthcare,

13 but there is no disparity between the care available on Earth and in the satellite world.  Absent

14 from Plaintiff's work is one of the defining characteristics of the story in *Elysium*—the inhumanity

15 of arbitrarily denying advanced healthcare that could easily save the lives of everyone in need.

16     **2.    "the plight of immigrants is brutal."** Query whether the Screenplay explores this

17 theme at all.  Its protagonist, Arlo, pays for his family to "repatriate" to Manhattan, New York, but

18 the Screenplay does not specifically explore immigration.  The Film, on the other hand, clearly

19 does do so in showing the struggles of those on Earth who risk their lives to obtain access to

20 Elysium's medical care by taking illegal shuttles to the space station.

21     **3.    "wealth corrupts and divides us."** This generic theme is not expressed similarly

22 between the two works because Plaintiff's Screenplay lacks the wealth disparity that is shown in

23 the Film.

24     **4.    "Heroic sacrifice."**  The Screenplay's protagonist, Arlo, never faces the dilemma

25 that the Film's protagonist, Max, faces of having to sacrifice his life for others to live.

26 The Screenplay does not explore this theme in the same way as the Film.

27     **5.    "Redemption comes from refusing to give up hope."**  This does not really

28 describe either work, but if it does, there are no similarities in how it is expressed.

7.    **The Mood / Pace is not Similar**.

The mood and pace of *Butterfly Driver* and *Elysium* are stock in science fiction and action/adventure works.  To the extent they are similar, therefore, they are *scenes a fair* which "merge" with the idea of this type of work and are not indicative of striking or substantial similarities.  *See Rice*, 330 F.3d at 1177 (holding that "an overall mood of secrecy and mystery" is "generic, constitute[s] *scenes a fair*, and merge[s] with the idea of [a show about] revealing magic tricks"); *Zella v. E.W. Scripps Co.*, 529 F.Supp.2d 1124, 1136 (C.D. Cal. 2007) (granting motion to dismiss and holding that the "upbeat mood flowing from a cooking/talk show . . . is merely another example of *scenes a fair* and merger, common to all cooking/talk shows.").

VI.    **CONCLUSION**

For the reasons stated above, the Screenplay and Film are not substantially or strikingly similar as a matter of law, and the Court should deny Plaintiff's Motion and grant summary judgment in Defendants' favor.

DATED: August 13, 2014                Respectfully submitted,

                                      KINSELLA WEITZMAN ISER
                                      KUMP & ALDISERT LLP


                                      By:        /s/ Michael J. Kump
                                      _____
                                           Michael J. Kump
                                           Attorneys for Defendants
                                           NEILL BLOMKAMP, SONY PICTURES
                                           ENTERTAINMENT INC., TRISTAR
                                           PICTURES, INC., MEDIA RIGHTS CAPITAL II,
                                           L.P., and QED INTERNATIONAL, LLC

10021.00015/223816

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850