UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

STEVE WILSON BRIGGS,

        Plaintiff,

    v.

NEILL BLOMKAMP, et al.,

        Defendants.

_____/

No. C 13-4679 PJH

**ORDER RE MOTIONS FOR
SUMMARY JUDGMENT**

The parties' motions for summary judgment came on for hearing before this court on September 3, 2014.  Plaintiff Steve Wilson Briggs appeared in propria persona, and defendants Neill Blomkamp, Sony Pictures Entertainment, Inc., Tristar Pictures, Inc., Media Rights Capital II, L.P., and QED International LLC appeared by their counsel Michael J. Kump and Gregory P. Korn.  Having reviewed the papers and other materials submitted by the parties, and having carefully considered their arguments and the relevant legal authority, the court hereby GRANTS defendants' motion and DENIES plaintiff's motion.

**BACKGROUND**

A.    Procedural and Factual Background

The following facts are as alleged in the first amended complaint ("FAC").  Plaintiff asserts that he completed a first draft of a screenplay entitled "Uberopolis: City of Light" in May 2005, and that he emailed copies of the screenplay to family and friends.   On December 16, 2005, he registered a revised version of "Uberopolis: City of Light" with the Writers Guild of America (West).

In January 2006, plaintiff began attempting to market his screenplay.  During approximately the next two years, he sent dozens of query letters and emails to literary

1   agents and film companies.  He also posted short synopses on screenwriter websites, and

2   entered screenwriting and scriptwriting competitions.

3        In January 2007, plaintiff again revised his screenplay, and renamed it "Butterfly

4   Driver."  He claims that in February 2007, he posted the entire "Butterfly Driver" screenplay

5   on triggerstreet.com, a filmmaker-screenwriter website designed to link filmmakers and

6   screenwriters with industry professionals, by allowing members to post screenplays, short

7   films, and short stories to get feedback from peers and professionals.  Plaintiff asserts that

8   at that time, the triggerstreet.com website had approximately 50,000 active members.

9        Plaintiff alleges that between February 2007 and August 2007, he posted "Butterfly

10  Driver" on triggerstreet.com approximately four times, making script revisions each time.  In

11  December 2007, plaintiff stopped marketing the "Butterfly Driver" screenplay, as he had

12  decided to film it himself some day.  From 2008 to 2012, he worked on other film projects.

13       On May 27, 2013, plaintiff went to a movie theater, where he watched a trailer for a

14  film called "Elysium," featuring a plot, characters, and settings that appeared to plaintiff to

15  have been misappropriated from "Butterfly Driver."  Later that evening, plaintiff read an

16  entry on Wikipedia about the film "Elysium."  He claims that this reading confirmed his view

17  that the story structure of "Elysium" closely conformed to his "Butterfly Driver" screenplay.

18       Plaintiff alleges that on June 13, 2013, he located a version of the screenplay for

19  "Elysium" online, and downloaded it.  He claims that the text of the script conformed to the

20  portion of the dialogue he had observed when he watched the trailer on May 27, 2013.

21  After an attorney recommended that he register his copyright for "Butterfly Driver," he

22  obtained a copyright registration from the U.S. Copyright Office on June 21, 2013.

23       Defendants released "Elysium" in August 2013, and plaintiff viewed the film for the

24  first time on August 10, 2013.  Upon viewing the film, he concluded that the "Elysium" film

25  and screenplay infringed his copyright in "Butterfly Driver," as a whole and with regard to

26  features such as plot, characters, settings, and themes.  He speculates that defendant Neill

27  Blomkamp ("Blomkamp") accessed the "Butterfly Driver" screenplay on triggerstreet.com,

28  and used it as the basis for his own screenplay for "Elysium."

2

United States District Court
For the Northern District of California

1    Plaintiff filed the present action on October 8, 2013, asserting one cause of action

2  for copyright infringement.  Each side now seeks summary judgment.

3  B.    Synopsis of "Butterfly Driver"

4    The protagonist of plaintiff's screenplay "Butterfly Driver" is Arlo Grainer.  The year is

5  2120.  Arlo is a "legend" on Earth because of his prior military service and subsequent

6  defiance of the "Global State" (or "State").  Arlo lives in a "Zone" outside the State's

7  jurisdiction, working as a "hover-jet" pilot flying supplies between Zones.  Living in the same

8  building, but in a separate apartment, are Arlo's estranged wife (Rianna) and his two

9  children (John Carl and Franny).

10    Arlo's antagonist, Drexler, is President of the State and the owner of "Uberopolis," a

11  "satellite city" that orbits Earth.  Uberopolis is three miles in diameter, and is enclosed in a

12  transparent, spherical shield, with a "flora-sphere" and an "aqua-sphere" beneath the city

13  floor.  It is an ultra-modern city, with casinos, golf courses, high-rise apartments, and

14  offices.  At the time of the story, half of Uberopolis (also called "Sky Town") is developed;

15  the other half (separated by a wall) is still under development.

16    At work in the warehouse from which he flies supplies, Arlo receives a distress

17  signal from a fellow pilot, Roddy, and races on a "sky-cycle" to Roddy's location to find that

18  he has been shot and is near death.  Roddy tells Arlo that he was ambushed by bounty

19  hunters, who "set us up to find the butterfly – Tamara."  He says they will be seeking out

20  Arlo and his family next.  Arlo flies home to collect his children and estranged wife, and

21  send them to New York, away from the Zone.

22    Knowing that to reenter the State, his family will need a hundred thousand dollars to

23  begin the "repatriation" process, Arlo accepts an offer from the warehouse operator, Dylan,

24  to make a dangerous "butterfly run" to transport Tamara Gwynn to Los Angeles on a sky-

25  cycle.  Tamara is heading to Los Angeles for a trial in a civil suit against the State

26  concerning her rights to the "A-cell" – a small glass cylinder that produces electricity from

27  "anti-matter" water.  She tells Arlo that use of the A-cell can potentially save more than 100

28  million people every year, who would otherwise die from "fuel pollution."

United States District Court

For the Northern District of California

1      Arlo sends the real A-cell to a different Zone to hide it; Tamara travels with a decoy.

2   On the flight, they are ambushed by police in "sky-cars" and crash into the streets of Los

3   Angeles.  They separate, and Arlo is apprehended.  Television news reports falsely claim

4   that Arlo kidnapped and killed Tamara.  Jerry Mathiessen, a federal agent who once

5   attended flight school with Arlo, is sent to investigate.  The State Secretary persuades Jerry

6   to take the case by promising to pay for medical assistance for Jerry's son.

7      Arlo is criminally charged and transported to a "work program" on Uberopolis until

8   his trial date.  Four months later, he is given a "ticket" to return to Earth for his trial.

9   While waiting for the shuttle transport, he meets a fellow prisoner, David Levine, also set to

10  return for trial.  They discuss the fact that the citizen-commute shuttles take five hours to

11  travel from Uberopolis to Earth and back, while the inmate return shuttles take only two

12  hours.  As they are being loaded onto the shuttle along with other prisoners, they notice

13  that there are no pilots, and conclude that Uberopolis has been killing prisoners by dumping

14  them into space during the shuttle flights.  They escape into an "airlock" to avoid suffering

15  the same fate.  They pilot the shuttle back to Earth and part ways.

16     Arlo locates his family in Rianna's mother's Manhattan apartment, and discovers that

17  daughter Franny is on a respirator, near death, and in need of the drug "Drexlerin."  Arlo

18  races to a warehouse that normally stocks the drug, but supplies on Earth are temporarily

19  exhausted because production of Drexlerin has been discontinued in anticipation of the

20  release of its replacement, "Drexlerin 2."  At the warehouse, Arlo meets brother and sister

21  Louis and Benni.  They provide Arlo with more respectable clothing, and help him obtain a

22  fake ID and passport that will enable him to covertly travel by shuttle to Uberopolis to find

23  Drexlerin.  As Arlo is arranging for his transport on the shuttle, he also recovers the A-cell,

24  which he had arranged to be sent to a friend for safekeeping.  Benni gives Arlo a yellow

25  butterfly "dreamcatcher" for luck.

26     Jerry manages to track Arlo down, but Arlo disarms Jerry and forces him into the

27  trunk of a sky-car.  Arlo tells Jerry he must find Drexlerin for Franny, and proceeds to

28  Uberopolis.  Upon arrival, Arlo obtains a police uniform and proceeds to the hospital

4

United States District Court
For the Northern District of California

1   warehouse to search for the Drexlerin.  He discovers that the warehouse is empty, and as

2   he is leaving the hospital, the security guards recognize him and give pursuit.  He steals an

3   unattended police "sky-ranger," and then contacts Drexler.  After he tells Drexler he has the

4   genuine A-cell, Drexler agrees to a meeting.

5       Based on the investigation he has been conducting, Jerry has figured out that Arlo

6   and Drexler are acquainted from their past during wartime.  After he is released from the

7   trunk of the sky-car, Jerry follows Arlo to Uberopolis and orders a technician in the "Drexler

8   Media" building to track Arlo's movements with surveillance cameras located throughout

9   the satellite.  Jerry forces the tech to broadcast the video from the surveillance cameras to

10  television stations.

11      With the surveillance cameras tracking and broadcasting his movements, Arlo

12  crashes the police sky-ranger through the glass windows of Drexler's 57th floor conference

13  room.  He persuades Drexler to dismiss the security guards by threatening to break the

14  glass A-cell and release the anti-matter, which will result in a massive explosion.

15      Arlo and Drexler converse.  Not knowing that the conversation is being televised,

16  Drexler confesses to a number of crimes, including dumping prisoners into space and

17  killing Zone residents and prisoners for transplant organs, and also to being an imposter.

18  Drexler is actually "Midland," a soldier previously known to Arlo.  Midland murdered the real

19  Drexler, adopted his identity, and inherited Drexler's fortune.

20      Drexler tells Arlo that Drexlerin is produced on Earth, but was "warehoused" on

21  Uberopolis "to keep it safe from pirates until our bunkers were ready" – and that the last

22  shipments were returned to Earth the previous day.  However, he has a few doses of

23  Drexlerin in his possession, and offers to exchange them for the A-cell.  He also offers to

24  have Arlo "escorted" to give his daughter the Drexlerin, after which he will be returned to

25  prison.

26      Arlo initially hesitates, telling Drexler that Tamara didn't want him to have the A-cell.

27  Drexler responds that "Tamara would have destroyed the energy industry and our economy

28  for her cause."  Drexler's plan is to phase the A-cell technology in over a thirty-year period,

United States District Court

For the Northern District of California

1  in order to protect the existing energy industry and the "quality of life," notwithstanding that

2  billions of people will die in the interim.

3      They begin to exchange the A-cell for the Drexlerin.  Drexler opens his briefcase and

4  removes the Drexlerin.  Arlo slowly extends the A-cell to Drexler, and takes the Drexlerin

5  from him.  He then sees in a mirror reflection that Drexler is reaching for a gun with his

6  other hand.  As Drexler's fingers come within an inch of the A-cell, Arlo tosses it out the

7  broken window.  Drexler scrambles out the window after the A-cell, gun in hand, followed

8  by Arlo.

9      As Drexler is about to grab the A-cell, Arlo seizes Drexler's ankle, and flings Drexler

10 toward the city floor.  However, Arlo's throw is not hard enough to hurt Drexler, because of

11 the reduced gravity on Uberopolis.  Arlo then seizes the A-cell, just before his own "gravity

12 garments" pull him down.

13     A lengthy fight and chase scene follows, involving Arlo, Drexler, Jerry, and the

14 police, culminating in Drexler bearing down on Arlo on a sky-ranger and shooting him in the

15 leg.  Arlo dives into a harbor to escape Drexler and encounters a dolphin named Spike

16 (whom he had previously met while waiting for transport with fellow prisoner David Levine)

17 and is guided to an escape hatch.

18     Drexler finds Arlo on a shuttle.  Just as Arlo is gaining the upper hand, he suffers a

19 debilitating "ice pick" headache caused by a longstanding chronic affliction.  Drexler shoots

20 Arlo and is on the verge of killing him when Jerry arrives and discharges his stun-gun into

21 Drexler's back, knocking him unconscious.  Arlo and Jerry pilot the shuttle off Uberopolis.

22 They are immediately targeted by a missile launched from Uberopolis.

23     Arlo drifts out of consciousness (from his bullet wound) and has a dreamlike vision of

24 a pale child with a respirator holding a yellow flower, and of Benni's dream catcher in the

25 eyes of Spike the dolphin.  Arlo awakes and orders Jerry to turn back toward Uberopolis.

26 The missile follows, and just before the shuttle collides with Uberopolis, Arlo launches an

27 evacuation pod.  The shuttle and missile continue forward and destroy Uberopolis.

28     Arlo and Franny survive.  They attend the funeral of Jerry's son, Matty, who died

United States District Court

For the Northern District of California

1  from a respiratory illness.  Rianna asks Arlo to "repatriate" into the State with his family, but

2  he declines, and returns to his job as a hover-jet pilot.

3  C.     Synopsis of "Elysium"

4      Defendants' film "Elysium" opens with images of Earth in total squalor.  The year is

5  2154, and the extremely wealthy have abandoned the planet to live on a luxurious space

6  station called "Elysium."  Elysium is exclusive to its wealthy citizens, who have access to

7  futuristic devices called "med bays," which cure all diseases and injuries, and can even halt

8  aging.  The less fortunate remaining on Earth are poor.  They live in rundown apartments

9  and have inadequate medical care, and are policed by a brutal robotic police force.

10     The film's protagonist, Max, grows up as a child in a convent where he befriends a

11  young girl, Frey.  As a child, Max steals under the delusion that he can buy his way onto

12  Elysium.  He continues stealing as an adult and has an extensive criminal history.  On

13  parole, Max lives in Los Angeles and works at a company called Armadyne building the

14  robots that police Earth.  Walking toward a bus headed to work, Max is confronted and

15  battered by robot police officers.  He proceeds to a hospital and is surprised when he is

16  treated by Frey, now a nurse.

17     The film cuts to a mass of people trying to board shuttles bound for Elysium.  An ID

18  is burned onto the wrist of everyone who boards the shuttle.  The shuttles take off.  As they

19  approach Elysium, the space station's Defense Secretary, Delacourt, gives an order to a

20  covert agent on Earth, Kruger, to destroy the shuttles.  Kruger destroys two of the shuttles

21  with shoulder-fired rockets.  The third shuttle lands on Elysium, and the "illegal aliens" on

22  board flee robot police forces.  One young girl enters a residence and is able to use a med

23  bay because the ID on her wrist fools the device into believing she is a citizen of Elysium.

24  Patel, the President of Elysium, reprimands Delacourt and dismisses Kruger.

25     Back on Earth, Max is accidentally shut in a chamber while working at Armadyne,

26  and is exposed to a heavy dose of radiation.  In a flashback scene, a nun hands the child

27  Max a locket with a photo of Earth to remind him that Earth looks as beautiful from there as

28  Elysium "looks beautiful from here."  Max awakes and is told by an Armadyne robot that he

United States District Court

For the Northern District of California

1   will die in five days from the radiation exposure.

2          Max finds Spider, a smuggler who runs the illegal shuttles to Elysium.  In exchange

3   for a promise of a shuttle ride to Elysium where he might be able to access a med bay to

4   cure his fatal condition, Max accepts a dangerous mission: he must kidnap Armadyne's

5   chief officer, John Carlyle, and download valuable data from Carlyle's brain into his own

6   using a futuristic device.  An exoskeleton is installed onto Max's body and head to give him

7   super-human strength.

8          Meanwhile, Delacourt has persuaded Carlyle, who also designed Elysium, to

9   prepare a "reboot sequence" that will allow her to wrest the presidency of Elysium from the

10  current President, Patel, with whom she has political differences.  Carlyle uploads the

11  software program into his brain, and leaves Earth on a private shuttle.  However, Max and

12  his fellow rebels intercept the shuttle, capture Carlyle, and plug Carlyle's brain into Max's.

13  Max's brain seizes when the download starts because of a defense mechanism that Carlyle

14  encoded into the reboot sequence.

15         Delacourt learns of the kidnapping and orders Kruger to intercede but to avoid

16  harming Max (because Max holds the reboot sequence in his brain).  Max evades Kruger

17  and his men, who arrive in an airship and kill everyone else.  Severely injured, Max finds

18  Frey, who takes him to her home.  He tells Frey that he must travel to Elysium to save his

19  life.  Frey begs Max to take her daughter Matilda, who is dying of leukemia, with him.  He

20  refuses, in order to protect them, and leaves.

21         Max returns to Spider's hideout to get a shuttle to Elysium, but the air traffic system

22  has been frozen by the authorities on Elysium.  Spider plugs a computer into Max's brain

23  and is astonished to see that Max now possesses a reboot sequence that would "override

24  the whole system" and "open the borders," thus making everyone a citizen of Elysium.  Max

25  is interested only in saving his own life and refuses to help Spider.  He leaves and

26  voluntarily surrenders to Kruger.  Max threatens that he will blow up Kruger's ship with a

27  grenade unless he is taken to a med bay on Elysium, but as he boards the ship, he

28  discovers that Kruger has found and kidnapped Frey and Matilda.

A fight erupts en route to Elysium.  Max drops the grenade.  It detonates, destroying Kruger's face and crashing the ship on Elysium.  Frey and Matilda flee to a house in hopes of using a med bay, but it does not work because Matilda is not a citizen.  All three are captured.

Delacourt confronts Kruger for crashing a ship onto Elysium.  Kruger, whose mangled face has been regenerated by a med bay, decides that he will use the reboot sequence to make himself the president of Elysium, and he stabs and kills Delacourt. Max, Frey, and Matilda are being held separately in a control center on Elysium.

Max escapes and sees on a video screen that Spider and his men have landed on Elysium. He contacts Spider to set up a rendezvous, and also rescues Frey and Matilda and tells them to head to a med bay.  Max and Spider race to download the reboot sequence as Kruger chases them.  Max suffers a seizure which allows Kruger to catch up, but he is able to kill Kruger.

Max and Spider make it to a control room.  Max understands that he will die the moment the reboot sequence is extracted from his brain.  Max studies his locket with the picture of Earth while staring at the actual planet out a large window.  He pushes a button to start the download and dies instantly.  When the download completes, Elysium's computer systems recognize everyone on Earth as citizens of Elysium. Matilda's leukemia is cured by a med bay, and an armada of shuttles equipped with med bays is dispatched toward Earth.

**DISCUSSION**

A.    Legal Standards

1.    Motions for Summary Judgment

A party may move for summary judgment on a "claim or defense" or "part of . . . a claim or defense."  Fed. R. Civ. P. 56(a).  Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Id.

A party seeking summary judgment bears the initial burden of informing the court of

United States District Court

For the Northern District of California

the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. <u>Celotex Corp.</u> <u>v. Catrett</u>, 477 U.S. 317, 323 (1986). Material facts are those that might affect the outcome of the case. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. <u>Id.</u>

Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. <u>Soremekun v. Thrifty Payless, Inc.</u>, 509 F.3d 978, 984 (9th Cir. 2007). On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case. <u>Celotex</u>, 477 U.S. at 324-25. If the moving party meets its initial burden, the opposing party must then set out specific facts showing a genuine issue for trial in order to defeat the motion. <u>Anderson</u>, 477 U.S. at 250; <u>see also</u> Fed. R. Civ. P. 56(c).

When deciding a summary judgment motion, a court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. <u>Anderson</u>, 477 U.S. at 255; <u>Hunt v. City of Los Angeles</u>, 638 F.3d 703, 709 (9th Cir. 2011).

2.      Copyright infringement

To prevail on a claim of copyright infringement, a plaintiff must demonstrate ownership of a valid copyright, and infringement – the copying of protected elements of the work. <u>Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.</u>, 499 U.S. 340, 361 (1991). Absent evidence of direct copying, the plaintiff must demonstrate both that the defendant had "access" to the plaintiff's work and that the two works are substantially similar. <u>Funky</u> <u>Films, Inc. v. Time Warner Entm't Co., L.P.</u>, 462 F.3d 1072, 1076 (9th Cir. 2006).

In evaluating whether two works are substantially similar, the Ninth Circuit employs an "extrinsic test" and an "intrinsic test." <u>See</u> <u>Benay v. Warner Bros. Entm't, Inc.</u>, 607 F.3d 620, 624 (9th Cir. 2010); <u>Rice v. Fox Broadcasting Co.</u>, 330 F.3d 1170, 1174 (9th Cir.

2003).  The extrinsic test is "an objective comparison of specific expressive elements[,]" while the intrinsic test is a subjective comparison that focuses on "'whether the ordinary, reasonable audience' would find the works substantially similar in the 'total concept and feel of the works.'"  Benay, 607 F.3d at 624 (quoting Cavalier v. Random House, Inc., 297 F.3d 815, 822 (9th Cir. 2002)).  Only the extrinsic test is applied at the summary judgment stage.  Funky Films, 462 F.3d at 1077.  The intrinsic test is left to the trier of fact.  Id.

The extrinsic test "'focuses on articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events in two works.'"  Benay, 607 F.3d at 624 (quoting Kouf v. Walt Disney Pictures & Television, 16 F.3d 1042, 1045 (9th Cir. 1994)).  The court must take care to inquire only whether the protectable elements, standing alone, are substantially similar.  Id. (citing Cavalier, 297 F.3d at 822); see also Rice, 330 F.3d at 1174 (courts "must distinguish between the protectable and unprotectable material because a party claiming infringement may place 'no reliance upon any similarity in expression resulting from unprotectable elements.'") (citation omitted).  In other words, courts "filter out and disregard the non-protectable elements in making [a] substantial similarity determination."  Funky Films, 462 F.3d at 1077 (quoting Cavalier, 297 F.3d at 822).

B.    The Parties' Motions for Summary Judgment

Plaintiff has attached a copy of the June 21, 2013 Certificate of Registration from the Copyright Office to the FAC.  A copyright registration is "prima facie evidence of the validity of the copyright and the facts stated in the certificate" if the work is registered before or within five years of when it is first published. 17 U.S.C. § 410(c); see also Entertainment Research Grp., Inc. v. Genesis Creative Grp., Inc., 122 F.3d 1211, 1217 (9th Cir. 1997). Defendants do not challenge plaintiff's ownership of a valid copyright in a work entitled "Butterfly Driver" (formerly "City of Light: Uberopolis").

Thus, plaintiff's burden on summary judgment is to show that there are no triable issues with regard to the second element of the claim of copyright infringement – the copying of protected elements of his original work – such that summary judgment must be

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    granted as a matter of law.  Celotex, 477 U.S. at 323; Soremekun, 509 F.3d at 984.

2    Specifically, plaintiff must provide direct evidence of copying, or circumstantial evidence

3    "through a combination of access to the copyrighted work and substantial similarity

4    between the copyrighted work and the accused product."  Three Boys Music Corp. v.

5    Bolton, 212 F.3d 477, 481 (9th Cir. 2000).

6            For their part, defendants' burden on summary judgment is to point out an absence

7    of evidence to support the "copying" element of plaintiff's claim; and, if they are successful,

8    the burden then shifts to plaintiff to set out specific facts showing a genuine issue for trial in

9    order to defeat the motion.  Anderson, 477 U.S. at 250; Fed. R. Civ. P. 56(c).

10               1.    Access

11           Defendants contend that plaintiff has no evidence of access.  Direct access is shown

12   if there is proof that the defendant actually viewed, read, or heard the work at issue.  Lucky

13   Break Wishbone Corp. v. Sears, Roebuck & Co., 528 F.Supp. 2d 1106, 1122 (W.D. Wash.

14   2007), aff'd, 373 Fed. Appx. 752 (9th Cir. 2010).  Here, plaintiff has provided no direct

15   evidence that defendants ever saw the "Butterfly Driver" screenplay.

16           Access may also be demonstrated by circumstantial evidence, which requires a

17   showing that the defendants had a "reasonable opportunity" or a "reasonable possibility" of

18   viewing plaintiff's work prior to the creation of the infringing work.  See Three Boys Music,

19   212 F.3d at 482 (access may be shown by a chain of events connecting plaintiff's work and

20   the defendant's opportunity to view/hear/copy the work, such as dealings through a third

21   party that had access to the plaintiff's work and with whom both the plaintiff and the

22   defendant were dealing; or by the plaintiff's work being widely disseminated).  Reasonable

23   access requires more than a "bare possibility," and "may not be inferred through mere

24   speculation or conjecture."  Id. (citations and quotations omitted); see also Art Attacks Ink,

25   LLC v. MGA Entm't Inc., 581 F.3d 1138, 1143-44 (9th Cir. 2009).

26           Both in his own motion and in his opposition to defendants' motion, plaintiff relies on

27   the allegations in the FAC.  There, he asserts that he posted the "Butterfly Driver" script on

28   a website operated by triggerstreet.com in February 2007, and that triggerstreet.com was

United States District Court

For the Northern District of California

1    "the only place" he ever posted a complete script of "Butterfly Driver."  FAC ¶¶ 18-22.  At

2    the time, triggerstreet.com allowed members to post screenplays and short films to get

3    feedback from peers and professionals – and gave them "a small hope of being noticed by

4    a Hollywood insider."  FAC ¶ 231.

5         Based on this, plaintiff asserts that triggerstreet.com "is where the [d]efendants had

6    access to [p]laintiff's script."  FAC ¶ 23.  He claims that he posted four versions of "Butterfly

7    Driver" on triggerstreet.com between February and August 2007, and that after he posted

8    one of the versions in late July 2007, "[a] young director (whose name escapes the

9    [p]laintiff) . . . praised the script through the [website's] message board."  FAC ¶ 26.

10   Plaintiff alleges that this director "MAY have been [d]efendant, Neill Blomkamp[,]" although

11   he also asserts that "Blomkamp, or any associate, may have accessed the work, without a

12   word."  FAC ¶ 26 (emphasis in original).  He does not believe that the founders of

13   triggerstreet.com "were complicit in the access of his work or the infringement[,] but . . . is

14   certain that one or more of the [d]efendants, or an acquaintance, accessed the [p]laintiff's

15   work on triggerstreet.com."  FAC ¶ 226.

16        In plaintiff's view, Blomkamp, who is credited with writing "Elysium," is "most likely

17   the infringer" because (a) triggerstreet.com is a website for short filmmakers and

18   screenwriters; (b) in 2007 Blomkamp was exclusively a short filmmaker, who was based in

19   Los Angeles (home of Trigger Street); (c) Blomkamp was "perhaps the most social media

20   savvy short filmmaker in the world – and living in the screenwriting hub of the world;" and

21   (d) plaintiff was a screenwriter.  See FAC ¶¶ 227, 232, 233.

22        Defendants contend, however, that plaintiff alleges no facts in the FAC to support his

23   claim that Blomkamp found the "Butterfly Driver" screenplay on triggerstreet.com.  They

24   argue further that plaintiff has no evidence that any defendant, including Blomkamp, had a

25   reasonable opportunity or any reasonable possibility of viewing "Butterfly Driver," and that

26   plaintiff is simply speculating when he alleges in the FAC (and argues in these motions)

27   that Blomkamp accessed his screenplay on triggerstreet.com.

28        Defendants also assert that such a contention is rebutted by Blomkamp's

13

United States District Court
For the Northern District of California

1    uncontroverted declaration filed in support of defendants' motion.  In his declaration,

2    Blomkamp states that before this lawsuit was filed, he had never heard of the website

3    triggerstreet.com; that he has never visited the website; and that he did not obtain a copy of

4    plaintiff's screenplay on that site or anywhere else, and was not given a copy by anyone.

5    Declaration of Neill Blomkamp ("Blomkamp Decl.") ¶¶ 7-8.

6         Blomkamp briefly explains the genesis of "Elysium" as follows.  He states that he

7    was raised in Johannesburg, South Africa, where he lived for 18 years before moving to

8    Vancouver.  As a teenager he began pursuing 3D animation and design, which he

9    continued studying in film school.  Blomkamp Decl. ¶ 2.  He made several short films

10   between 2004 and 2007, with storylines involving extraterrestrials and robotic workers.  His

11   first feature film was "District 9," which tells the story of extraterrestrials who are marooned

12   in South Africa when their spacecraft becomes disabled, and are confined to camp outside

13   of Johannesburg, and which explores themes of racism and segregation, and has a main

14   character who transforms into an alien after coming in contact with an extraterrestrial

15   substance.  Blomkamp Decl. ¶¶ 3-4.  He asserts that he created "Elysium" as he creates all

16   his works, proceeding from visual concepts (in this case, utopian space stations and a

17   robotic police force) and incorporating themes of racial and class segregation (building on

18   his earlier works).  Blomkamp Decl. ¶¶ 5-6.

19        As noted above, to establish infringement, a plaintiff that has a valid copyright

20   registration must provide evidence of both access and copying.  Here, plaintiff has no

21   evidence that Blomkamp or any defendant had access to his "Butterfly Driver" screenplay.

22   Plaintiff contends that he "dedicated over a page of the FAC (page 4 line 11 to page 5 line

23   13) to alleging facts supporting the plausibility of Blomkamp accessing his screenplay on

24   triggerstreet.com."  However, allegations in a complaint are not evidence that can be used

25   to support or oppose summary judgment.  See Celotex, 477 U.S. at 324; see also

26   Hernandez v. Spacelabs Med. Inc., 343 F.3d 1107, 1112 (9th Cir. 2003).  Moreover, the

27   allegations in the FAC are entirely speculative as they relate to Blomkamp's access to the

28   screenplay.  Plaintiff has failed to provide any evidence supporting his assertion that

United States District Court

For the Northern District of California

1   defendants had access to his screenplay.

2       In his own motion, plaintiff argues that access can be established under the "chain of

3   events" theory.  He reiterates that he posted his screenplay on triggerstreet.com; that

4   triggerstreet.com was based in Los Angeles; that the majority of triggerstreet.com members

5   were "short filmmakers and screenwriters;" and that Blomkomp was a short film-maker who

6   was "media-savvy" and who was based in Los Angeles (the "screenwriting hub of the

7   world").

8       Even assuming for the sake of argument that these factual assertions are judicially

9   noticeable and/or supported by evidence, together they do no more than suggest a bare

10  possibility of access, which is insufficient to sustain a copyright infringement claim.  Plaintiff

11  has not provided evidence of a chain of events sufficient to establish a reasonable

12  possibility of access.  See Jason v. Fonda, 698 F.2d 966, 967 (9th Cir. 1982); see also Art

13  Attacks, 581 F.3d at 1144.

14      He also asserts that his screenplay was so widely disseminated that it is reasonably

15  possible that Blomkamp had access to his work.  He claims that he emailed the screenplay

16  to his family and friends, and that he posted drafts of the screenplay on triggerstreet.com.

17  However, even were this claim supported by evidence, it does not show  wide

18  dissemination sufficient to support an inference that defendants had access to his work, or

19  to raise a triable issue as to access.  He also contends that over a 23-month period he sent

20  queries to agents seeking representation, posted short synopses of the storyline on

21  screenwriter websites, and entered screenwriting competitions.  Again, these

22  communications and Internet postings do not constitute evidence of wide dissemination of

23  the screenplay.

24      2.      Infringement

25      Had plaintiff provided some evidence of access (even circumstantial), he could

26  potentially show infringement by demonstrating that the two works are "substantially

27  similar."  Because plaintiff lacks any evidence of access, however, he can establish

28  copyright infringement only by showing "striking similarity."  See Three Boys Music, 212

United States District Court

For the Northern District of California

1  F.3d at 485 ("in the absence of any proof of access, a copyright plaintiff can still make out a

2  case of infringement by showing that the [works] were 'strikingly similar'") (citations

3  omitted); see also Pringle v. Adams, 556 Fed. Appx. 586, 587 (9th Cir. Feb. 21, 2014);

4  Seals-McClellan v. Dreamworks, Inc., 120 Fed. Appx. 3, 4 (9th Cir. 2004) (citing Baxter v.

5  MCA, Inc., 812 F.2d 421, 424 n.2 (9th Cir. 1987)).

6      Striking similarity is a high bar.  "At base, 'striking similarity' simply means that, in

7  human experience, it is virtually impossible that the two works could have been

8  independently created."  4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright

9  § 13.02[B] (2005), quoted in Stewart v. Wachowski, 574 F.Supp. 2d 1074, 1103 (C.D. Cal.

10  2005); see also Bernal v. Paradigm Talent and Literary Agency, 788 F.Supp. 2d 1043,

11  1052 (C.D. Cal. 2010).  That is, "[t]o show a striking similarity between works, a plaintiff

12  must produce evidence that the accused work could not possibly have been the result of

13  independent creation."  Seals-McClellan, 120 Fed. Appx. at 4 (emphasis in original)

14  (citation omitted).

15      Defendants contend that the protectable elements of the two works share no

16  similarity in expression – let alone "striking similarity."  Protectable expression includes "the

17  specific details of an author's rendering of ideas."  Funky Films, 462 F.3d at 1077 (citation

18  and quotation omitted).  What is not protectable are "basic plot ideas for stories" or other

19  generic concepts.  Id.; see also Van v. Cameron, 566 Fed. Appx. 615, 616 (9th Cir. 2014).

20      Plaintiff asserts that "Elysium" infringes numerous elements of his "Butterfly Driver"

21  screenplay, including "plot, characters, settings, conflicts, themes, catalyst, crisis, climax,

22  inciting incident, his hero's 'character affliction,' and 'keepsake necklace' and more."

23  Defendants argue that neither the plot/sequence of events, nor the settings, nor the

24  dialogue, nor the characters, nor the themes, nor the mood/pace in the two works are

25  similar.  In addition, defendants assert that the parties' works share nothing more than

26  "stock" or "cliché" ideas.  In opposition and in support of his own motion, plaintiff argues

27  that all the elements alleged in the FAC are similar.

28      When evaluating literary works for similarity, courts compare the works' plot, themes,

United States District Court

For the Northern District of California

1    dialogue, mood, setting, pace, characters, and sequence of events.  See Berkic, 761 F.2d

2    at 1292.  Here, while there may be some superficial similarities between the two works, a

3    close examination of the screenplay and the film reveals many significant differences and

4    few real similarities among the protectable elements.[1]

5                                    Plot/sequence of events

6          Plaintiff asserts that defendants copied numerous "plot features" of the "Butterfly

7    Driver" screenplay.  Generally, the "plot features" identified by plaintiff are similar only at a

8    very abstract level.  Indeed, many of these features reflect generic themes that are not

9    expressly similar in the two works.[2]

10         First, plaintiff contends that in both "Butterfly Driver" and "Elysium," there is a hero

11   who must get to the satellite world for medicine or medical care.  This is an abstract idea

12   that is not expressed similarly in the screenplay and the film.  In the screenplay, Arlo is on a

13   mission to save his daughter Franny, and travels to Uberopolis after he discovers that

14   supplies of Drexlerin on Earth are exhausted.  In the film, Max is dying of a fatal dose of

15   radiation, and must travel to Elysium because that is the only place that there is any

16   possibility of receiving the necessary medical treatment to counter the radiation poisoning.

17   He travels there to save himself, not a child.

18   _____

19         [1]  Plaintiff compares the "Butterfly Driver" screenplay to the apparently unauthorized
     (and unauthenticated) version of the "Elysium" screenplay he downloaded.  The proper
20   comparison is between the "Butterfly Driver" screenplay and the film "Elysium."  See Quirk v.
     Sony Pictures Entm't, Inc., 2013 WL 1345075 at *6 (N.D. Cal. Apr. 2, 2013) (in a case where
21   the plaintiff alleged that the defendant's film infringed his novel, the "only relevant question
     [was] . . . whether the final movie as filmed, edited, and released" contained matter
22   substantially similar to protectable elements of the plaintiff's novel); see also See v. Durang,
     711 F.2d 141, 142 (9th Cir.1983).
23
           In addition, plaintiff claims he downloaded the "Elysium" screenplay on June 13, 2013,
24   a week before he obtained his copyright registration.  However, he had seen a trailer for the
     film "Elysium" on May 27, 2013.  While the actual film was not released in the theaters until
25   October 9, 2013, plaintiff cannot maintain an action for copyright infringement based on an
     undated version of an "Elysium" screenplay that he downloaded prior to his copyright
26   registration.

27         [2]  In addition, a number of what plaintiff characterizes as "plot features" appear to the
     court to instead be features of setting, theme, or character.  Accordingly, the court has
28   endeavored to place any analysis of those features under the appropriate heading.

1    Second, plaintiff asserts that the hero in the "Butterfly Driver" screenplay is poor,

2  witnesses the death of his best friend, and needs I.D. and transport to a satellite world, and

3  that the same is true of the hero in the film "Elysium."  However, these ideas are not

4  expressed similarly in the two works.  In the screenplay, Arlo requires a fake ID because he

5  is a fugitive on the run from the authorities and can't travel to Uberopolis under his own

6  identity.  In the film, Max (or anyone traveling to Elysium) needs an ID burned onto his/her

7  arm so he/she will be recognized as a citizen of Elysium.

8    There is no support for plaintiff's assertion that the two works are similar in the

9  manner that each hero "witnesses the death of his best friend."  Arlo responds to a distress

10  call from Roddy, and arrives just as Roddy (who was shot by bounty hunters) is dying, to

11  learn that bounty hunters are after his (Arlo's) family.  Max and his friend Julio are on a

12  mission to kidnap Carlyle and steal data from his brain, when the covert agent Kruger

13  arrives and kills Julio with a sword.

14    Third, plaintiff contends that in both works, there is a disabled transporter who helps

15  the hero's emigration plan, on condition that the hero accept a dangerous mission.  This

16  appears to be an attempt to compare the screenplay's Dylan and the film's Spider – two

17  very different characters who play very different roles in the story.

18    In "Butterfly Driver," Dylan is Arlo's boss at the warehouse, and he plays a minor role

19  by setting Arlo up with a "butterfly run" so that Arlo can earn the money he needs for his

20  family's repatriation.  In the film "Elysium," Spider is not Max's boss, and there are no

21  "butterfly runs."  Rather, Spider is an independent operator who runs undocumented

22  shuttles from Earth to Elysium.  He engages Max to kidnap Carlyle and download data from

23  his brain, and coordinates the effort to reboot Elysium's computers to make everyone on

24  Earth a citizen of Elysium.  While it is true that both Dylan and Spider have physical

25  disabilities, there is no comparison between the role played by Spider in the plot of the film

26  "Elysium" and the minor role played by Dylan in the plot of the "Butterfly Driver" screenplay.

27    Fourth, plaintiff asserts that there is an agent in each work who is sent by the villain

28  to apprehend the hero, and who accepts the assignment after negotiating.  This appears to

United States District Court

For the Northern District of California

1  be an attempt to compare the roles of Jerry and Kruger in the plots of the screenplay and

2  the film, respectively.  However, their roles are vastly different.  In the screenplay, Jerry is a

3  federal agent working for the State.  He investigates Arlo on suspicion of murdering Tamara

4  Gwynn.  After discovering that Arlo is innocent, he helps Arlo expose Drexler as a murderer

5  and imposter, and saves Arlo from Drexler.  In the film, Kruger does none of those things.

6  Instead, he pursues Max with the goal of obtaining the reboot sequence that has been

7  downloaded into Max's brain.  And rather than attempting to rescue Max, Kroger hunts him

8  down and attempts to kill him.

9      Fifth, plaintiff contends that in each work, the hero carries a "keepsake necklace,"

10  which factors in to the story's conclusion.  In the "Butterfly Driver" screenplay, Benni, who

11  appears to be interested romantically in Arlo, gives him a yellow butterfly dreamcatcher for

12  good luck.  Although Arlo sees the dreamcatcher in Spike the dolphin's eye during his

13  dreamlike vision, its significance to the work is negligible.  By contrast, in the film "Elysium,"

14  the nun who raises Max in the orphanage gives him a locket with a picture of Earth.  This

15  locket is not a dreamcatcher, a good luck charm, or a token of romantic interest.  It is a

16  teaching tool to remind Max of the beauty around him.  Moreover, the locket plays into the

17  climax of the film in a way that is unrelated to the plot of the screenplay.

18      Sixth, plaintiff asserts that in each work, the hero threatens the villain with detonating

19  an explosive device.  In "Butterfly Driver," Arlo threatens to use the A-cell to blow up

20  Uberopolis if Drexler refuses to dismiss the security guards and meet with him.  In the film

21  "Elysium," Max threatens that he will blow up Kruger's shuttle if Kruger or his men try to

22  harm him.  The only similar element here is the stock idea of using a threatened explosion

23  as leverage.

24      Seventh, plaintiff contends that both the screenplay and the film have "techie"

25  programmers who help the hero with fake identification to get into the satellite world.

26  However, this characterization is misleading and does not reflect the actual plot of either

27  work.  The identification required by Arlo (fake ID, necessitated by fact that he is a fugitive

28  and can't travel under his own name) is different from the identification required by Max (ID

United States District Court
For the Northern District of California

1    burned into the arm, which will enable him to pass as a citizen of Elysium).

2         Eighth, plaintiff asserts that each work includes a primary character who negotiates

3    with insurers (or a hospital) for the life of his/her child.  This is a common or even generic

4    idea which, as defendants note, has been previously used in the plot of films such as the

5    2002 film "John Q" with Denzel Washington.  As for the "negotiating," plaintiff appears to be

6    attempting to compare the screenplay's Jerry, whose son Matty needs a "filter room"

7    because of respiratory ailments, with the films's Frey, whose daughter is in the hospital with

8    leukemia.  However, Jerry is offered financial help with the "filter room" if he accepts the

9    task of investigating Arlo, but nothing like this occurs with Frey, who is simply forced to take

10   her daughter home from the hospital because her daughter cannot be cured there.

11   Ninth, plaintiff contends that both "Butterfly Driver" and "Elysium" include a climatic battle

12   between the hero and the villain, during which the hero suffers a terrible headache.

13   Plaintiff appears to be attempting to compare the chase and fight scene between Arlo and

14   Drexler in his screenplay, and the chase and fight scene between Max and Kruger in

15   "Elysium."

16        These scenes are not similar except at the most general level.  In the "Butterfly

17   Driver" screenplay, Arlo confronts Drexler by flying a sky-cycle through the glass windows

18   of his 57th floor office.  Not knowing that the conversation is being recorded by surveillance

19   cameras and broadcast on television, Drexler confesses to his crimes including being an

20   imposter.  In the ensuing struggle, Arlo and Drexler exit the office through the broken

21   window, but float to the ground unharmed because of reduced gravity on Uberopolis.  Their

22   chase and fight scene takes them through the streets of Uberopolis and eventually onto a

23   shuttle.  Arlo suffers a headache mid-combat and Drexler seizes the moment to shoot him

24   in the neck. Drexler is about to kill Arlo when Jerry intercedes and saves his life.

25        By contrast, in the film "Elysium," Max is being held captive in an Elysium control

26   center. He escapes and sees on a video screen that Spider and his men have arrived on

27   the space station.  Max rescues Frey and Matilda and tells them to find a med bay.  He

28   then meets Spider, and the two of them race to a control room where they can start the

United States District Court

For the Northern District of California

1   reboot sequence in Max's brain.  Max and Spider are fleeing Kruger when Max suffers a

2   seizure caused by the defense mechanism that Carlyle coded into the reboot sequence.

3   Kruger catches up, but Max kills him in a hand-to-hand fight with the help of an exoskeleton

4   that was grafted onto his body to give him added strength.  Max and Spider continue to the

5   control room where they succeed in rebooting Elysium's computers.  These scenes from

6   the film are nothing like the scenes in the screenplay.

7        Tenth, plaintiff asserts that both works conclude with a "globally significant

8   resolution."  This is a generic idea that is not copyrightable.  Moreover, it is not expressed

9   in a similar manner in the two works.  The screenplay concludes with Arlo destroying

10  Uberopolis, while the film concludes with the software program that was downloaded into

11  Max's brain rebooting Elysium's computers to open up citizenship to everyone on Earth.

12  While these resolutions may be "global" and even "significant," they are clearly not similar.

13       In short, none of the "plot features" identified by plaintiff is similar in the two works,

14  except at the highest level of abstraction.  Because unprotected elements are irrelevant, it

15  is "not the basic plot ideas for stories, but the actual concrete elements that make up the

16  total sequence of events and the relationships between the major characters" that must be

17  compared.  Funky Films, 462 F.3d at 1077 (quoting Berkic v. Crichton, 761 F.2d 1289,

18  1293 (9th Cir. 1985)).  Similarities in general plot ideas are not probative of infringement.

19  Id. at 1081; see also Benay, 607 F.3d at 624 ("[f]amiliar stock scenes and themes that are

20  staples of literature are not protected").  Likewise, scènes à faire – or situations that "flow

21  naturally from generic plot-lines" – are unprotected and therefore ignored under the

22  extrinsic test.  Funky Films, 462 F.3d at 1077; see also Benay, 607 F.3d at 624-25.

23       Benay, Funky Films, and Berkic are all cases in which the Ninth Circuit noted

24  similarities between the plaintiff's work and the accused work at relatively high level of

25  abstraction, but many substantial differences upon closer examination.  In Benay, the

26  authors of a screenplay ("The Last Samurai") sued the creators of a film (also called "The

27  Last Samurai") alleging copyright infringement.  Both works told the story of an American

28  war veteran who travels to Japan in the 1870s to train the Japanese Imperial Army in

21

United States District Court

For the Northern District of California

1    modern Western warfare in order to combat a "samurai uprising."  Id., 607 F.3d at 625.  In

2    both works, the protagonist meets the Emperor, who is struggling to modernize Japan; the

3    protagonist introduces modern warfare to the Imperial Army, using contemporary Western

4    weaponry and tactics; and the protagonist suffers a personal crisis and is transformed as a

5    result of his interaction with the samurai.  Id.  Nevertheless, the court found that the two

6    works were similar only at a "cursory" level, and that a closer examination of the

7    protectable elements exposed more differences than similarities.  Id.

8         The court described the screenplay as "largely a revenge story," in which the

9    protagonist "emerges from domestic security, to despair at the loss of his son, to revenge

10   and triumph when he defeats his ruthless antagonist, Saigo."  Id.  In contrast, the film,

11   which the court described as "more a captivity narrative," somewhat reminiscent of

12   "Dances with Wolves," the protagonist "moves from isolation and self-destructive behavior,

13   to the discovery of traditional values and a way of life that he later comes to embrace."  Id.

14        In Funky Films, the creator of a screenplay ("The Funk Parlor") sued the creators of

15   a television series ("Six Feet Under") alleging copyright infringement.  Among other things,

16   both works involved narratives about a family-run funeral parlor, the death of the family

17   patriarch, the inheritance of the business by the family's two sons (one older and more

18   "creative" and the other younger and more "conservative"), and the return of the older

19   brother from a distant city to help run the family business, which was on fragile financial

20   footing and was fighting off a rival funeral parlor.  Id., 462 F.3d at 1077-78.  Nevertheless,

21   despite these apparent similarities, the court found that an actual reading  of the two works

22   reveals numerous significant differences.

23        For example, the court found that the father's suicide in "The Funk Parlor" sets the

24   stage for a series of additional murders, including several of the main characters.  The

25   story revolves around the older brother, who rehabilitates the business, falls in love with

26   one of the central characters, proposes to her, and then discovers she is a serial murderer

27   and feels compelled to kill her to save his own life.  Id. at 1078.  By contrast, the court

28   noted, "Six Feet Under" is not a murder mystery, and does not revolve around a particular

United States District Court

For the Northern District of California

1    plot line, as the series develops separate plot lines around each member of the family, and

2    examines each character's psyche and his or her interpersonal interactions and emotional

3    attachments in the wake of the cataclysmic death of the patriarch of the family.  Id.

4         In Berkic, the author of a screenplay ("Reincarnation, Inc.") sued the writer/director

5    and producer of a film ("Coma"), which was based on a novel by the same name by Robin

6    Cook. The plaintiff alleged that both the book and the movie infringed his screenplay.  The

7    court found that "[a]t a very high level of generality, the works do show a certain gruesome

8    similarity," as both works "deal with criminal organizations that murder healthy young

9    people, then remove and sell their vital organs to wealthy people in need of organ

10   transplants[.]"  In addition, the court noted, both works "[t]o some extent . . . take their

11   general story from the adventures of a young professional who courageously investigates,

12   and finally exposes, the criminal organization."  Id., 761 F.2d at 1293.

13        However, looking at "the actual concrete elements that make up the total sequence

14   of events," the court found the plot ideas to be less similar than dissimilar, as the main

15   character in the screenplay does not, until very late in the story, participate in the

16   investigation that exposes the criminal organization, and was in fact a dupe of the criminal

17   organization.  Id.  In addition, the police lieutenant who investigates the deaths was seeking

18   to advance his career, while the main character in the film/book – a doctor investigating the

19   unexplained brain deaths of young, healthy patients – was motivated by  personal

20   concerns, as her best friend had previously fallen victim to the organization.  Id.

21        Similarly, in the present case, the general plot features identified by plaintiff are

22   unprotected because they share only abstract similarities, and do not reflect objective

23   details that are original to the plaintiff.  As such, they do not support a finding that there is

24   substantial similarity between "Butterfly Driver" and "Elysium," let alone a striking similarity.

25                                    Characters

26        Plaintiff argues that the characters of "hero," "villain," and "sick child" in the film

27   "Elysium" are similar to characters in the "Butterfly Driver" screenplay.  First, with regard to

28   the heroes, plaintiff claims that there are similarities between Arlo and Max as to age (35-

United States District Court

For the Northern District of California

45 years old); general economic status (impoverished); the fact that each carries a "keepsake necklace," which he received from a "special woman from his past;" and the fact that each "suffers from headaches," and battles a headache in the climax of the story.  He also asserts that each hero has a similar goal – Arlo has less than a week to get from Earth to a satellite world, to get medicine to save his daughter, while Max has less than a week to get to a satellite world, to get medical care to save himself and his "girl-friend's" daughter, and that in order to accomplish that goal, each hero contacts underworld figures to get I.D. and transport to the satellite world.

It is true that each hero is within the same age range, but that is not a protectable character feature.  As for general economic status, that too is a generic idea.  Arlo is a war hero and hover-craft pilot who flies supplies in the Zones outside the "Global State," and is a father of two who goes on a selfless mission to save his daughter, and succeeds.  By contrast, Max is unmarried, has no children, is on parole, and works at a local factory making robotic police officers.  Also unlike Arlo, Max is on a self-centered mission to save his own life at the expense of the lives of others.  Essentially, Arlo and Max are similar only in that each occupies the role of a male protagonist.

It is also true that Arlo and Max both suffer a chronic ailment.  However, in "Butterfly Driver," Arlo has a long history of suffering from "ice pick" headaches that sometimes "knock him to his knees."  Indeed, Jerry recalls that Arlo was "kicked out" of flight school because he was considered unfit to fly by virtue of the chronic headaches.  By contrast, Max, the hero of "Elysium," suffers seizures (not headaches), but this ailment begins only after he downloads the reboot sequence from Carlyle's brain.  Moreover, while Arlo suffers a headache and Max suffers a seizure in the climatic scenes of the respective works, those scenes are not similar.  In the screenplay, Arlo and Drexler are fighting in a shuttle when Arlo suffers a headache, and Drexler shoots him in the neck.  In the film, Max suffers a seizure, which allows Kruger time to catch up, but Max kills Kruger in a fight.

Nor are the heroes similar with regard to what plaintiff refers to as "the keepsake necklace."  In "Butterfly Driver," Benni gives Arlo a yellow dreamcatcher for "good luck,"

**United States District Court**
For the Northern District of California

and as he faces possible death near the end of the screenplay, he sees the dreamcatcher in a "vision." However, he does not die. In "Elysium," a nun gives Max a locket when he is a child, to remind him of the beauty around him, and as he is dying from the effect of the downloading of the reboot sequence, he looks at the locket and remembers Frey (in a dreamlike way).

Second, plaintiff contends that there are similarities between the two villains (Delacort in "Elysium" and Drexler in "Butterfly Driver") in that each had "genetic reprogramming" to make them appear younger; each orders mass killings of prisoners travelling in space shuttles; each is rich and lives on a crime-free satellite world; each sends an agent to apprehend the hero because of information he possesses; and each is evil but attempts to justify his/her actions as good for the world.

A number of these features (wealth, living on a crime-free satellite world, acting with evil intent but seeking to justify actions as good for the world) are generic features that are not protectable. Nor are Drexler and Delacort similar in any other way. Drexler is male, and ex-soldier, a former acquaintance of Arlo's and an imposter who murdered the real Drexler and his family and stole Drexler's identity. Drexler is the President of the Global State and owner of Uberopolis, which he built with the money he inherited as "Drexler." By contrast, Delacort is female, has no prior relationship with Max, and holds no position on Earth. She does not own Elysium, but is intent on staging a coup to take over its presidency. While both Drexler and Delacort are ruthless authorities (a type of "stock character"), the similarity ends there.

It is true that both Delacort and Drexler appear younger than they are. In "Butterfly Driver," Drexler had his DNA "reprogrammed," with the result that his "bulging biceps" were three times normal strength and he appeared younger, but the screenplay also makes clear that Drexler had his DNA modified because he was really Midland but was trying to pass as Drexler. By contrast, Delacort and the other citizens of Elysium routinely use the med bays to prevent aging and cure disease – not to "reprogram DNA" – but in addition, only citizens of Elysium are permitted access to the med bays. There is nothing comparable in the

United States District Court

For the Northern District of California

1   screenplay.

2        Third, plaintiff asserts that there is a similarity between the two works in the use of a

3   "sick child" who will live for less than a week if medical assistance is not provided.  This is

4   an attempt to compare Franny to Matilda.  This idea of the "sick child" is a generic idea that

5   is expressed differently in the parties' works.  In the "Butterfly Driver" screenplay, Franny

6   appears briefly, has little or no dialogue, and is cured without much ado when Arlo returns

7   home with the Drexlerin.  In the film "Elysium," Matilda (the daughter of Max's friend Frey)

8   is intermixed in the drama.  She is kidnaped by Kruger, taken to Elysium, and eventually

9   successfully uses a med bay on the space station.  Moreover, unlike Franny, Matilda is

10  critical to the story arc.  She is the catalyst for Max's decision to sacrifice himself at the end

11  of the film.

12       Plaintiff also contends that there is similarity between what he calls "secondary

13  characters."  The court finds, however, that all these character comparisons focus on

14  abstract, unprotected traits. None of the characters are similar at the level of protectable

15  expression.  For example, plaintiff attempts to compare Rianna (lives in a slum but is an

16  educated, devoted mother) and Benni (hopeful, beautiful, but disappointed with men

17  around her) in "Butterfly Driver;" with Frey (alleged to be a "hybrid" of Rianna and Benni,

18  who lives in an uneducated slum, but is educated, tough, and a devoted mother, also

19  beautiful, hopeful, and disappointed with men around her) in "Elysium."

20       The assertion that Frey is a "hybrid" of Rianna and Benni demonstrates that she is

21  substantially similar to neither of them.  And indeed, Frey and Rianna share no similarities

22  except for the unprotected characteristic of having an young daughter who is ill.  Moreover,

23  Rianna appears only briefly in the screenplay, but Frey is a critical character in the film –

24  her friendship with Max is a catalyst for his decision to sacrifice his own life.  Frey and

25  Benni are even less similar than Frey and Rianna.  Benni is a mercenary who guards a

26  warehouse with her bother Louis.  She helps Arlo obtain a fake ID to enable him to travel to

27  Uberopolis, and gives him a yellow "dream catcher" for luck.  Benni has nothing in common

28  with Frey except that they both have a vague romantic interest in the male protagonist –

**United States District Court**
For the Northern District of California

1   which is never acted on.

2       Plaintiff asserts that there are similarities between Jerry (a "good" character who

3   when sent to apprehend the hero by a high-ranking official, bargains for medical care for

4   his son) in "Butterfly Driver;" and Kruger (a "bad" character who when sent to apprehend

5   the hero bargains for a mansion and more before accepting the mission) in "Elysium."

6   These two characters could not be more dissimilar (law-abiding vs. outside the law; former

7   friend of the hero's vs. no former relationship with the hero; attempts to help the hero vs.

8   attempts to kill the hero).  The only similarity – that each is an "agent" who pursues the

9   protagonist – is simply a "stock" character feature that is not protectable.

10      Plaintiff also contends that there are similarities between Dylan (runs an

11  underground base with flight pattern monitors on walls, sometimes transports immigrants,

12  is disabled with missing arm) in "Butterfly Driver;" and Spider (runs and underground base,

13  with flight path monitors on walls, transports immigrants, is disabled, with paralyzed leg) in

14  "Elysium."  As noted above, however, Dylan is a minor character in the "Butterfly Driver"

15  screenplay, with virtually no relevance to the story, while Spider in the "Elysium" film is a

16  central character.  The fact that one has a missing arm and the other has a paralyzed leg

17  does not make them similar as "characters" in the story.

18      Finally, it is important to note that there are a number of important characters in

19  each work that have no parallel in the other.  For example, Tamara plays an important role

20  in "Butterfly Driver," and has no possible counterpart in the film "Elysium," while several

21  characters in the film – the nun who raised Max, Carlyle, President Patel, and the robot

22  police force – have no parallel with the screenplay.

23                          <u>Setting</u>

24      Plaintiff identifies the following attributes of the setting, which he claims is similar to

25  the setting of "Elysium."  He describes Uberopolis as a giant satellite world for the super-

26  rich, between 1 and 3 miles in diameter, with forests and large aquatic features, and a

27  proposed capacity in the range of 300,000, and which orbits an overpopulated,

28  impoverished earth.  Fantastic medical technologies are available there, and it is also

1    where a genetically reprogrammed villain lives; where the final battle transpires; and where

2    prisoners in orange jumpsuits board shuttles bound for earth.

3          Plaintiff contends that in contrast to this world is a dystopian Earth (impoverished,

4    overpopulated ruin of earth), where the poor have little access to health care; the hero lives

5    in a slum overrun by thugs and crime; police and military vehicles loom in the sky and

6    brutalize the poor; Army ships full of "undesirables" are released into the slums; the poor

7    are brutalized by the government of the satellite world; rich businesses build manufacturing

8    plants to take advantage of cheap labor; and the poor live in the ruins of cities in decay.

9    Plaintiff claims that the "conjoined setting" of rich satellite world and poor dystopian Earth is

10    a "unique" creation, with no connection to any prior storyline with all the same features.

11          The court finds, however, that the setting of the "Butterfly Driver" screenplay is not

12    similar to the setting of "Elysium," except at the most abstract level.  Moreover, although

13    both the screenplay and the film use the common idea of "a giant satellite world for the

14    super-rich," the expressions of these locations is different.

15          Uberopolis is not exclusive to the "super-rich," as there is a constant shuttling of

16    ordinary citizens between Earth and Uberopolis, and Drexler appears in TV ads urging

17    residents of Earth to buy homes and apartments on Uberopolis.  The Global State has "100

18    per cent employment" and "almost no crime."  While there is some poverty in the "Zones,"

19    the City of Manhattan is portrayed like a typical major city with apartment complexes,

20    shopping malls, and subways.  Citizens on Earth drive sky-cars, sky-cycles, and hover-jets.

21    Moreover, advanced medical care is available both on Earth and on Uberopolis, and there

22    is no class divide between the populations of Earth and Uberopolis.

23          By contrast, Elysium is indeed reserved exclusively for the "super-rich," and Earth's

24    population is barred from moving to (or even freely traveling to) Elysium.  There are no

25    malls, apartment complexes, or subways on Earth.  The population does not drive sky-cars.

26    The entire population is heavily unemployed and extremely poor.  They live in shantytowns,

27    with defunct skyscrapers smoldering in the background.  They are policed by a abusive

28    robotic police force which has no counterpart in the "Butterfly Driver" screenplay.  There is

United States District Court

For the Northern District of California

1   a stark class divide between the population of Earth and Elysium, and the med bays on

2   Elysium are reserved exclusively for "citizens" of Elysium.  Nor is there any support for the

3   assertion that both satellites "feature giant forests and aquatic features," as Uberopolis has

4   a flora-sphere and an aqua-sphere beneath the city floor, but there is no description of

5   "giant forests" on the satellite.  Apart from the generalized idea of Earth set in the future,

6   there are few similarities between the setting of the two works.

7       Moreover, a setting that combines "giant satellite world for the super-rich" and "poor

8   dystopian earth" is not new or original with the "Butterfly Driver" screenplay.  Defendants

9   have provided a declaration (and report) from their expert Jeff Rovin, who has had a long

10  career as a professional writer, and has authored more than 100 books, both fiction and

11  non-fiction, including several works analyzing films and television series in various genres

12  including science fiction.

13      The Oxford English Dictionary defines "dystopia" as "[a]n imaginary place or

14  condition in which everything is as bad as possible."  According to Mr. Rovin, the word

15  "dystopia" was coined by John Stuart Mill in 1868 to describe the flip side of "utopia."  Mr.

16  Rovin explains that in fiction, "dystopia" is typically the result of military, political, and

17  economic oppression that results in dehumanization, often accompanied by poverty and

18  disease.  See Declaration of Jeff Rovin ("Rovin Decl."), Exh. A at 8-9.

19      Mr. Rovin states that a dystopian future (with special privileges for the wealthy and

20  powerful) is an exceedingly common feature of the "prior art," a term he uses to refer to

21  earlier-published works in the same genre (futuristic science fiction).  He cites to H.G.

22  Wells' The Time Machine, Jack London's The Iron Heel, Aldous Huxley's Brave New World,

23  Margaret Atwood's Oryx and Crake, and also to the films "Metropolis" (1927), "Soylent

24  Green" (1973), "Demolition Man" (1983), and to the TV series "Rock and Rule" (1983), and

25  "Futurama" (1999-2013).  See Rovin Decl., Exh. A at 9-15.

26      Apart from this, Mr. Rovin also points out that, strictly speaking, the "Butterfly Driver"

27  screenplay does not describe a dystopian world.  In the screenplay, citizens of Earth enjoy

28  "100 percent employment" and "almost no crime."  While Earth is "overpopulated," it is not

29

**United States District Court**

For the Northern District of California

1  unlivable.  For example, Manhattan has upscale areas and slums, apartment complexes,

2  shopping malls, and subways.  Citizens drive sky-cars, sky-cycles, and hover-jets.  Mr.

3  Rovin opines that Earth in plaintiff's screenplay is "futuristic," not "dystopian," and plainly

4  draws on past science fiction in television series and comic books.  Rovin Decl., Exh. A at

5  16-21.

6       Mr. Rovin asserts further that the idea of a satellite as a refuge for the super-rich is

7  not a novel idea.  He cites to the short story "Abercrombie Station" (1952), the "Star Trek"

8  episode "The Cloud Minders" (1969), the novel <u>A Wizard in Bedlam</u> (1979), the novel <u>The</u>

9  <u>Anarch Lords</u> (1981), the August 1981 issue of the comic book <u>Heavy Metal</u>, the novel <u>The</u>

10  <u>Taking of Satcon Station</u> (1982), the novel <u>Touch the Stars</u> (1983), the novel <u>The</u>

11  <u>Lagrangists</u> (1983), and a number of other works.  <u>See</u> Rovin Decl., Exh. A at 30-45.  He

12  concludes that far from being new, plaintiff's concepts of wealth and privilege in connection

13  with space habitats have been a part of science fiction for decades.  <u>Id.</u>

14       In order to establish similarity in settings, plaintiff must show that his screenplay and

15  the film "Elysium" express the settings similarly.  However, plaintiff cannot do that, because

16  the screenplay and the film share nothing more than the generic idea of a futuristic Earth

17  and an orbiting space station.

18  Themes

19       Plaintiff asserts that the two works share at least five central themes – (1) survival

20  without adequate healthcare is inhumane; (2) the plight of immigrants is brutal; (3) wealth

21  corrupts and divides us; (4) heroic sacrifice (Arlo for his daughter, Max for Matilda and

22  mankind); and (5) redemption comes from refusing to give up hope.

23       First, plaintiff contends that the theme that survival without adequate healthcare is

24  inhumane is shown by the fact that in both works, advanced medicine found on the satellite

25  world.  However, apart from a generic "medical" theme, this feature is not similar in the two

26  works.  In the "Butterfly Driver" screenplay, the drug Drexlerin is ordinarily equally available

27  on both Earth and Uberopolis.  The only question is ability to pay and availability (which is

28  limited for commercial reasons at the time Arlo is attempting to locate the drug for Franny).

30

United States District Court
For the Northern District of California

1  In the film "Elysium" the "advanced medicine" consists of med bays, not drugs, and those

2  med bays are categorically unavailable to Earth's population, which forces people who are

3  ill to attempt to travel illegally to Elysium to access the med bays.  There is nothing akin to

4  that in the screenplay, which has as a theme Arlo's attempt to locate Drexlerin for his

5  daughter Franny.

6       Second, the "plight of immigrant" theme is a generic theme that is not expressed

7  similarly in the two works.  "Butterfly Driver" refers to Arlo's arranging for his family to

8  "repatriate" from the Zones to the "State" to obtain better healthcare for Franny.  However,

9  it describes nothing similar to the illegal immigration that occurs in "Elysium," where people

10 on Earth risk their lives to get on board undocumented shuttles, hoping to travel to Elysium

11 to access the space station's med bays, which are restricted to citizens of Elysium.

12      As for the themes of the corrupting influence of wealth, heroic sacrifice, and

13 redemption, those are abstract concepts that are not protectable.  Moreover, plaintiff has

14 not established that the themes in the two works are similar.  "Elysium" overtly explores

15 themes of current relevance in the United States and in Blomkamp's native South Africa,

16 including class inequality and availability of universal health care, while "Butterfly Driver"

17 includes none of those themes.

18                          Mood/pace

19      Plaintiff contends that the film "Elysium" mirrors the mood of the screenplay

20 "Butterfly Driver," and that the pacing of both works is similar – fast but not frenetic.  He

21 asserts that both works feature disabled characters, suggesting a brutal government; that

22 both works are serious, with little humor in narrative, dialog, or action; that the settings and

23 themes of both works are identical; and that both works use similar scenes to darken the

24 mood, such as unnecessary, casual police beating of the heroes.

25      The bare concept of a pace that is "fast but not frenetic" is unprotectable.  In

26 addition, any elements relating to the mood/pace of the two works – to the extent they are

27 similarly "serious" or "dark" – are stock or generic ideas, or scènes à faire which are not

28 protectable.  See Rice, 330 F.3d at 1177 (overall mood of secrecy and magic is generic,

31

United States District Court

For the Northern District of California

1   constitutes scènes à faire, and "merges" with the work at issue).  Thus, any similarity is not

2   indicative of striking or substantial similarity.

3   C.      Plaintiff's Motion to Exclude Defendant's Expert and his Expert Report

4        Plaintiff seeks an order disqualifying defendants' expert Jeff Rovin and excluding his

5   report.  Defendants have established that Mr. Rovin is "qualified as an expert by

6   knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  Mr. Rovin is

7   knowledgeable and an expert in the area of "science-fiction genre" – and his testimony has

8   "a reliable basis in the knowledge and experience of his discipline."  Kumho Tire Co. v.

9   Carmichael 526 U.S. 137, 148 (1999).

10       As such, Mr. Rovin cites to many previously published works to show that plot

11  features, settings, and characters in "Butterfly Driver" are not new or original as plaintiff

12  suggests, but reflect themes that have appeared numerous times in the past.  As

13  defendants' motion makes clear, Mr. Rovin's testimony supports defendants' argument that

14  many of the plot features, themes, characters, and other features of the "Butterfly Driver"

15  screenplay are "stock" or "generic" elements or scènes-à-faire, which are not protectable;

16  and to support their argument that the "Butterfly Driver" screenplay and the "Elysium" film

17  are not strikingly similar or even substantially similar.

18                                          **CONCLUSION**

19       In accordance with the foregoing, defendants' motion for summary judgment is

20  GRANTED, and plaintiff's motion is DENIED.  In addition, plaintiff's motion to disqualify

21  defendants' expert Jeff Rovin is DENIED.

22

23  **IT IS SO ORDERED.**

24  Dated:  October 3, 2014

25                                          _____
                                            PHYLLIS J. HAMILTON
26                                          United States District Judge

27

28

                                            32